FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2018 MAR 22 PM 5:01

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | TDC-18-0157 |
| v. | CRIMINAL NO. |
| LEE ELBAZ, a/k/a "Lena Green," | (Conspiracy to Commit Wire Fraud, 18 U.S.C. § 1349; Wire Fraud, 18 U.S.C. § 1343; Aiding and Abetting, 18 U.S.C. § 2; Forfeiture, 28 U.S.C. § 2461, 18 U.S.C. § 981, 21 U.S.C. § 853) |
| Defendant | |

*******

## INDICTMENT

The Grand Jury for the District of Maryland charges that at times material to this Indictment:

### GENERAL ALLEGATIONS

### The Defendant and Related Entities

1. The defendant, **LEE ELBAZ** ("**ELBAZ**"), was a resident of the country of Israel.

2. Yukom Communications was an Israel-based business that provided sales and marketing services, including "retention services" for two internet-based businesses with the brand names BinaryBook and BigOption.

3. BinaryBook and BigOption sold and marketed financial instruments known as "binary options." BinaryBook and BigOption sold and marketed binary options to customers located throughout the world, including in the United States and within the District of Maryland.

4. Yukom provided retention services on behalf of BinaryBook and BigOption through the use of communications by email and by phone to individuals in the United States, including in the District of Maryland, and elsewhere throughout the world. Retention services

were services provided with the objective to obtain additional deposits from investors who had previously made deposits.

5. A conversion agent was a salesperson responsible for converting a prospective binary options customer into an investor and obtaining an initial deposit of funds. A retention agent was responsible for working with the investor going forward with the goal of obtaining additional deposits. Yukom salespeople sometimes referred to themselves as "brokers" or "traders" to potential investors.

6. From in or about May 2014 through in or about June 2017, **ELBAZ** was an employee of Yukom and served in various capacities, including as Chief Executive Officer from at least in or about March 2016 through December 2016.

7. In correspondence and other communications, **ELBAZ** identified herself as the "Trading Floor Manager" for BinaryBook and BigOption.

8. **ELBAZ** supervised representatives of BinaryBook and BigOption, at Yukom and elsewhere, who performed retention services on behalf of BinaryBook and BigOption.

### Binary Options

9. A binary option was a type of option contract in which the payout depended on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount. Unlike standard options, investors in binary options were not being given the opportunity to actually purchase a stock or a commodity but, rather, were effectively predicting whether its price would be above or below a certain amount at a certain time of the day. The option holder was typically promised that when the binary option expired, the option holder would receive either a pre-determined amount of cash or nothing.

10. While some binary options were listed on registered exchanges or traded on a designated contract market that were subject to oversight by U.S. regulators such as the Securities and Exchange Commission and the Commodity Futures Trading Commission, neither BinaryBook nor BigOption sold binary options that were traded on a legal and regulated designated contract market in the United States.

### Related Definitions

11. A "bonus" was an amount of purported funds that representatives of BinaryBook and BigOption could contribute to an investor's account to be used in trading.

12. A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade.

### Victims

13. Victim A, an investor in BinaryBook, was a resident of Gaithersburg, Maryland, located in the District of Maryland.

14. Victim B, an investor in BigOption, was a resident of Laurel, Maryland, located in the District of Maryland.

15. Victim C, an investor in BinaryBook, was a resident of Annapolis, Maryland, located in the District of Maryland.

## COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

16. Paragraphs 1 through 15 are incorporated here.

17. Beginning in or about May 2014 and continuing through approximately June 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendant,

**LEE ELBAZ,**

and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other and others, both known and unknown to the Grand Jury, to commit wire fraud, that is, knowingly and with the intent to defraud, having devised and intending to devise, and willfully participated in, a scheme and artifice to defraud binary options investors in BinaryBook and BigOption and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

18. It was the purpose of the conspiracy for **ELBAZ** and representatives of Yukom, BinaryBook, and BigOption to obtain the maximum deposit from investors and to take steps to ensure that investors lost the money in their accounts—thereby making money for themselves and their brand in the process.

**Manner and Means of the Conspiracy**

19. **ELBAZ** and **ELBAZ's** co-conspirators and subordinates induced investors to deposit funds based on misrepresentations, including: (1) false statements and material omissions regarding the alignment of financial incentives between investors and representatives; (2) false statements and material omissions regarding the suitability of binary options as investments and returns on investments in binary options; (3) false statements and material omissions about the names, qualifications, and physical location of representatives assisting investors; and (4) false statements and material omissions regarding investors' ability to withdraw investment funds and about the reasons that funds could not be withdrawn. Representatives of BinaryBook and BigOption also made false statements and material omissions—and engaged in the deceptive use of—so-called "bonuses," "risk free trades," and "insured trades."

*False Statements and Material Omissions*
*Regarding the Alignment of Financial Incentives Between*
*Investors and Representatives of BinaryBook and BigOption*

20. **ELBAZ** and her co-conspirators made materially false statements and failed to disclose material information to binary options investors about whether the financial incentives of representatives of BinaryBook and BigOption were aligned with binary options investors.

21. Representatives of BinaryBook and BigOption working under **ELBAZ's** supervision at Yukom and elsewhere claimed to be representing the interests of investors when, in fact, they were not representing the interests of investors.

22. **ELBAZ** and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such claims. For example:

    a. On or about February 24, 2016, Representative A emailed **ELBAZ** and other representatives of BinaryBook noting that there would be a "retention class"—*i.e.*, a retention training—"with Lena" the next day and that attendance for the relevant

individuals was "mandatory." **ELBAZ** used the alias "Lena Green." On or about February 25, 2016, Representative B, who was in charge of training at Yukom, emailed a "Call script" in response to a request from **ELBAZ**. The "script" included various representations to be made to investors, including that "I am only here to help you generate the profit you want to achieve" and that "my company is very interested in helping you generate the biggest possible profit in the account."

    b.    On or about June 6, 2016, Representative B emailed a similar "Call script" to Representative C that included various representations to be made to investors, including that "I am only here to help you generate the profit you want to achieve" and that "my company is very interested in helping you generate the biggest possible profit in the account."

    c.    Also attached to the June 6, 2016, email from Representative B to Representative C was a document entitled "Resistances" that included a series of potential objections from investors and included instructions on how to respond. The document advised that if someone was "[s]cared" that he "doesn't want to lose," one potential response was that "I only make money when you are profitable." Representatives were also advised that they could represent "that [they] make 5% commission every time [investors] withdraw profits." The document also advised representatives to state to investors that "we have a mutual interest – the more money you make – the bigger the commission I take."

    d.    On or about August 23, 2016, Manager A circulated to Representative C a document with "pitch" material. The document advised representatives to tell investors

that "as your account manager my goal for you is to be as profitable as possible since my pay check is based on your profits."

  e. On or about August 23-24, 2016, **ELBAZ** corresponded with Representative D about an upcoming training course for other representatives. On or about August 23, 2016, Representative D sent an email to **ELBAZ** and Manager B regarding and attaching a "Course Manual." On or about August 24, 2016, Representative D sent an email to **ELBAZ**, Manager A, and Manager B regarding and attaching a "REVISED" manual. The "Course manual" attached to the email sent by Representative D on or about August 24, 2016, included a section on addressing "Client Objections," including objections about "Results," and advised representatives that they could state, "We have a mutual goal here, to make you profits. When you make money, I make money."

23. In fact, when investors lost money, the owners of BinaryBook and BigOption profited, and **ELBAZ** and other representatives of BinaryBook and BigOption at Yukom and elsewhere received commissions based on net investor deposits (*i.e.*, investor deposits minus withdrawals), not investor profits.

24. **ELBAZ** and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to maximize investor deposits. For example:

  a. On or about May 20, 2015, Manager C wrote to **ELBAZ** and other representatives concerning the process of "reassigning [investor] leads." Manager C wrote that because "a few people [had] left the company," their "portfolio's [*sic*]" were being "reassign[ed]." Manager C went on to state that "[y]our job is to call them and to tell the CM [*i.e.*, customer] that the previous broker got promoted and you are going to handle the account for them." Manager C further advised that representatives should "not try to take

money from them on the first call, unless they really want to," and that "[t]here is a lot more money to take from these people."

b. On or about September 29, 2015, Representative A sent an email to other representatives regarding a sales "marathon" in which representatives would compete with one another and be rewarded based upon their ability to obtain investor deposits. Representative A commented in the email, "This is not cemetery here! It's a boiler room! .... DON'T LEAVE THE MONEY! JUST TAKE IT!"

c. On or about November 6, 2015, Representative A sent an email to other representatives concerning their employment responsibilities. According to Representative A, these responsibilities included "to squeeze and up-sale the client."

d. On or about January 26, 2016, Representative E advised other representatives about the use of an "Academy" training session, which was marketed to investors as an educational program designed to improve their ability to successfully trade on their own. Representative E advised others to "[r]emember that the goal is to get them addicted to the platform and having them trade more volume."

*False Statements and Material Omissions Regarding the*
*Suitability of Binary Options as Investments and Investment Returns*

25. **ELBAZ** and her co-conspirators made materially false statements and failed to disclose material information to binary options investors about the suitability of their investments and about the expected returns on their investments.

26. **ELBAZ** and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such misrepresentations. For example:

a. The "Call script" circulated to **ELBAZ** by Representative B on or about February 25, 2016, advised other representatives to inform investors that they "manage

around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; that they have an "average success rate of 70%" that would yield a "profit of 19%"; and that "the more funds we have in your account – the bigger the profit."

  b. The "Call script" circulated on or about June 6, 2016 by Representative B to Representative C similarly advised other representatives to inform investors that they "manage around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; that they have a "track record, (success rate) [sic] which is 70%" that would yield "an average profit of 19%"; and that "the more funds we have in your account – the bigger the profit."

  c. The "pitch" material circulated on or about August 23, 2016, by Manager A to Representative C advised representatives to tell investors that "[m]ost of my clients make between 17% – 20% monthly on their investment"; that "you can start trading conservatively to generate a 17% return"; and that "I wish for this account to serve as an [sic] long term investment account."

  d. The "Course manual" sent to **ELBAZ** by Representative D on or about August 24, 2016, included a section containing a "SPEECH" to be given to investors that included various representations, including that "[t]his account will allow [sic] to see much higher proceeds than any form of bank in the financial market. (70%-80% Profit per trade)." The same "SPEECH" included the representation that "[t]oday I manage around 80 clients which are generating a profit of 15%- 25% on a monthly basis"; that "[t]he way I achieve it for my clients is by relying on a track record of 70%, which means that for each 10 trades, at least 7 will be in the money"; and that "[m]oney makes money, and the more funds you have in your account– the bigger the profit you will be able to make."

### *False Statements and Material Omissions Regarding the Names, Qualifications, and Physical Location of Representatives*

27. **ELBAZ** and her co-conspirators made materially false statements and failed to disclose material information to binary options investors about the true names, qualifications, and physical location of representatives of BinaryBook and BigOption who were purporting to assist investors.

28. For example, **ELBAZ** used the alias "Lena Green," including when interacting with investors. Such aliases were referred to internally within Yukom, BinaryBook, and BigOption as "stage names," and **ELBAZ** approved these "stage names."

29. Representatives of BinaryBook and BigOption at Yukom and elsewhere would falsely claim to be located in the city of London in the United Kingdom, including through the use of phone numbers provided to investors with area codes associated with the United Kingdom.

30. **ELBAZ** and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such misrepresentations. For example:

   a. The "Call script" sent to **ELBAZ** by Representative B on or about February 25, 2016, advised other representatives to tell investors, "as you can probably hear on my voice, I'm not British originally, I'm actually from XXX and I moved to London XXX years ago to complete my Master's degree in Economics from XXX." The "Call script" circulated on or about June 6, 2016 by Representative B to Representative C contained similar statements.

   b. The "Course manual" sent to **ELBAZ** by Representative D on or about August 24, 2016, included the representation in the proposed "SPEECH" to investors that "[a]s you can probably hear by my voice, I am not British originally, I'm actually from

_____ and I moved to London \_\_\_\_ years ago to complete my Master's degree in Economics from _____."

### *False Statements and Material Omissions Regarding Investors' Ability to Withdraw Funds from Accounts*

31.     **ELBAZ** and her co-conspirators made materially false statements and failed to disclose material information to binary options investors about investors' ability to withdraw funds from their investment accounts.

32.     **ELBAZ** and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such misrepresentations. For example, the "Resistances" guidance circulated on or about June 6, 2016 by Representative B to Representative C advised the representation to investors that they "can withdraw at any time if he/she decides this is not for him [*sic*]." The document also advised representatives to state to investors that "[w]hat you are doing today is opening a new bank account, checking account – You are transferring funds from your personal bank account to this account – you can always withdraw funds from the account."

33.     In fact, representatives of BinaryBook and BigOption took steps to prevent certain investors from withdrawing funds.

34.     One tactic to prevent withdrawals was to offer investors the use of an "Academy" session that would supposedly provide them with the skills to improve their trading performance by explaining certain market concepts to them. In fact, the information provided in such sessions did not materially improve investors' trading performance.

35.     Requests for withdrawals by investors would sometimes be granted in order to retain the investor with the ultimate objective of obtaining more money in the future. For example, on or about July 7, 2016, Manager B wrote an internal email in response to correspondence

regarding a withdrawal request by an investor. Manager B instructed one of the representatives, "If necessary send something . Has a lot of money .. [*sic*]."

### *False Statements and Material Omissions Regarding and the Deceptive Use of "Bonuses," "Risk Free Trades," and "Insured Trades"*

36. **ELBAZ** and her co-conspirators made materially false statements and failed to disclose material information to binary options investors about the terms of and restrictions accompanying so-called "bonuses," "risk free trades," and "insured trades."

37. "Bonuses" were accompanied by burdensome "turnover" requirements—such as requiring that the investor trade 30 times the amount in the account before she could withdraw any bonus funds—but investors were more likely to lose their money over time as they increased their trading activity.

38. The terms of "bonuses," "risk free trades," and "insured trades" were not truthfully disclosed to investors in communications, and **ELBAZ** and others trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such misrepresentations. For example:

    a. The "Call script" circulated to **ELBAZ** by Representative B on or about February 25, 2016, advised other representatives to inform investors that "[t]he bonus is there to help us leverage the account" and that "you can always withdraw your initial investment and the profit but you cannot withdraw the bonus, [*sic*] it is just there to help us leverage the account." This "Call script" did not include a discussion of any turnover requirement imposed by the "bonus."

    b. The "Call script" circulated on or about June 6, 2016 by Representative B to Representative C similarly advised other representatives to inform investors that "[t]he bonus is there to help us leverage the account" and that "you can always withdraw your

initial investment and the profit but you cannot withdraw the bonus, [sic] it is just there to help us leverage the account." This "Call script" did not include a discussion of any turnover requirement imposed by the "bonus."

      c.     The "Resistances" guidance circulated on or about June 6, 2016 by Representative B to Representative C advised representatives that they could inform investors, "I would like to offer you a RISK FREE trade, so even in the off chance we lose the trade, the full amount will be reimbursed to you as a bonus, so you have nothing to lose" (emphasis in original). The document also advised that if an investor was "hesitant" about investing more money because he or she had previously "lost money in our company," the representative should "tell him [sic] that the amount he/she adds into the new account will be insured with BigOption/BinaryBooks [sic] bonus funds." This guidance did not include a discussion of any turnover requirement imposed by the "bonus."

      d.     The "Course manual" sent to **ELBAZ** by Representative D on or about August 24, 2016, included the representation in the proposed "SPEECH" to investors that bonuses were available "to give you the highest leverage possible right from the start" and that "[t]he bonus cannot be withdrawn but the point is to make profits using a higher investment and so it should [sic] bother you at all, we are here for the long run right?" The "SPEECH" did not include a discussion of any turnover requirement imposed by the "bonus."

39.    "Bonuses," "risk free trades," and "insured trades" were used as a tool to impede investors' ability to withdraw funds from their accounts. For example, on or about April 10, 2015, **ELBAZ** emailed with other representatives concerning a potential withdrawal by an investor who had received a bonus. After one representative wrote that the bonus had been "removed," **ELBAZ**

responded, "Put a note or add some small bonus so if the client will ask to wd [withdraw] the profit we can explain that he cant [sic] do it because the bonus."

18 U.S.C. § 1349

## COUNTS TWO THROUGH FOUR
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

40. Paragraphs 1 through 15 and 18 through 39 are incorporated here.

41. Beginning in or about May 2014 and continuing through approximately June 2017, the exact dates being unknown to the Grand Jury, in the District of Maryland and elsewhere, the defendant,

**LEE ELBAZ,**

knowingly and with the intent to defraud, having devised and intending to devise, and willfully participated in, a scheme and artifice to defraud binary options investors in BinaryBook and BigOption and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted, and aided and abetted the transmission, by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice.

### Wires in Execution of the Scheme

42. On or about the dates set forth below, in the District of Maryland and elsewhere, the defendant,

**LEE ELBAZ,**

for the purpose of executing and attempting to execute the scheme to defraud, knowingly caused to be transmitted by means of wire communications in interstate commerce, writings, signs, signals, pictures, and sounds, to wit:

14

| Count | Date | Description |
|---|---|---|
| 2 | On or about August 28, 2015 | Representative F emailed Victim A on behalf of BinaryBook at Victim A's Google email account regarding bank wire transfer instructions while Victim A was in the District of Maryland |
| 3 | On or about March 11, 2015 | While in Maryland, Victim B spoke by telephone with Representative G, working on behalf of BigOption |
| 4 | On or about June 15, 2016 | An email was sent on behalf of BinaryBook's "Compliance Department" to Victim C at Victim C's Apple email account requesting the completion of a Deposit Confirmation Form while Victim C was in the District of Maryland |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE ALLEGATION

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 28 U.S.C. § 2461(c), in the event of the defendant's conviction under any of Counts One through Four of this Indictment.

2. As a result of the offenses charged in Counts One through Four of this Indictment, the defendant,

### LEE ELBAZ,

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

### Substitute Assets

3. If, as a result of any act or omission of the defendant, any proceeds subject to forfeiture:

a. cannot be located upon the exercise of due diligence;

b. have been transferred or sold to, or deposited with, a third party;

c. have been placed beyond the jurisdiction of the court;

d. have been substantially diminished in value; or

e. have been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

18 U.S.C. § 981
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

SANDRA L. MOSER
Acting Chief
Criminal Division, Fraud Section
United States Department of Justice

_____
ANKUSH KHARDORI
TRACEE PLOWELL
Trial Attorneys
Criminal Division, Fraud Section
United States Department of Justice

A TRUE BILL:

**SIGNATURE REDACTED**
Foreperson

Date: 3/22/18