**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| LEE ELBAZ,<br>    a/k/a "Lena Green," | Criminal Action No. TDC-18-157 |
| Defendant | |

**THE GOVERNMENT'S OPPOSITION TO
<u>THE DEFENDANT'S MOTIONS TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. i

INTRODUCTION ....................................................................................................... 1

THE INDICTMENT ..................................................................................................... 2

    I.     Background ...................................................................................... 3

    II.    The Alleged Conspiracy and Scheme to Defraud ................................... 4

          A.     The Alignment of Financial Incentives Between Investors and
                 Representatives of BinaryBook and BigOption........................... 4

          B.     The Suitability of Binary Options as Investments and Investment
                 Returns ...................................................................................... 5

          C.     The Names, Qualifications, and Physical Location of
                 Representatives ......................................................................... 6

          D.     Investors' Ability to Withdraw Funds from Accounts .............. 6

          E.     "Bonuses," "Risk Free Trades," and "Insured Trades" .............. 6

    III.   The Victimization of Residents of Maryland and Elsewhere in the United
         States .............................................................................................. 7

ARGUMENT ............................................................................................................. 8

    I.     The Court Should Deny the Defendant's Motion to Dismiss the Indictment
         for Failure to State an Offense ......................................................... 8

          A.     Applicable Legal Standards ..................................................... 8

          B.     The Indictment Properly Alleges that the Defendant Participated in
                 a Conspiracy to Commit Wire Fraud ...................................... 9

          C.     The Indictment Properly Alleges that the Defendant Committed
                 Wire Fraud ............................................................................. 13

    II.    The Court Should Deny the Defendant's Motion to Dismiss the Indictment
         for Failure to State an Offense on the Purported Basis that the Charged
          Offenses Are Improperly Based on Extraterritorial Conduct ............... 15

          A.     Applicable Legal Standards ................................................... 15

          B.     Counts Two through Four Represent a Permissible Domestic
                 Application of Section 1343 .................................................. 18

C.      Count One Represents a Permissible and Constitutional Domestic Application of Section 1349 ...................................................................... 22

        1.     Count One Represents a Permissible Domestic Application of Section 1349 Because the Object of the Conspiracy Includes Domestic Wire Fraud ...................................................... 22

        2.     The Commerce Clause Supports Application of Section 1349 to the Conduct Alleged in Count One ................................. 25

III.    The Court Should Deny the Defendant's Motion to Dismiss the Indictment for Failure to Allege Proper Venue ....................................................................... 30

      A.      Applicable Legal Standards ....................................................... 30

        1.     Pretrial Challenges to Venue ......................................... 30

        2.     The Relevant Venue Provisions ..................................... 31

      B.      The Motion Should Be Denied Because the Indictment's General Allegations of Venue Are Sufficient .......................................... 31

      C.      Even Assuming the Indictment's General Allegations of Venue Were Insufficient, the Motion Should Be Denied ................... 33

CONCLUSION ................................................................................................... 35

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Boyce Motor Lines v. United States*, 342 U.S. 337 (1952) ........................... 8

*Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768 (S.D.N.Y. 2016) ...................................... 20, 21

*Gonzales v. Raich*, 545 U.S. 1 (2005) ............................................. 26, 27, 28

*Harmon v. Brucker*, 355 U.S. 579 (1958) ............................................. 29-30

*Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247 (2010) ...................................... 16, 24

*Pasquantino v. United States*, 544 U.S. 349 (2005) ................................... 16

*Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) .................................... 24

*Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165 (4th Cir. 2009) ............................... 29

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016) ............................................. 15, 24

*South Atlantic Ltd. Partnership of Tennessee v. Riese*, 284 F.3d 518 (4th Cir. 2002) ............... 19

*United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82 (D.D.C. 2017) ........... 20, 21

*United States v. Allen*, 160 F. Supp. 3d 698 (S.D.N.Y. 2016) ..................................... 17

*United States v. Ayesh*, 762 F. Supp. 2d 832 (E.D. Va. 2011) ..................................... 16

*United States v. Bollinger*, 798 F.3d 201 (4th Cir. 2015) ........................................... 26

*United States v. Brandon*, 298 F.3d 307 (4th Cir. 2002) ................................... 10

*United States v. Burns*, 990 F.2d 1426 (4th Cir. 1993) ............................................. 30

*United States v. Chao Fan Xu*, 706 F.3d 965 (9th Cir. 2013) ................................... 23

*United States v. Chinasa*, 489 F. App'x 682 (4th Cir. 2012) ........................................ 10, 23, 33

*United States v. Condolon*, 600 F.2d 7 (4th Cir. 1979) ..................................... 16

*United States v. Curry*, 461 F.3d 452 (4th Cir. 2006) ................................... 19

*United States v. Daniels*, 973 F.2d 272 (4th Cir. 1992) ................................... 10

*United States v. Day*, 700 F.3d 713 (4th Cir. 2012) ................................... 25, 30, 32, 33

*United States v. Duke*, 409 F.2d 669 (4th Cir. 1969) ................................... 15

*United States v. Duncan*, 598 F.2d 839 (4th Cir. 1979) .................................................. 34

*United States v. Ebersole*, 411 F.3d 517 (4th Cir. 2005) ..................................... 30, 31, 32-33, 34

*United States v. Edwards*, 188 F.3d 230 (4th Cir. 1999) .......................................... 14

*United States v. Ellyson*, 326 F.3d 522 (4th Cir. 2003) .......................................... 24

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012) ..................................... 30, 31, 32

*United States v. Feola*, 420 U.S. 671 (1975) .............................................. 29

*United States v. Garlick*, 240 F.3d 789 (9th Cir. 2001) ........................................ 16

*United States v. Gasperini*, No. 16-CR-441, 2017 WL 2399693 (E.D.N.Y. June 1, 2017) ........ 21

*United States v. Green*, 599 F.3d 360 (4th Cir. 2010) .......................................... 32

*United States v. Griley*, 814 F.2d 967 (4th Cir. 1987) .................................. 30

*United States v. Hawit*, No. 15-CR-252 (PKC),
2017 WL 663542 (E.D.N.Y. Feb. 17, 2017) ..................................... 18, 23

*United States v. Hayes*, 118 F. Supp. 3d 620 (S.D.N.Y. 2015) .................................. 17

*United States v. Hill*, 700 F. App'x 235 (4th Cir. 2017) .................................. 29

*United States v. Hilton*, 257 F.3d 50 (1st Cir. 2001) .................................. 24

*United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988) .......................................... 10

*United States v. Hussain*, No. 16-CR-00462-CRB-1, 2017 WL 4865562
(N.D. Cal. Oct. 27, 2017) ..................................... 17, 18, 23

*United States v. Melgar-Hernandez*, 832 F.3d 261 (D.C. Cir. 2016) .......................... 23

*United States v. Prevezon Holdings*, 122 F. Supp. 3d 57 (S.D.N.Y. 2015) ................... 21

*United States v. Squires*, 581 F.2d 408 (4th Cir. 1978) .................................. 29

*United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) ......................... 13, 14, 16, 33

*United States v. Johnson*, 510 F.3d 521 (4th Cir. 2007) ..................................... 33-34

*United States v. Kim*, 246 F.3d 186 (2d Cir. 2001) .................................. 16, 17, 18

*United States v. LeFaivre*, 507 F.2d 1288 (4th Cir. 1974) .......................... 18

*United States v. Loayza*, 107 F.3d 257 (4th Cir. 1997) .................................. 8

*United States v. Lopez*, 514 U.S. 549 (1995) ....................................................................... 26, 28

*United States v. Martinez*, 901 F.2d 374 (4th Cir. 1990) ............................................................. 30

*United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 1994) ........................................................... 8, 34

*United States v. McNeil*, 45 F. App'x 225 (4th Cir. 2002) ..................................................... 13-14

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................................................... 28

*United States v. Palin*, 874 F.3d 418 (4th Cir. 2017) .................................................................... 9

*United States v. Perry*, 757 F.3d 166 (4th Cir. 2014) ................................................... 9, 10, 19, 20

*United States v. Royer*, 549 F.3d 886 (2d Cir. 2008) ............................................................. 24-25

*United States v. Stewart*, 256 F.3d 231, 243 (4th Cir. 2001) ................................................. 34-35

*United States v. Terry*, 257 F.3d 366 (4th Cir. 2001) .................................................................... 8

*United States v. Thomas*, 367 F.3d 194 (4th Cir. 2004) ............................................................... 10

*United States v. Watford*, 692 F. App'x 108, 111 (4th Cir. 2017) ................................................. 9

*United States v. Williams*, 820 F. Supp. 3d 663 (D. Md. 2011) ................................................... 23

*Whitfield v. United States*, 543 U.S. 209 (2005) ......................................................................... 32

**Statutes**

18 U.S.C. § 2 .................................................................................................................................. 15

18 U.S.C. § 1343 ................................................................................................................. *passim*

18 U.S.C. § 1349 ................................................................................................................. *passim*

18 U.S.C. § 3237(a) ...................................................................................................................... 31

**Other**

Fed. R. Crim. P. 18 ...................................................................................................................... 31

U.S. Const. art. III, § 2 ................................................................................................................. 31

The United States of America respectfully submits this memorandum in opposition to the Defendant's four motions to dismiss.

## <u>INTRODUCTION</u>

The motions should be denied because the arguments advanced by the Defendant are contrary to the law, the facts alleged in the Indictment, or both. The motions, in fact, largely present variations on a single theme—that the Defendant should escape any consequences in the United States for her alleged criminal conduct because she happened to be outside the country when she participated in the conspiracy and scheme to defraud set forth in the Indictment—an internet-based investment fraud. The Defendant advances these arguments despite the fact that the use of wires (emails and telephones) were integral to the alleged fraudulent conduct at issue, and despite the fact that United States residents—including residents of Maryland—were victimized by the Defendant's conduct. There is no basis in the law to endorse this result.

*First*, the Defendant's Motion to Dismiss the Indictment for Failure to State an Offense (Dkt. No. 58) should be denied because the Defendant does not dispute that the Indictment properly alleges every essential element of the offenses charged. In support of her motion, the Defendant ignores the core allegations contained in the Indictment concerning those offenses, selectively and narrowly interprets supporting allegations in the Indictment as if they purported to set forth the full extent of the Government's evidence when they do not, and then purports to analyze those allegations as if they were the full evidence at trial from the perspective of a juror—all of which is contrary to controlling law.

*Second*, the Defendant's Motion to Dismiss the Indictment for Failure to State an Offense Since the Charged Offenses Are Improperly Based on Extraterritorial Conduct (Dkt. No. 57) should be denied because she is properly being prosecuted for domestic conduct. With respect to the substantive wire fraud counts alleged in the Indictment, courts have held that a prosecution is

appropriately domestic based on the use of United States wires in furtherance of a scheme to defraud. It follows that a conspiracy to commit a substantive offense that is domestic in nature is likewise appropriately domestic.

*Third*, the Defendant's Motion to Dismiss Count One for Failure to State an Offense Since Congress Lacks Authority Under the Commerce Clause to Criminalize a Foreign Conspiracy (Dkt. No. 59) should be denied because it finds no support in the Constitution or caselaw interpreting the Commerce Clause. Where, as here, the relevant statutory provisions include explicit nexuses to interstate and foreign commerce, a challenge under the Commerce Clause is meritless. At a minimum, the Defendant's challenge should be rejected prior to the development of facts at trial.

*Finally*, the Defendant's Motion to Dismiss the Indictment for Failure to Allege Proper Venue (Dkt. No. 56) should be denied because the Indictment properly alleges venue as a general and specific matter.

*          *          *

As explained further below, the Defendant's arguments are meritless and devoid of any support in the law. If the Court were to accept any of them despite this dearth of support, the consequence would be a dramatic limitation on the Government's ability to protect United States residents from criminal schemes whose participants attempt to stay abroad even as they reach into the United States to advance their schemes, and it would make it easier to victimize United States residents through financial frauds perpetrated through the internet—a significant vehicle for fraud that is likely to grow even more significant in its reach and impact. The motions should be denied.

## THE INDICTMENT

The Indictment charges the Defendant with one count of conspiracy to commit wire fraud (in violation of 18 U.S.C. § 1349) and three counts of wire fraud (in violation of 18 U.S.C. § 1343). (Dkt. No. 37.) The Indictment alleges that the Defendant participated for over three years in a

fraudulent scheme involving the sale and marketing of purported financial instruments known as "binary options"—including as the Chief Executive Officer of Yukom Communications—that victimized United States residents, including residents of this District, and others worldwide. The allegations in the Indictment are summarized below.

## I.  Background

During the relevant period, Yukom provided sales and marketing services—including "retention services"—for two internet-based businesses with the brand names BinaryBook and BigOption, which purportedly sold and marketed "binary options." (Indictment ¶¶ 2, 3.) The Defendant was an Israeli resident and Yukom was based in Israel. (*Id.* ¶¶ 1, 2.)

A binary option is a type of option contract in which the payout depends on the outcome of a discrete event, typically related to whether the price of a particular asset—such as a stock or a commodity—would rise above or fall below a specified amount. (*Id.* ¶ 9.) Investors are effectively predicting whether its price will be above or below a certain amount at a certain time of the day, and when this option "expires," the option holder receives either a pre-determined amount of cash or nothing. (*Id.*)

A "conversion agent" is a salesperson responsible for converting a prospective binary options customer into an investor and obtaining an initial deposit of funds, whereas a "retention agent" is responsible for working with the investor going forward with the goal of obtaining additional deposits. (*Id.* ¶ 5.) Yukom salespeople sometimes referred to themselves as "brokers" or "traders" when interacting with investors. (*Id.*)

From in or about May 2014 through in or about June 2017, the Defendant was an employee of Yukom and served in various capacities, including as CEO from at least in or about March 2016 through December 2016. (*Id.* ¶ 6.) She supervised representatives of BinaryBook and BigOption, at Yukom and elsewhere, who performed retention services on behalf of BinaryBook and

BigOption, and she also referred to herself as the "Trading Floor Manager" for BinaryBook and BigOption. (*Id.* ¶¶ 7, 8.)

## II. The Alleged Conspiracy and Scheme to Defraud

The Defendant is alleged to have participated in a conspiracy and scheme to defraud binary options investors during her time working on behalf of Yukom, BinaryBook, and BigOption. (Indictment ¶¶ 17, 41.) The Indictment refers throughout to conduct undertaken by the Defendant and her co-conspirators and co-schemers and refers in particular (as evidence of the charged conduct) to conduct and communications engaged in by ten individuals associated with Yukom, BinaryBook, and/or BigOption—seven individuals who are referred to in anonymized form as Representatives A through G and three individuals who are referred to in anonymized form as Managers A through C.

As explained below, the Indictment sets forth detailed allegations regarding five categories of false statements, material omissions, and deceptive conduct—in each case, explicitly attributed to the Defendant "and her co-conspirators." (*Id.* ¶¶ 20, 25, 27, 31, 36.)

### A. The Alignment of Financial Incentives Between Investors and Representatives of BinaryBook and BigOption

The Indictment alleges that the Defendant and her co-conspirators "made materially false statements and failed to disclose material information to binary options investors about whether the financial incentives of representatives of BinaryBook and BigOption were aligned with binary options investors." (Indictment ¶ 20.) In particular, "[r]epresentatives of BinaryBook and BigOption working under [the Defendant's] supervision at Yukom and elsewhere claimed to be representing the interests of investors when, in fact, they were not" because "when investors lost money, the owners of BinaryBook and BigOption profited, and [the Defendant] and other representatives of BinaryBook and BigOption at Yukom and elsewhere received commissions

based on net investor deposits (*i.e.*, investor deposits minus withdrawals), not investor profits." (*Id.* ¶¶ 21, 23.)  In other words, the Defendant and her co-conspirators are alleged to have held interests adverse to the investors who they were purporting to assist—and to have lied to those investors about that fact.

The Indictment alleges that the Defendant "trained and encouraged representatives of BinaryBook and BigOption at Yukom and elsewhere to make such [false] claims" (*id.* ¶ 22), including through the use of internal call scripts and training materials that the Defendant and her co-conspirators utilized.  One such document included the misrepresentation to investors that "[w]e have a mutual goal here, to make you profits.  When you make money, I make money." (*Id.* ¶ 22(e).)  (The Defendant refers to these types of documents as "marketing materials" in an apparent effort to minimize their significance (*see, e.g.*, Dkt. No. 58 at 4), when, in fact, they constitute evidence of fraudulent conduct.)  At the same time, the Defendant's alleged co-conspirators were admitting that their objective was "to take [money] from these people," that they were running "a boiler room," and that their "goal [was] to get [investors] addicted to the [trading] platform and having them trade more volume." (*Id.* ¶¶ 24(a), 24(b), 24(d).)

## B. The Suitability of Binary Options as Investments and Investment Returns

The Indictment alleges that the Defendant and her co-conspirators "made materially false statements and failed to disclose material information to binary options investors about the suitability of their investments and about the expected returns on their investments." (Indictment ¶ 25.)  Here too, internal documents are alleged to constitute evidence of this fraudulent conduct and its pervasiveness.  For instance, an internal call script circulated to the Defendant encouraged representatives to falsely tell investors that they "manage around 80 clients which are generating a profit of between 15 – 25 % on a monthly basis"; that they have an "average success rate of

70%" that would yield a "profit of 19%"; and that "the more funds we have in your account – the bigger the profit." (*Id.* ¶ 26(a).)  None of this was true.

### C.     The Names, Qualifications, and Physical Location of Representatives

The Indictment alleges that the Defendant and her co-conspirators "made materially false statements and failed to disclose material information to binary options investors about the true names, qualifications, and physical location of representatives of BinaryBook and BigOption who were purporting to assist investors." (Indictment ¶ 27.)  The Defendant herself used a fake name— "Lena Green"—when interacting with investors, and it was her job to approve these fake names, which were referred to internally as "stage names." (*Id.* ¶ 28.)  Representatives also falsely claimed to be in London, and internal call scripts instructed representatives to tell investors that they had a "Master's degree in Economics." (*Id.* ¶¶ 29. 30(a), 30(b).)

### D.     Investors' Ability to Withdraw Funds from Accounts

The Indictment alleges that the Defendant and her co-conspirators "made materially false statements and failed to disclose material information to binary options investors about investors' ability to withdraw funds from their investment accounts." (Indictment ¶ 31.)  Put simply, the Defendant and her co-conspirators are alleged to have taken steps to prevent investors from withdrawing funds from their trading accounts—including through the use of an effectively worthless "Academy" training session that would supposedly provide investors with the skills to improve their trading performance (*id.* ¶ 34).

### E.     "Bonuses," "Risk Free Trades," and "Insured Trades"

The Indictment alleges that the Defendant and her co-conspirators "made materially false statements and failed to disclose material information to binary options investors about the terms of and restrictions accompanying so-called 'bonuses,' 'risk free trades,' and 'insured trades.'" (Indictment ¶ 36.)  A "bonus" was an amount of purported funds that representatives of

BinaryBook and BigOption could contribute to an investor's account to be used in trading. (*Id.* ¶ 11.) A "risk free trade" or "insured trade" was a trade offered by representatives to investors in which the investors' accounts would be reimbursed by "bonus" funds in the event of a losing trade. (*Id.* ¶ 12.)

Bonuses, risk free trades, and insured trades were allegedly "used as a tool to impede investors' ability to withdraw funds from their accounts" (*id.* ¶ 39) because they imposed burdensome "turnover requirements" that were not properly disclosed to investors—effectively locking investors in to additional trading before funds could supposedly be withdrawn. (*Id.* ¶¶ 37-39.) At the same time, "investors were more likely to lose their money over time as they increased their trading activity" (*id.* ¶ 37), so the supposed benefits offered by the Defendant and her co-conspirators to investors were, at best, illusory. In fact, they were designed to harm the investors that the representatives were falsely claiming to assist.

## III. The Victimization of Residents of Maryland and Elsewhere in the United States

The Indictment alleges that "BinaryBook and BigOption sold and marketed binary options to customers located throughout the world, including in the United States and within the District of Maryland." (Indictment ¶ 3.) Yukom representatives also used "email" and the "phone" to communicate with "individuals in the United States, including in the District of Maryland, and elsewhere throughout the world." (*Id.* ¶ 4.)

The Indictment refers specifically to three victims of BinaryBook and BigOption as Victim A, Victim B, and Victim C, and they are alleged to have been in Maryland when communicating with representatives—in particular, while in Gaithersburg, Laurel, and Annapolis, respectively. (*Id.* ¶¶ 13-15, 42.) Three of those communications through Maryland—one corresponding to each

victim—are charged as wires in furtherance of the alleged scheme, and the Defendant is alleged to have "caused" these wires.  (*Id.*)

## ARGUMENT

### I.    The Court Should Deny the Defendant's Motion to Dismiss the Indictment for Failure to State an Offense

Contrary to the Defendant's claims, the Indictment plainly and fairly sets forth the essential facts constituting the offenses charged in a manner that both permits the Defendant to defend herself at trial and obviates any risk of double jeopardy.

#### A.    Applicable Legal Standards

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "be a plain, concise and definite written statement of the essential facts constituting the offense charged." The Fourth Circuit Court of Appeals has held that "[a]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense."  *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997).

When reviewing a motion to dismiss an indictment for failure to state an offense, a district court must accept all factual allegations in the indictment as true.  *See Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16 (1952).  The Court should also construe the indictment in a "practical," rather than "purely technical," manner.  *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) (internal citations omitted); *see also United States v. Terry*, 257 F.3d 366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss [a count of the] indictment implicates only the legal sufficiency of its allegations, not the proof offered by the Government.").

The Fourth Circuit has further explained that "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the [offense] intended to be punished." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (internal quotations omitted; alteration in original). Any such description should, however, "be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific [offense], coming under the general description, with which he is charged" and, in turn, "contain a statement of the *essential facts* constituting the offense charged." *Id.* (internal quotations omitted; alteration and emphasis in original). *See also United States v. Palin*, 874 F.3d 418, 424 (4th Cir. 2017) (internal quotations and citations omitted), *cert. denied,* 138 S. Ct. 1451 (2018), and *cert. denied sub nom. Webb v. United States*, No. 17-8210, 2018 WL 1471381 (Apr. 23, 2018).

### B. The Indictment Properly Alleges that the Defendant Participated in a Conspiracy to Commit Wire Fraud

The Defendant's motion to dismiss the conspiracy count should be denied on the basis of the allegations in Paragraph 17 of the Indictment—which alleges, as the Government would be required to prove at trial (1) that two or more people made an agreement to commit wire fraud (Paragraph 17 alleges that individuals "known and unknown to the Grand Jury" "agree[d] with each other"); (2) that the Defendant knew the unlawful purpose of the agreement (Paragraph 17 alleges that the Defendant "knowingly" joined the agreement "to commit wire fraud"); and (3) that the Defendant joined in the agreement willfully (Paragraph 17 alleges that the Defendant "willfully" joined the agreement). *See United States v. Watford*, 692 F. App'x 108, 111 (4th Cir. 2017) (citing *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015), for elements of conspiracy to commit wire fraud).

The Indictment then proceeds to lay out a lengthy explanation of the purpose of the conspiracy and detailed allegations regarding the manner and means of the conspiracy, including the five types of misrepresentations and deceptive conduct on the part of the Defendant and her co-conspirators. This is notwithstanding the fact that, as the Defendant concedes, the Government is not required to prove an overt act in furtherance of a conspiracy under Section 1349. *See United States v. Chinasa*, 489 F. App'x 682, 685 (4th Cir. 2012).

The Defendant's contention that the Indictment is insufficient relies on mischaracterizations of the governing caselaw and of the allegations in the Indictment. As to the law, the Defendant cites decisions that stand, at most, for the proposition that an indictment is defective if it fails to allege an essential element of the offense even in a conclusory way, but Paragraph 17 alleges every essential element of a conspiracy to commit wire fraud. *See United States v. Thomas*, 367 F.3d 194, 197 (4th Cir. 2004) (noting that an indictment should be dismissed where the allegations, "even if true, would not state an offense," but concluding the standard is inapposite where a defendant challenges the sufficiency of the record at trial); *United States v. Daniels*, 973 F.2d 272, 275 (4th Cir. 1992) (count "of the indictment was fatally defective because it failed to specifically include every essential element of the charged offense"); *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988) (count of indictment defective where it failed to allege "an effect on interstate commerce" as an essential element of a RICO charge) (cited in Dkt. No. 58 at 4, 7). The Defendant separately cites caselaw that holds that *merely* including an allegation that tracks the language of the statute at issue is insufficient, but following Paragraph 17, the Indictment provides a lengthy explanation of the purpose of the conspiracy and detailed allegations regarding the manner and means of the conspiracy. *See, e.g.*, *Perry*, 757 F.3d at 171; *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002) (cited in Dkt. No. 58 at 7).

None of these cases stands for the proposition that the Court should assess the supplemental allegations in the Indictment—allegations that must simply inform the Defendant of the essential conduct and facts at issue—as if the Court were evaluating their sufficiency at a trial in which no other evidence were provided. Even if that were somehow the case (and it is not), the Defendant's characterization of the allegations is both incomplete and incorrect.

*First*, the Defendant incorrectly claims that there is no allegation that individuals "sharing marketing materials" "or those . . . allegedly making false statements to investors were employees whom [the Defendant] supervised, much less that she entered into an agreement with them to make false statements to investors or even had reason to know that any agreement to defraud investors existed." (Dkt. No. 58 at 4-5.) The Indictment repeatedly alleges that the Defendant "and her co-conspirators" made specific types of misrepresentations to investors, that these misrepresentations were made by "[r]epresentatives of BinaryBook and BigOption working under [the Defendant's] supervision," and that she and others "trained and encouraged representatives to make" these specific types of misrepresentations to investors, including through the use of scripts and training materials. (*See* Indictment ¶¶ 20-22, 24, 25-27, 30-32, 36, 38.) The Defendant refers to these as "boilerplate assertions" that merely "parrot[] the language of § 1349" (Dkt. No. 58 at 7), when, in fact, they are detailed allegations of specific forms of misrepresentations and deceptive conduct carried out by the Defendant and her co-conspirators.

*Second*, the Defendant claims that "[s]imply alleging that [the Defendant] had supervisory responsibility over employees who allegedly conspired to defraud investors does not state an offense" (Dkt. No. 58 at 5), but that is not what the Indictment does. The anonymized references to "Representatives" and "Managers" in the conspiracy count are allegations that expand on the core allegations in the Indictment pertaining to misrepresentations made by "[the Defendant] and

her co-conspirators," including allegations that "[the Defendant] and others trained and encouraged representatives" to make such misrepresentations. (Indictment ¶¶ 20-22, 24, 25-27, 30-32, 36, 38.)

*Third*, the Defendant argues that "the few factual allegations that actually pertain to [the Defendant], even if true, could not support a finding that [she] conspired to commit wire fraud" (Dkt. No. 58 at 5), but this requires ignoring the multiple forms of misrepresentations attributed to the Defendant "and her co-conspirators," apparently on the theory—unsupported by any caselaw—that the Government is obligated to set forth its evidence of the conspiracy in the Indictment.

*Fourth*, the Defendant mischaracterizes an "example" of how misrepresentations concerning bonuses "were used as a tool to impede investors' ability to withdraw funds from their accounts." (Indictment ¶ 39.) The Indictment alleges that in one instance the Defendant specifically directed a representative to add a bonus to an investor's account in order to prevent him or her from withdrawing "profit," and the Defendant claims that this is evidence of a "*disagreement*" between her and another employee (Dkt. No. 58 at 6 (emphasis in original)), when, in fact, it is evidence of the Defendant instructing another employee to engage in conduct in furtherance of the charged conspiracy.

*Fifth*, the Defendant claims that "allegations that [she] *received* emails . . . do not state the charged offense, which requires that [she] affirmatively agreed to participate in a conspiracy" (Dkt. No. 58 at 6 (emphasis in original)), but Paragraph 17 charges such an affirmative agreement, and far from suggesting that the referenced emails would necessarily be the only evidence of such an agreement, the Indictment repeatedly specifies that they are examples of the conduct that is alleged. (*See* Indictment ¶¶ 22, 24, 26, 30, 35, 38.)

*Finally*, the Defendant argues that "[t]he allegations in Paragraphs 41 and 42 in support of Counts Two through Four cannot be read into Count One to cure its defects" where there is a "missing essential element of a charge" (Dkt. No. 58 at 7), but for the reasons stated above, there is no "missing essential element" of the conspiracy charge.

### C.    The Indictment Properly Alleges that the Defendant Committed Wire Fraud

The Defendant's motion to dismiss the substantive wire fraud counts should be denied on the basis of the allegations in Paragraph 41 of the Indictment—which alleges, as the Government would be required to prove at trial (1) the existence of a scheme to defraud (Paragraph 41 alleges that the Defendant "devised," intend[ed] to devise," and "willfully participated in" a scheme to defraud binary options investors) and (2) the use of a wire communication in furtherance of the scheme (Paragraph 41 alleges that the Defendant "transmitted and caused to be transmitted" wires "for the purpose of executing the scheme"). *See United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012), *as amended* (Mar. 29, 2012).

The sufficiency of Counts Two through Four of the Indictment is further supported by Paragraph 40, which incorporates the detailed conduct alleged in support of Count One, and Paragraph 42, which (among other things) alleges that the Defendant "caused" specific wires in furtherance of the scheme in the form of email and telephone communications on behalf of BinaryBook and BigOption with Maryland-based victims.

The Defendant claims that Counts Two through Four "do not allege that [the Defendant] made or caused to be made a materially false statement" (Dkt. No. 58 at 9), but all that is necessary for the Government to establish is that the use of wires was reasonably foreseeable—even if the Defendant did not actually intend to execute the wires at issue, and even if she did not directly or personally execute them. *See, e.g.*, *United States v. McNeil*, 45 F. App'x 225, 229 (4th Cir. 2002)

(per curiam); *United States v. Edwards*, 188 F.3d 230, 233-34 (4th Cir. 1999).  Moreover, the wires in question need not themselves have constituted "materially false statement[s]"; instead, they must merely have been wires *in furtherance* of the scheme to defraud, which could include (among other things) false statements.  *See Jefferson*, 674 F.3d at 366.

Similarly meritless is the Defendant's claim that the Court should dismiss the wire fraud counts on the basis that a subset of representations attributed to the Defendant—namely, that she was the "Trading Floor Manager" for BinaryBook and BigOption and that her name was "Lena Green"—are, as a matter of law, insufficient to support a conviction.  First, the Defendant cites no authority for the proposition that a court can dismiss an indictment based on its own pretrial assessment of whether certain claims are "material" or not, regardless of whether it is applying an objective or subjective standard.  Second, the Defendant ignores the litany of misrepresentations attributable to the Defendant and her co-conspirators.  And third, there is no basis in law or logic for the Court to conclude that a defendant's failure to disclose her use of a fake name to investors is immaterial as a matter of law.

The Defendant also mischaracterizes the allegations in the Indictment in arguing that Counts Two through Four "do not allege use of a wire communication in furtherance of a scheme to defraud," that she "caused a wire communication to be used," or that the correspondents referenced in Paragraph 42 "were part of the group allegedly scheming with her" (Dkt. No. 58 at 10).  Paragraph 42 does just that as to each of the three counts—alleging that these were wires "for the purpose of executing and attempting to execute the scheme to defraud" set forth throughout Paragraphs 1 through 15, 18 through 39, and 41—and the Government will establish that at trial.

Finally, the Court should reject the Defendant's contention that Counts Two through Four, "to the extent they rely on an aiding and abetting theory of liability, should be dismissed" because

"the citation to 18 U.S.C. § 2 is" supposedly "barely more than a citation" (Dkt. No. 58 at 11). For nearly 50 years, the controlling law in this Circuit has been that "one may be convicted of aiding and abetting under an indictment which charges only the principal offense," though "a reference" to the statutory provision is "the better practice." *United States v. Duke*, 409 F.2d 669, 671 (4th Cir. 1969). The Indictment does precisely that—identifying Section 2 as a basis for liability and also specifically charging that the Defendant "aided and abetted" the transmission of wires in violation of the wire fraud statute (Indictment ¶ 41)—and it is replete with allegations concerning the conduct of the Defendant, her alleged co-conspirators, and the Defendant's knowledge of and participation in the dissemination of false statements to investors that would support wire fraud convictions on an aiding and abetting theory.

## II. The Court Should Deny the Defendant's Motion to Dismiss the Indictment for Failure to State an Offense on the Purported Basis that the Charged Offenses Are Improperly Based on Extraterritorial Conduct

The Defendant's various contentions that the Indictment improperly seeks to prosecute extraterritorial conduct in a manner contrary to the relevant statutory provisions—or, in the case of Count One, the Constitution as well—should likewise be rejected. The conduct at issue in this case—a conspiracy and scheme to defraud that ensnared American residents through the use of wires in the United States—falls squarely within the ambit of Section 1343 and Section 1349 based on well-established precedent that makes clear that this is a permissible prosecution of relevant domestic conduct.

### A. Applicable Legal Standards

Where conduct alleged to violate a federal statute occurs both domestically and abroad, the location of the conduct relevant to the statute's "focus" determines whether the case involves a domestic or extraterritorial application of the statute. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). To identity a statute's focus, courts look to "those transactions that the

statute seeks to regulate." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 267 (2010) (internal quotations omitted). The Government in this case seeks a domestic application of both Section 1343 and Section 1349.

The Fourth Circuit has not explicitly identified the "focus" of the wire fraud statute for purposes of examining its territorial reach, but it has consistently held that the use of wires constitutes the "essential conduct element" of the offense. *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012) (emphasis omitted)*; see also United States v. Condolon*, 600 F.2d 7, 8 (4th Cir. 1979) ("The gravamen of the [wire fraud] offense is simply the misuse of interstate communication facilities to execute 'any scheme or artifice to defraud.'"); *United States v. Ayesh*, 762 F. Supp. 2d 832, 837 (E.D. Va. 2011) ("the heart of wire fraud is the misuse of domestic wires"). It is the "wire transmission itself—i.e., misuse of the . . . wire—[that] has consistently been viewed as the *actus reus* that is punishable by federal law." *Jefferson*, 674 F.3d at 367.

The decisions from the Fourth Circuit accord with decisions from both the Ninth Circuit and Second Circuit Courts of Appeals. *See United States v. Garlick*, 240 F.3d 789, 792-93 (9th Cir. 2001); *United States v. Kim*, 246 F.3d 186, 188-89 (2d Cir. 2001). Indeed, as the Defendant concedes (Dkt. No. 57 at 10 n.2), the Supreme Court has held that the statute was properly applied and not given "extraterritorial effect" in a case in which interstate wires—telephone calls—were used "to execute a scheme to defraud a foreign sovereign of tax revenue." *Pasquantino v. United States*, 544 U.S. 349, 371-72 (2005).

As a result, the majority of courts to have considered challenges like the one advanced by the Defendant here—*i.e.*, that the government seeks an impermissible extraterritorial application of the wire fraud statute where the purported gravamen of the conduct may have occurred abroad— have rejected them on the basis that the statute is not being applied extraterritoriality if the charged

wires in furtherance of the scheme travelled through the United States. *See Kim*, 246 F.3d at 188-89 (finding domestic application of statute due to use of domestic wires, notwithstanding perpetration of scheme abroad); *United States v. Hussain*, No. 16-CR-00462-CRB-1, 2017 WL 4865562, at *5 (N.D. Cal. Oct. 27, 2017) (holding in light of Ninth Circuit's ruling in *Garlick* that "[s]o long as the government identifies a domestic wire transmission, the statute is not improperly extraterritorial in its application"); *United States v. Allen*, 160 F. Supp. 3d 698, 707 (S.D.N.Y. 2016) (holding that defendants "were charged and convicted of using *U.S.* wires to further a fraudulent scheme," and "[s]uch acts were properly prosecuted as a domestic criminal violation") (emphasis in original); *United States v. Hayes*, 118 F. Supp. 3d 620, 628 (S.D.N.Y. 2015) (rejecting defendant's argument that the location of the wires is "ancillary" to the location of the scheme to defraud because "the location of the wires is the [c]ourt's primary concern").

The historical context of the wire fraud statute also confirms that it was Congress's intent to criminalize conduct comparable to the allegations in the Indictment. As the Second Circuit observed in *Kim*, "[i]n 1956, Congress amended the [wire fraud] statute to include the words 'foreign commerce' so as to reach fraud schemes furthered by foreign wires as well as by interstate wires." 246 F.3d at 189. Citing the available legislative history, the court explained that "[t]he amendment was prompted by the failed prosecution of an individual who made a fraudulent telephone call from Mexico to the United States and successfully argued that § 1343 did not cover such a foreign communication." *Id.* As a result, Congress "acted to 'close [the] loophole' that limited prosecution to cases in which the fraudulent transmission occurred between two states, and explicitly extended the coverage of § 1343 to foreign communications." *Id.* (quoting H.R. Rep. No. 2385, 84th Cong., 2d Sess. 1 (1956), *reprinted in* 1956 U.S.C.C.A.N. 3091, 3092). As noted above, it is well-settled that the statute is violated even if the relevant wires "were sent and received

by innocent parties," provided that the defendant knew or reasonably could have known that the use of wires would have followed as a result of her scheme. *Id.* at 190.

With respect to the territorial application of Section 1349, courts have recognized that if the substantive offense represents a properly domestic application of the statute at issue, a conspiracy to commit that substantive offense represents a properly domestic application of conspiracy law as well. *See Kim*, 246 F.3d at 191 n.2 (2d Cir. 2001) ("Because there was jurisdiction over the wire fraud counts against [the defendant], there was also jurisdiction over the conspiracy counts"); *United States v. Hawit*, No. 15-CR-252, 2017 WL 663542, at *4 (E.D.N.Y. Feb. 17, 2017) (holding that Section 1349 applies domestically if "the Superseding Indictment sufficiently alleges that [the defendant] participated in a conspiracy to commit a 'domestic' violation of the wire fraud statute"); *Hussain*, 2017 WL 4865562, at *6 ("the superseding indictment alleges a domestic conspiracy, because the objects of the conspiracy were instances of domestic wire fraud"). *See also United States v. LeFaivre*, 507 F.2d 1288, 1299 (4th Cir. 1974) (holding in the context of the Travel Act that "[t]he jurisdictional element should be viewed for purposes of the conspiracy count exactly as we view it for purposes of the substantive offense— simply as a jurisdictional peg on which to hang the federal prosecution"), *cert. denied,* 420 U.S. 1004 (1975).

### B. Counts Two through Four Represent a Permissible Domestic Application of Section 1343

This case represents a domestic application of Section 1343 because the Government has alleged that the Defendant caused the use of wires into the District of Maryland in furtherance of the alleged scheme to defraud (Indictment ¶¶ 3, 4, 41, 42).

The Defendant acknowledges that the Indictment alleges the use of domestic wires, but she argues they are "not sufficiently domestic" because (1) the wires are not "adequately tied to the

alleged scheme to defraud" and (2) the Indictment fails to allege sufficiently that the Defendant "knowingly caused" the wires to be sent in furtherance of the alleged scheme. (Dkt. No. 57 at 10.) Each of these arguments is meritless.

*First*, as explained above, the Indictment sufficiently alleges both essential elements of wire fraud: "the existence of a scheme to defraud" and "the use of . . . [a] wire communication in furtherance of the scheme." *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006). The Indictment alleges that the Defendant and her co-conspirators, including representatives of BinaryBook and BigOption working under the Defendant's supervision at Yukom, made misrepresentations as part of a scheme to defraud investors and sent specific wire communications to investors to execute that scheme. (Indictment ¶¶ 19-42.) The Defendant provides no authority supporting her contention that the Indictment fails to allege an "adequate[] tie[]" between the wires and the scheme alleged, particularly given that the Indictment specifically alleges that these wires were sent "for the purpose of executing and attempting to execute the scheme." (*Id.* ¶ 14.) These allegations provide the Defendant with a "statement of the facts and circumstances as will inform [her] of the specific [offense] . . . with which [she] is charged." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (quoting *Hamling v. United States,* 418 U.S. 87, 117 (1974)).

To the extent that the Defendant suggests that the nexus between the alleged scheme and the alleged wires is inadequate because the wire communications are not alleged to have incorporated the misrepresentations alleged in the Indictment, that claim relies on an incorrect legal premise. As noted above, a wire communication must only further the alleged scheme to defraud in some way; it need not itself contain any fraudulent misrepresentations. *South Atlantic Ltd. Partnership of Tennessee v. Riese*, 284 F.3d 518, 531 (4th Cir. 2002). As such, even if the

Court assumes (although it should not) that the charged wire communications themselves lacked fraudulent misrepresentations, that assumption does not undermine the sufficiency of proof—let alone the sufficiency of the Indictment—for Counts Two through Four.

*Second*, contrary to the Defendant's claim, the Indictment sufficiently alleges the Defendant's connection to the charged wire communications. *Perry*, the sole case upon which the Defendant relies (Dkt. No. 57 at 11), does not compel a different conclusion. *Perry* held only that, to the extent that an indictment relies upon a "general description based on the statutory language," the indictment also should include "a statement of the facts and circumstances as will inform the accused of the specific [offense] coming under the general description." 757 F.3d at 171 (quoting *Hamling*, 418 U.S. at 117-18). The Indictment—which alleges that representatives of BinaryBook and BigOption worked under the Defendant's supervision at Yukom and that the Defendant knowingly caused the transmission of three specific wire communications in furtherance of the scheme to defraud (Indictment ¶¶ 19-42)—satisfies this standard.

Notwithstanding that the Fourth Circuit has determined the core conduct regulated under Section 1343 to be the charged wires in furtherance of the alleged scheme, a minority of courts have concluded that the "focus" of the wire fraud statute is on the broader conduct constituting the scheme to defraud and that a multi-factor analysis of the charged conduct should be undertaken to determine whether it is sufficiently domestic in nature. *See, e.g.*, *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102 (D.D.C. 2017); *see also Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768 (S.D.N.Y. 2016) (assessing "focus" of mail fraud statute). As an initial matter, these cases propose a qualitative and indeterminate analysis that is unmoored from the statutory text of Section 1343 and of precisely the sort that the Supreme Court rejected in *Morrison*, and there is no reason for this Court to follow their lead.

Moreover, of the few courts to explicitly adopt this approach, none has analyzed a case in which both the wires allegedly used to commit the fraud *and* victims of the alleged fraud were in the United States, as alleged here. In *All Assets Held at Bank Julius*, the court found that the wire fraud statute did not apply domestically in a number of schemes to defraud involving the use of domestic wires, but none that involved victims in the United States. 251 F. Supp. 3d at 103. Likewise, in *United States v. Prevezon Holdings*, 122 F. Supp. 3d 57, 70-71 (S.D.N.Y. 2015), the court found that the wire fraud statute did not apply domestically in a scheme involving only the use of domestic wires to route funds to a foreign individual. *See also Elsevier, Inc.*, 199 F. Supp. 3d at 788 (noting in a RICO action that plaintiffs had "failed to show that Defendants' conduct affected the market for Plaintiffs' products in any country other than Brazil"); *United States v. Gasperini*, No. 16-CR-441, 2017 WL 2399693, at *9 (E.D.N.Y. June 1, 2017) (noting in a prosecution concerning computer intrusion that the "ultimate aim" of the alleged fraud was supposedly "foreign companies and persons" but that the defendant "target[ed] computers in the U.S. for intrusion and exploitation" as a means to that end).

The Indictment in this case alleges a scheme to defraud that implicates the United States far more substantially. Here, the allegations involve (1) a scheme to defraud binary options investors in the United States (Indictment ¶¶ 3, 4); (2) wire communications into the United States (*id.* ¶¶ 41, 42); and (3) victims located in the United States (*id.* ¶ 42). Taken together, these allegations fall squarely within "the focus of congressional concern" in enacting the wire fraud statute: "(1) preventing schemes to defraud through the use of U.S. wires and (2) allowing the wire fraud statute to apply to the use of U.S. wires to send a communication between the United States and a foreign country." *All Assets Held at Bank Julius*, 251 F. Supp. 3d at 103 (citing Senate and House Reports).

Finally, because the Indictment is appropriately premised on domestic conduct, the Defendant's contention that applying Section 1343 "extraterritorially" would "violate principles of due process" (Dkt. No. 57 at 11) is irrelevant.

### C. Count One Represents a Permissible and Constitutional Domestic Application of Section 1349

The Defendant advances two principal arguments that Count One represents an improper domestic application of Section 1349—both of which are meritless. *First*, the Defendant argues that because Section 1349 does not require proof an overt act, the scope of its territorial application should be determined only by the physical location in which the co-conspirators entered into the alleged conspiratorial agreement—notwithstanding that the object of the alleged conspiracy was domestic wire fraud. (As with Counts Two through Four, because there is no extraterritorial application of the statute being sought, the Defendant's claim that applying the statute "extraterritorially" would "violate due process" (Dkt. No. 57 at 6) is irrelevant.)

*Second*, the Defendant appears to argue in her separately-filed motion concerning the Commerce Clause (Dkt. No. 59) that, even if the Court finds that Section 1349 properly reaches the conduct alleged in Count One, an application of the statute to the charged conduct would represent an unconstitutional exercise of Congress's authority under the Commerce Clause. There is no support in any relevant caselaw for this contention.

### 1. Count One Represents a Permissible Domestic Application of Section 1349 Because the Object of the Conspiracy Includes Domestic Wire Fraud

The Court should reject the Defendant's claim that the Indictment is premised on an extraterritorial application of Section 1349 for several reasons.

*First*, Count One represents a permissible domestic application of Section 1349 because the Indictment alleges domestic wire fraud as the object of the alleged conspiracy. While the

Defendant correctly states that Section 1349 punishes the formation of an agreement, she ignores that the statute punishes an agreement *to commit a substantive offense*—here, wire fraud. Recognizing that conspiracy statutes target conduct necessarily correlating to some substantive offense, courts have found that the *object* of the conspiracy, and not simply the formation of the agreement, is the focus of a conspiracy statute. *See United States v. Chao Fan Xu*, 706 F.3d 965, 978-79 (9th Cir. 2013), *abrogated on other grounds by RJR Nabisco*, 136 S. Ct. 2090; *Hawit*, 2017 WL 663542, at *4; *Hussain*, 2017 WL 4865562, at *6.

Contrary to the Defendant's claims, the physical location of the conspiratorial agreement is not dispositive in determining the territorial scope of the conduct properly at issue. The Indictment alleges that the Defendant and Yukom provided retention services on behalf of BinaryBook and BigOption, which, in turn, sold and marketed binary options to customers in the United States, in part, by wire communications into the United States. (Indictment ¶¶ 3-4, 41-42.) These alleged acts—participation in a conspiracy to commit a domestic violation of the wire fraud statute—constitute domestic acts within the reach of Section 1349. The cases cited by the Defendant—which stand only for the general proposition that the Government does not need to prove an overt act to obtain a conviction under Section 1349 (or, in the case of *United States v. Melgar-Hernandez*, 832 F.3d 261 (D.C. Cir. 2016), discuss only the territorial jurisdiction of state courts)—do not compel a different conclusion. *See United States v. Chinasa*, 489 F. App'x 682, 685-86 (4th Cir. 2012); *United States v. Williams*, 820 F. Supp. 3d 663, 664 (D. Md. 2011).

Nor do the Supreme Court's holdings in *Morrison* and *RJR Nabisco* change the analysis. While the *Morrison* court repudiated the use of a broad-based "effects test" to determine the scope of a statute's territorial application, it held that the "focus" of the anti-fraud provision of the Securities Exchange Act at issue in that case was *not* "where the deception originated," but rather

the transactions at which that deception was directed—"purchases and sales of securities in the United States." 561 U.S. at 266. As for *RJR Nabisco*, the Court did not pass on the "focus" of any substantive offense and assumed without deciding that the territorial application of the RICO conspiracy provision tracked that of the statute's substantive prohibitions. 136 S. Ct. at 2105. *See also id.* (holding that whether a RICO enterprise is foreign or domestic is not controlling, as long as the enterprise affects commerce involving the United States).

*Second*, the Defendant's narrow focus on where the alleged co-conspirators entered into the agreement ignores the role of the internet in perpetrating the scheme, and her position, if accepted, would significantly impede the Government's law enforcement efforts in what is perhaps the most significant engine of commerce and communication in history. (*See* Indictment ¶¶ 2-4.) Even if the conspiracy did not specifically target the United States, the use of the internet to facilitate transactions evinces an intent to reach a global set of customers. Indeed, the transmission of information through the internet has been held to be sufficient to establish a nexus with interstate or foreign commerce for jurisdictional purposes, regardless of the location of the defendant. *See United States v. Ellyson*, 326 F.3d 522, 533 (4th Cir. 2003) (holding that child pornography obtained via the internet had been transmitted in interstate commerce); *United States v. Hilton*, 257 F.3d 50, 54-55 (1st Cir. 2001) (same). *See also Reno v. American Civil Liberties Union*, 521 U.S. 844, 851 (1997) (observing that the "tools" of the internet "constitute a unique medium . . . located in no particular geographical location but available to anyone, anywhere in the world, with access to the Internet"). Perpetrating a conspiracy through the internet, among other channels, properly exposes the Defendant to the risk of being held to account for her actions in multiple jurisdictions. *Cf. United States v. Royer*, 549 F.3d 886, 895 (2d Cir. 2008) (holding in the context of a venue challenge that "the defendants, having concocted a scheme that relied so heavily on the actions of

the [web] site subscribers for its success and that defrauded investors throughout the country, can hardly complain that their very *modus operandi* subjected them to prosecution in numerous districts, including the Eastern District of New York").

*Third*, Count One represents a permissible domestic application of Section 1349 because the Government would offer proof at trial of overt acts in furtherance of the conspiracy in the United States—and in Maryland, in particular—as explained in more detail in response to the Defendant's motion to dismiss for purported lack of venue (*see infra* Section III.C). A conspiracy to commit wire fraud occurs in any location in which "an overt act in furtherance of the charged conspiracy" occurred. *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012). Based on this principle, the Government will establish at trial that the conspiracy with which the Defendant is charged occurred, among other locations, in the United States.

A conclusion that Section 1349 cannot apply to the alleged conspiracy would effectively immunize from federal criminal liability those who plan global conspiracies on foreign soil, even where residents of the United States were targeted or suffered injury and even where—as the Government will establish at trial—the agreement actually resulted in Americans being defrauded. There is no support in law or logic for the cramped and novel interpretation of the statute that is advanced by the Defendant, and the Court should reject it.

### 2. The Commerce Clause Supports Application of Section 1349 to the Conduct Alleged in Count One

The Defendant suggests that, even if the Court finds that Section 1349 properly reaches the conduct alleged in Count One, such an application of the statute would represent an unconstitutional exercise of Congress's authority under the Foreign Commerce Clause. (Dkt. No. 59.) As explained below, this contention finds no support in the Constitution or caselaw.

The Commerce Clause grants Congress broad, although not unlimited, power to enact legislation to regulate interstate and foreign commerce. *See, e.g.*, *United States v. Bollinger*, 798 F.3d 201, 209 (4th Cir. 2015). Regarding the regulation of commerce among the states, the Commerce Clause permits Congress to enact laws to regulate (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (internal citations omitted).

Congress's power to regulate commerce between the United States and foreign nations is somewhat broader. Regarding the regulation of foreign commerce, the Fourth Circuit has held that the Commerce Clause permits the same scope of congressional power as with interstate commerce, except that, under the third prong, it may regulate activities that "demonstrably affect [foreign] commerce"—a more lenient standard than the "substantially affect[]" standard applied to interstate commerce. *Bollinger*, 798 F.3d at 215-16.

As with any of its enumerated powers, Congress has the authority to "make all Laws which shall be necessary and proper for carrying into Execution" its powers under the Commerce Clause. *Gonzales v. Raich*, 545 U.S. 1, 5 (2005) (quoting U.S. Const. art. I, § 8). Further, with laws regulating either interstate or foreign commerce, there need only be a rational basis upon which Congress could have concluded that an activity substantially or demonstrably affects commerce— the activity need not affect commerce in fact. *Bollinger*, 798 F.3d at 216.

Whether the commerce at issue here is considered interstate or foreign, the Commerce Clause supports the application of Section 1349 to the conduct alleged in Count One. In particular, prohibiting a conspiracy under Section 1349—including the conspiracy alleged in the

Indictment—reasonably falls within the scope of Congress's authority to regulate activities having a substantial effect on interstate, or a demonstrable effect on foreign, commerce.

As an initial matter, most of the arguments that the Defendant advances under the rubric of her Commerce Clause challenge constitute a *facial* challenge to Section 1349, not, as the Defendant asserts, an as-applied challenge. (*See* Dkt. No. 59 at 8 n.2.) Because "an agreement to do something in the future" does not, according to the Defendant, necessarily involve the use of the channels or instrumentalities of foreign commerce, and because "the mere act of agreeing to defraud" does not itself change the number of investors, number of deposits, or prices in the market, Section 1349 cannot reach the conduct alleged in Count One under the Commerce Clause as interpreted by the Defendant. (*Id.* at 4.) By this logic, Congress could not properly enact *any* conspiracy statute under its Commerce Power, even one proscribing an agreement, as here, made by commercial actors, plainly in connection with commercial transactions. Nor would the application of Section 1349 to the conduct charged in Count One require the creation of commercial conduct to regulate, as the Defendant implies. (*See* Dkt. No. 59 at 5 (citing *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549-52 (2012) (Roberts, C.J.)).)

Even if the scope of the Defendant's challenge can be limited to the application of Section 1349 to the conduct alleged in Count One, it should still be rejected. As the Defendant recognizes, Section 1349 is part of a broader statutory scheme aimed at preventing the use of domestic channels of communications to further schemes to defraud. *See* 18 U.S.C. §§ 1341-1349. Considering this statutory scheme, however, the Defendant's challenge to the statute is baseless: "[w]here the class of activities is regulated and that class is within the reach of federal power, the courts have no power to excise, as trivial, individual instances of the class." *Gonzales*, 545 U.S. at 23 (quoting *Perez v. United States*, 402 U.S. 146, 154 (1971)). The arguments that the Defendant advances in

her purported as-applied challenge—*first*, that the effect the alleged conspiracy had on commerce is too attenuated (Dkt. No. 59 at 4), and *second*, that the alleged conspiracy supposedly did not "target[]" binary options investors in the United States (*id.* at 7)—do not warrant contravening the Supreme Court's general holding.

*First*, to the extent that the Supreme Court has declined to extend Congress's Commerce Power, it has done so under challenges to statutes that lacked any jurisdictional requirement that the activities proscribed be connected to interstate or foreign commerce, unlike Section 1349 (to the extent that it incorporates Section 1343). *See Lopez*, 514 U.S. 549 (holding Congress's Commerce Power did not reach the regulation of gun possession in school zones on the theory that, in aggregate, gun possession may lead to violence, which would impair the national economy); *see also United States v. Morrison*, 529 U.S. 598 (2000) (holding that Congress's Commerce Power did not reach the regulation of gender-motivated violence on theory that such violence, in aggregate, impaired national levels of employment and productivity). Unlike the conspiracy to defraud alleged here, neither *Lopez* nor *Morrison* involved statutes that proscribe offenses explicitly involving "interstate or foreign commerce" (18 U.S.C. § 1343). What the Supreme Court found insufficient in those cases were the future incidental effects that the proscribed non-economic activities may have on the national economy broadly—not, as here, the effects that an activity *explicitly connected to commerce* may have on commerce. *See Lopez*, 514 U.S. at 563-54; *see also Morrison*, 529 U.S. at 615.

*Second*, even if it were true, as the Defendant contends, that the conspiracy did not explicitly "target[]" binary options investors in the United States, that is irrelevant to an analysis under the Commerce Clause. Federal jurisdiction may attach to a criminal offense even where the actor had no knowledge or intent to affect interstate or foreign commerce. "[T]he existence of the

fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute." *United States v. Feola*, 420 U.S. 671, 677 n.9 (1975). This includes proof of the Commerce Clause element. *See United States v. Squires*, 581 F.2d 408, 409-10 (4th Cir. 1978). Accordingly, whether the Defendant and her co-conspirators directed their misrepresentations at investors in the United States, or whether the conspiracy simply swept up those investors, among others worldwide, does not bear upon the validity of Count One under the Commerce Clause.

Moreover, the Government will establish overt acts in furtherance of the conspiracy in the United States—and in Maryland in particular—at trial. Criminalizing a conspiracy being advanced in the United States and that includes among its victims United States residents is hardly the "freewheeling hypothetical[]" (Dkt. No. 59 at 7) upon which the Defendant argues the Government is predicating its case.

*Finally*, even if the Court believes the application of Section 1349 to the Defendant may exceed Congress's authority under the Commerce Clause, it would be premature for the Court to consider the Defendant's challenge prior to trial. The Fourth Circuit has held that an as-applied challenge to a federal statute is a fact-specific issue, most appropriate for resolution following trial. *See Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009) (en banc) (holding that an as-applied challenge is "based on a developed factual record and the application of a statute to a specific person"). *See also United States v. Hill*, 700 F. App'x 235, 237 (4th Cir. 2017) ("Because this is an as-applied challenge, whether Hill's conduct sufficiently affects interstate commerce as to satisfy the constitutional limitations placed on Congress' Commerce Clause power may well depend on a consideration of facts, and because the facts proffered here may or may not be developed at trial, it is premature to determine the constitutional issues."); *cf.*

*Harmon v. Brucker*, 355 U.S. 579, 581 (1958) (holding that courts have a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case").

### III. The Court Should Deny the Defendant's Motion to Dismiss the Indictment for Failure to Allege Proper Venue

The Indictment, on its face, alleges activity concerning the charged offenses that is sufficient to support venue in this District. As a result, the Defendant's motion should be denied.

#### A. Applicable Legal Standards

##### 1. Pretrial Challenges to Venue

A pretrial motion to dismiss an indictment for lack of venue is a "challenge to the sufficiency of the indictment" that is "limited to the allegations contained in the indictment." *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). If the indictment is not facially defective due to an apparent "infirmity of law in the prosecution," there is no basis for dismissal. *Id.* (citation and internal quotations omitted).

Assuming that the indictment is facially sufficient, the Government bears the burden *at trial* of proving venue by a preponderance of the evidence. *See United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 2038 (2013) *reh'g denied*, 134 S. Ct. 25 (2013); *United States v. Burns*, 990 F.2d 1426, 1436 (4th Cir. 1993); *United States v. Griley*, 814 F.2d 967, 973 (4th Cir. 1987). If the trial is by jury, the Court must adequately instruct the jurors before they deliberate on the issue. *See United States v. Martinez*, 901 F.2d 374, 376 (4th Cir. 1990). The defense can also make a claim of lack of venue during a motion for judgment of acquittal at the close of the Government's case. *See United States v. Ebersole*, 411 F.3d 517, 530 (4th Cir. 2005).

### 2. The Relevant Venue Provisions

A defendant is entitled to be tried in the state or district where the alleged crime was committed. U.S. Const. art. III, § 2; U.S. Const. amend. VI; *see also* Fed. R. Crim. P. 18 ("the government must prosecute an offense in a district where the offense was committed").

As the Defendant acknowledges (Dkt. No. 56 at 2), venue is appropriate in a prosecution for conspiracy to commit wire fraud and wire fraud pursuant to 18 U.S.C. § 3237(a), which provides that "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." *See Ebersole*, 411 F.3d at 527 (wire fraud is a continuing offense under 18 U.S.C. § 3237(a)).

### B. The Motion Should Be Denied Because the Indictment's General Allegations of Venue Are Sufficient

Contrary to the Defendant's claims otherwise, the Indictment's general allegations of venue in this District are sufficient under controlling Fourth Circuit law. The motion should be denied on this basis alone.

In *Engle*, the Fourth Circuit affirmed a district court's denial of a pretrial motion to dismiss an indictment charging the defendant with sexual exploitation of a minor. Like the charges against the Defendant in this case, the crime at issue in *Engle* was a continuing offense under Section 3237(a), and the government had alleged in relevant part that the conduct at issue had occurred "in the Eastern District of Virginia and elsewhere." 676 F.3d at 415-16. The Fourth Circuit held that "[b]ased on these allegations, which clearly designate 'the Eastern District of Virginia and elsewhere' as the location of [the defendant's] illegal acts, his pretrial motion to dismiss . . . on venue grounds should have been denied." *Id.* at 416. The Court went on to address additional arguments raised by the parties—explaining, in effect, that it would address their arguments

notwithstanding that they had apparently misconstrued the proper standard for a pretrial venue challenge—but its central holding was unambiguous. *See id.* at 415 ("Notwithstanding the manner in which the parties have argued the venue issue throughout this case, it appears that the actual issue presented by [the defendant's] motion to dismiss (and this appellate argument) is more limited than they contend.").

As in *Engle*, the Indictment in this case alleges that each count occurred "in the District of Maryland and elsewhere." (Indictment ¶¶ 17, 41.) The Defendant concedes as much—referring to these allegations, ostensibly pejoratively, as "conclusory" (Dkt. No. 56 at 2)—but under *Engle*, these allegations are sufficient to establish venue in this District at the pretrial stage and require the Court to deny the Defendant's motion.

The Defendant claims that "[t]o demonstrate proper venue for Count One . . . the Indictment must contain factual allegations that the wire fraud conspiracy was formed in the District of Maryland or an overt act in furtherance of the conspiracy was committed in the District of Maryland" (Dkt. No. 56 at 3), but the cases cited for this claim provide no support for the Defendant's contention because they all involved *post-trial* appeals challenging either jury instructions or the sufficiency of evidence at trial. *See Whitfield v. United States*, 543 U.S. 209, 212 (2005); *United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012); *United States v. Green*, 599 F.3d 360, 368 (4th Cir. 2010) (cited in Dkt. No. 56 at 3).

Similarly misplaced is the Defendant's claim that "[t]o establish proper venue for wire fraud . . . the government must show *the defendant* caused a wire communication" to be transmitted to or from the venue (Dkt. No. 56 at 6 (emphasis in original)). Here too, the Defendant cites decisions involving *post-trial* appeals taking issue with jury instructions and/or the sufficiency of

the government's evidence at trial—not the allegations in an indictment. *See Ebersole*, 411 F.3d at 526; *United States v. Jefferson*, 674 F.3d 332, 368-69 (4th Cir. 2012) (cited in Dkt. No. 56 at 6).

### C. Even Assuming the Indictment's General Allegations of Venue Were Insufficient, the Motion Should Be Denied

Notwithstanding the foregoing, the Indictment contains allegations that, if proven at trial, would be sufficient to establish venue in this District—further establishing that the motion should be denied.

As the Defendant acknowledges (Dkt. No. 56 at 3), venue is proper on a charge of conspiracy to commit wire fraud in any district in which an overt act in furtherance of the conspiracy was committed by any of the conspirators. *See, e.g.*, *Day*, 700 F.3d 727. The Defendant notes that "the Indictment does not allege any overt acts, much less any that occurred in Maryland" (Dkt. No. 56 at 4), but she correctly concedes in a footnote that Section 1349 "does not require proof of an overt act" (*id.* at 3 n.1). *See United States v. Chinasa*, 489 F. App'x 682, 685 (4th Cir. 2012).

In any event, venue on the conspiracy count could be properly established at trial with evidence that—even though the conspiratorial agreement was not formed in Maryland and none of the co-conspirators are alleged to have entered the state—the conspiracy was furthered when, as set forth in Counts Two through Four of the Indictment, representatives of BinaryBook and BigOption sent emails to or communicated by phone with victims in the District, including regarding "bank wire transfer instructions" and to "request[] the completion of a Deposit Confirmation Form" (Indictment ¶ 42). As the Fourth Circuit recognized in *Day,* "simple acts"—such as phone calls to or from the district—"can give rise to venue in conspiracy cases," even where those acts were "de minimis in context" or "completely legal." 700 F.3d at 727; *see also United States v. Johnson*, 510 F.3d 521, 524 (4th Cir. 2007) ("It is well-accepted that there may

be more than one appropriate venue, or even a venue in which the defendant has never set foot, so long as it meets the relevant constitutional and statutory requirements.") (internal quotations omitted).

Contrary to the Defendant's claim (Dkt. No. 56 at 4-5), it is irrelevant that the allegations in Counts Two through Four were not explicitly incorporated into Count One. That is because (i) the general allegation of venue in Paragraph 17 is sufficient (as explained above); (ii) these alleged acts are, on their face, instances of the conduct described in Paragraphs 3 and 4, which are explicitly incorporated into Count One and allege, respectively, that BinaryBook and BigOption sold and marketed to customers "within the District of Maryland" and communicated by email and phone with individuals "in the District of Maryland"; (iii) the Government was under no obligation to allege any overt acts (as the Defendant concedes); and (iv) the Fourth Circuit has instructed that indictments be construed in a "practical," rather than "purely technical," manner when challenged on a motion to dismiss, *Matzkin*, 14 F.3d at 1019; *see also United States v. Duncan*, 598 F.2d 839, 849 (4th Cir. 1979) ("the rule of express allegation or incorporation has obvious validity, but only with respect to the inclusion of essential elements of the offense charged").

With respect to the substantive wire fraud counts, venue could be properly established at trial with evidence that the communications set forth in Counts Two through Four occurred as alleged, because Paragraph 42 alleges that the Defendant "caused" the email and phone communications with the referenced victims in the District of Maryland "for the purpose of executing and attempting to execute" the alleged scheme. *See Ebersole*, 411 F.3d at 527. The Defendant cites no authority for the proposition that the Government must allege the means by which it will establish this at trial, and her suggestion that it is relevant that she is not alleged "herself" to have "sent or received" these wires (Dkt. No. 56 at 6) is wrong. *See, e.g.*, *United*

*States v. Stewart,* 256 F.3d 231, 243 (4th Cir. 2001) (citing with approval *United States v. Kim,*

246 F.3d 186, 192 (2d Cir. 2001), as "holding that venue was proper for a substantive wire fraud

conviction . . . when the defendant, although not the actual sender or receive of wire transmissions,

'caused communications to be transmitted into and out of the district' in which the defendant was

tried"). Similarly baseless is the suggestion that it is relevant to the Court's analysis that the

charged wires are not "alleged to have contained false statements or material omissions" (Dkt. No.

56 at 6); the relevant question is whether, as the Indictment alleges, the wires were in furtherance

of the alleged scheme.

**<u>CONCLUSION</u>**

For the reasons set forth above, the Court should deny the Defendant's motions.

Dated:  June 20, 2018

Respectfully submitted,

Sandra Moser
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:  _____/s/_____

Ankush Khardori
Trial Attorney

Tracee Plowell
Acting Assistant Chief

Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Ave. N.W.
Washington, D.C. 20530

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 20, 2018, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system, which will notify counsel for the Defendant of the filing.

By:    <u>        /s/                </u>
          Ankush Khardori
          Trial Attorney
          Fraud Section, Criminal Division
          U.S. Department of Justice