# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

LEE ELBAZ,

Defendant.

Criminal Action No. TDC-18-0157

## MEMORANDUM OPINION

Defendant Lee Elbaz is charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and three counts of wire fraud, in violation of 18 U.S.C. § 1343 and 2. Presently pending before the Court are four Motions to Dismiss filed by Elbaz in which she argues that the Indictment fails to state an offense, the charged offenses are improperly based on extraterritorial conduct, the conspiracy charge exceeds Congress's power under the Commerce Clause to criminalize a foreign conspiracy, and the Indictment fails to allege proper venue in the District of Maryland. Elbaz has also filed a Motion to Strike Paragraph 10 of the Indictment and a Motion, in the Alternative, for a Bill of Particulars. After briefing, the Court held a hearing on all six Motions on July 30, 2018. For the reasons set forth below, the Motions to Dismiss are denied, the Motion to Strike is denied, and the Motion for a Bill of Particulars is granted in part and denied in part.

## BACKGROUND

The Indictment alleges the following facts, which the Court accepts as true for purposes of the Motions.

Elbaz, a resident of Israel, was the Chief Executive Officer of Yukom Communications, an Israel-based business that provided sales and marketing services for two internet-based

businesses with the brand names BinaryBook and BigOption ("the Companies"). BinaryBook and BigOption sell financial instruments known as "binary options," consisting of bets on the outcome of a particular event, that result in the payment of either a pre-determined amount of money or nothing. Indictment ¶ 9, ECF No. 37. Elbaz identified herself as the "Trading Floor Manager" for BinaryBook and BigOption. *Id.* ¶ 7.

Count One of the Indictment charges Elbaz with conspiracy to commit wire fraud. The fraud was allegedly perpetrated in several ways. Sales representatives of the Companies ("Representatives") would misrepresent their personal financial incentives to investors by stating that they were paid a commission based on investor profit, when in fact they were paid a commission based on investor deposits. The Indictment alleges that Elbaz trained and encouraged Representatives to make such claims.

Representatives also misrepresented the average investment return on binary options. Representatives were given a script that included false statements such as that investor returns averaged 15-25 percent per month and that there was an average success rate of 70 percent. Elbaz allegedly trained and encouraged employees of the Companies to make such misrepresentations.

Furthermore, Representatives, following scripts provided by Elbaz, made false statements about their educational backgrounds, claiming to have a master's degree in economics; their location, stating that they were in London; and their names, using "stage names" or other aliases. Elbaz allegedly trained and encouraged Representatives to make such statements and personally approved the stage names.

The Indictment also alleges that Representatives misstated to investors how easy it was for investors to withdraw their funds. When an investor sought to withdraw funds, the

Representatives instead offered the investor an "Academy" class that was purportedly designed to improve trading performance, but did not, in fact, do so. *Id.* ¶ 34. Elbaz allegedly trained and encouraged employees to make misrepresentations that funds could be withdrawn easily.

Finally, Representatives did not disclose material information about various proposed investment terms, including "bonuses," "risk free trades," and "insured trades." *Id.* ¶¶ 36-39. Although these terms implied that investors would receive additional money or decreased risk, these tools were actually mechanisms used to make it more difficult to withdraw deposits. Elbaz allegedly trained and encouraged employees to make misrepresentations about the ability to withdraw funds invested in these instruments.

Counts Two, Three, and Four charge Elbaz with three counts of wire fraud. In these counts, the Indictment charges that on three separate occasions, Elbaz caused, or aided and abetted, the sending of wire transmissions from Representatives to victims in Maryland for the purpose of executing a scheme to defraud. The Indictment identifies three Maryland victims through pseudonyms as Victims A, B, and C, and it provides specific dates on which a Representative of BinaryBook or BigOption communicated with the victim through a wire transmission.

## DISCUSSION

The Court will first address Elbaz's Motions to Dismiss, then consider the Motion to Strike, and finally examine the Motion for a Bill of Particulars.

### I.    Motions to Dismiss

#### A.    Legal Standard

Elbaz has been charged in Counts Two, Three, and Four with substantive counts of wire fraud in violation of 18 U.S.C. § 1343, which states:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343 (2012). Elbaz is also charged with aiding and abetting these offenses under 18 U.S.C. § 2, which provides that anyone who "commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2.

Elbaz is charged in Count One with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, which states: "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349.

Elbaz has filed her Motions to Dismiss under Federal Rule of Criminal Procedure 12, which states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits" and includes challenges of failure to state an offense and improper venue. Fed. R. Crim. P. 12(b)(1), (3)(A)(i), (3)(B)(v). Under *United States v. Engle*, 676 F.3d 405 (4th Cir. 2012), a court may dismiss an indictment "where there is an infirmity of law in the prosecution." *Id.* at 415. It may not do so based on a "determination of facts that should have been developed at trial." *Id.* Thus, when evaluating a challenge to an indictment under Rule 12, the Court must base its determination solely on the facts contained in the indictment and must accept all facts in the indictment as true. *Id.*

## B. Failure to State an Offense

Elbaz seeks dismissal of the Indictment for failing to state an offense. According to Elbaz, the Indictment does not set forth the essential facts that would fairly inform her of the conduct forming the offense charged in Count One. In her view, the Indictment fails to allege any facts that link her to the perpetrators of the fraud, or that show that she was aware of the fraud at all. Elbaz further argues that Counts Two, Three, and Four are deficient because there is no factual allegation that she made or caused to be made a materially false statement, or that the individuals who communicated with the Maryland victims were connected to Elbaz. Finally, she argues that there are no facts that support the charge that she aided and abetted wire fraud.

When a defendant challenges the sufficiency of an indictment, courts apply a "heightened scrutiny to ensure that every essential element of an offense has been charged." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014). "An indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *Id.* (quoting *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009)). An indictment is allowed to set forth the offense in the words of the statute itself, so long as it includes all of the necessary elements of the offense, but the statutory language must also be accompanied by a "statement of the essential facts constituting the offense charged." *Perry*, 757 F.3d at 171 (quoting *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004)). However, while an indictment is intended to be "concise," Fed. R. Crim. P. 7(c), there is no requirement that it "include every fact to be alleged by the government," *United States v. Moyer*, 674 F.3d192, 203 (3d Cir. 2012).

When the charged crime is conspiracy, "all that is necessary in the indictment is that the object of the conspiracy be set forth sufficiently to identify the offense which the defendant is

charged with conspiring to commit." *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994). The sufficiency of the indictment is determined by "practical, as opposed to purely technical considerations," with the key question being whether it tells the defendant all that is needed to show for his defense, and whether it provides enough information that the defendant will not be placed in double jeopardy. *Id.*

On Count One, the elements of conspiracy to commit wire fraud are "(1) two or more persons made an agreement to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully." *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015). The Indictment clearly states these elements. In paragraph 17, the Indictment alleges that Elbaz "and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate, and agree with each other and others . . . to commit wire fraud." Indictment ¶ 17. The object of the conspiracy was explicitly identified as the commission of the federal crime of wire fraud, which was described as "knowingly and with the intent to defraud, having devised . . . a scheme and artifice to defraud binary options investors in BinaryBook and Big Option, . . . knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice in violation of Title 18, United States Code, Section 1343." *Id.*

Thus, each element of conspiracy, as well as the object of the conspiracy, is fairly stated. *See Perry*, 757 F.3d at 171; *Matzkin*, 14 F.3d at 1019. Although this description largely tracks the statute, the Indictment is not limited to the statutory language. It also includes the "essential facts constituting the offense charged," including the dates of the offense (from May 2014 to June 2017) and the location (the District of Maryland and elsewhere). Indictment ¶ 17. It

6

describes the object of the conspiracy as wire fraud relating to a scheme to defraud "binary options investors in BinaryBook and Big Option." *Id.*

Beyond those basic facts, which are typically sufficient to state a conspiracy charge, the Indictment sets forth a detailed description of the manner and means of the conspiracy, including that Elbaz and her co-conspirators induced investors to deposit funds based on four different categories of misrepresentations made by BinaryBook and BigOption personnel, specifically misrepresentations that Representatives were paid based on total investor profits, when in fact they were paid based on total investor deposits, misrepresentations about the profitability of their accounts, misrepresentations about the location and education of particular Representatives, and misrepresentations about investors' ability to withdraw their funds. These additional facts are more than enough to identify the offense Elbaz is charged with conspiring to commit and to allow Elbaz to understand whether she is being subjected to double jeopardy.

Elbaz claims that the Indictment does not provide sufficient facts to connect her to the perpetrators of the fraud or to show that she was aware of the actual acts of wire fraud. Elbaz further claims that the Indictment "must contain factual allegations from which a reasonabl[e] jury could conclude that the defendant made or caused to be made a materially false statement." Mot. Dismiss (Failure to State an Offense) at 9, ECF No. 58. First, these claims misunderstand the purpose of an indictment, which is to put the defendant on notice of the charge against her, not to demonstrate that the Government has sufficient facts to convict the defendants. Unlike for a civil complaint, there is no requirement that an indictment offer sufficient facts, which if true, would establish the offense. Rather, an indictment must merely identify those essential facts necessary to inform her of the charge, prepare a defense, and avoid double jeopardy, not lay out the whole of the Government's case. *See, e.g., Moyer*, 674 F.3d at 203.

Second, as Elbaz has argued, the essential element of the offense is the agreement to commit a crime, which the Indictment has alleged. There is no requirement that a defendant know the identity of all other co-conspirators in order to sustain a conviction. Indeed, an indictment charging conspiracy does not need to name co-conspirators because it is "the existence of the conspiracy, rather than the particular identity of the conspirators" that is the essential element of the crime. *United States v. Am. Waste Fibers Co., Inc.*, 809 F.2d 1044, 1046 (4th Cir. 1987). It is also not required, to establish a conviction for conspiracy, to show that the defendant was aware of any particular criminal act. Even if a member of a conspiracy did not know of certain criminal acts by co-conspirators, that member "is responsible for the acts of the others in furtherance of the conspiracy." *United States v. Snead*, 527 F.2d 590, 591 (4th Cir. 1975). Thus, facts showing the defendant's knowledge of particular criminal acts are not essential elements that must be stated in a conspiracy indictment.

Third, to the extent that Elbaz argues that certain facts about her involvement must be alleged in order to allow her to prepare her defense, the Indictment further describes her alleged role in the conspiracy by stating, among other things, that Elbaz supervised the representatives who made false statements in furtherance of the fraud, that she trained and encouraged the representatives to make misrepresentations, and that she used an alias in interacting with investors and approved stage names for representatives to use. The Indictment provides specific examples of such activities by alleging that she taught a "retention class" on February 24, 2016, received a "Course Manual" on August 24, 2016, received a communication from a manager stating that "there is a lot more money to take from" investors, and directed a representative to place a small bonus in an investor account on April 10, 2015. Indictment ¶¶ 22a, 22e, 24a. These facts are sufficient to provide notice to Elbaz of the conspiracy charge against her, to

allow her to prepare her defense, and to permit her to assess whether she is subject to double jeopardy. To the extent that any additional facts are needed, they will be discussed in relation to the Motion for a Bill of Particulars.

As for the substantive wire fraud charges in Counts Two, Three, and Four, the Indictment likewise states all of the elements of the offense and provides notice of the charges against Elbaz. To convict a person of the crime of wire fraud, the Government must show that the defendant "(1) devised or intended to devise a scheme to defraud and (2) used . . . wire communications in furtherance of the scheme." *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012). As charged in the Indictment, a person who aids and abets the crime of wire fraud may also be found guilty of the substantive offense. 18 U.S.C. § 2. Paragraph 41 of the Indictment states that Elbaz:

> [K]nowingly and with the intent to defraud, having devised and intending to devise, and willfully participated in, a scheme and artifice to defraud binary options investors in BinaryBook and BigOption, and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted, and aided and abetted the transmission, by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice.

Indictment ¶ 41. The Indictment therefore stated all of the elements of a wire fraud offense. Although this language largely tracked the statutory text, the Indictment included "essential facts constituting the offense charged," *Perry*, 757 F.3d at 171, including (1) that the scheme was to defraud binary investors in BinaryBook and Big Option, and (2) the scheme occurred between May 2014 and June 2017. It included, in paragraph 42, the dates of each charged count, the type of wire transmission, the company for which the Representative worked when engaged in that communication, and the location of the receipt of the communication, the District of Maryland. Indictment ¶ 42.

These facts are more than sufficient to state the elements of the offense and to provide notice of the charge against the defendant in order to prepare a defense and to avoid double jeopardy. Again, there is no requirement that the Indictment provide more, or include sufficient facts to establish a violation of the statute. For example, in *United States v. Loayza*, 107 F.3d 257 (4th Cir. 1997), an indictment for mail fraud described the scheme to defraud and specified the date, amount, and originating bank of several allegedly fraudulent checks, but did not state the specific check number or the name of the victim. *Id.* at 261. The United States Court of Appeals for the Fourth Circuit found this information sufficient to "place [the defendant] on notice of the charges." *Id.* The court went on to state that, while the defendant "understandably wants the government to disclose its theory of the case and the supporting evidentiary facts . . . [t]hat is not and never has been required at the indictment stage." *Id.* (quoting *United States v. Arlen*, 947 F.2d 139, 145 n.7 (5th Cir. 1991)).

As discussed above, there is no requirement that the Indictment specifically provide details showing that Elbaz was connected to the Representatives identified in Counts Two, Three, and Four, or that she was aware of those wire transmissions. First, by alleging that she "caused" the wires to be transmitted, or "aided and abetted" the transmission, the Indictment adequately states the elements of the offense to provide notice of the charge. The Indictment need not offer up all of the evidence that will be used to prove guilt.

Second, the Court notes that facts showing that Elbaz was aware of these wire transmissions are not even necessary for a conviction. Under the *Pinkerton* theory of liability, if Elbaz is convicted of the conspiracy count, she would be liable for all reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy, including the wire fraud charges in Counts Two, Three, and Four, even if she was not specifically aware of those transmissions.

*See, e.g., Pinkerton v. United States*, 328 U.S. 640, 647 (1946); *United States v. Singh*, 518 F.3d 236, 253-54 (4th Cir. 2008). Thus, there was no requirement that the Indictment include specific facts connecting Elbaz to the wire transmissions or the representatives who made them

Elbaz's reliance on *United States v. Hooker*, 841 F.2d 1225 (4th Cir. 1988), as an example of a case in which an indictment was dismissed for a failure to allege essential facts, is misplaced. In *Hooker*, the court dismissed a RICO charge against a defendant because the Indictment failed to allege an essential *element* of the crime, specifically the interstate commerce element, not an essential *fact* in addition to the necessary elements. *Id.* at 1227, 1232. That defect is not present here, where there is no significant dispute that the Indictment alleges all of the necessary elements for both the conspiracy charge and the substantive wire fraud counts. Accordingly, because the Court finds that the Indictment adequately states offenses for both wire fraud and conspiracy to commit wire fraud, the Motion to Dismiss the Indictment for Failure to State an Offense will be denied.

## C. Extraterritoriality

Elbaz also moves to dismiss all counts of the Indictment on the assertion that the Indictment improperly seeks to prosecute extraterritorial conduct. Specifically, Elbaz argues that since a wire fraud conspiracy requires proof only of an agreement to commit wire fraud, and since that agreement occurred overseas, the agreement is not within the scope of 18 U.S.C. § 1349. On the substantive wire fraud counts, Elbaz argues that the allegations of three wire transmissions to victims in the United States do not establish the crime as domestic because the "focus" of the wire fraud statute is not the wire communications, but the broader scheme to defraud, which she claims was foreign in nature, and in any event the allegations do not tie Elbaz to the wires. Mot. Dismiss (Extraterritoriality) at 10-11, ECF No. 57. Elbaz further argues that

11

even if the Court finds that the wire fraud and wire fraud conspiracy statutes apply to Elbaz's extraterritorial conduct, applying those provisions to her conduct would violate due process.

The United States Supreme Court has outlined a two-step framework for analyzing extraterritoriality issues. First, a court must consider whether a statute was intended to apply extraterritorially. *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). This determination requires a "clear, affirmative indication" in the statute itself and must be more than a mere reference to "foreign commerce." *Id*; *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 263 (2010). If the statute applies to extraterritorial conduct, the inquiry is over and the Court may apply the statute to any conduct regardless of geography, absent some other limitation. *RJR Nabisco*, 136 S. Ct. at 2101.

If the statute does not apply extraterritorially, then a court must determine whether the case involves a domestic application of the statute. *Id.* In so doing, a court must examine the "focus" of the statute and determine if any alleged conduct that is relevant to that focus occurred in the United States. *Id.* The focus of a statute is the conduct that it seeks to regulate, as well as the parties that the statute seeks to protect. *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137-38 (2018). "If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad." *RJR Nabisco*, 136 S. Ct. at 2101. If "the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application" of the statute, "regardless of any other conduct that occurred in U.S. territory." *Id.*

There is no claim that the statutes at issue, 18 U.S.C. §§ 1343 and 1349, apply extraterritorially. Therefore, the question to consider is whether there was conduct occurring in the United States that was relevant to the "focus" of each statute. In *Morrison*, the Supreme

Court assessed the "focus" of a statute for extraterritoriality purposes by considering what "transactions the statute seeks to regulate" and what "parties or prospective parties to those transactions that the statute seeks to protect." *Morrison*, 561 U.S. at 267. The Court also considered the text of other statutes that made up part of the same regulatory scheme and the policy justification for different possible statutory interpretations. *Id.* at 268-69.

Although the Fourth Circuit has not specifically addressed how to determine a statute's "focus" for purposes of this analysis, it has considered the wire fraud statute in detail. In *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012), the court held that the "essential conduct element" prohibited by § 1343 is "the misuse of wires," such that each use of a wire in furtherance of a scheme to defraud is a separate offense. *Id.* at 366. Likewise, in *United States v. Condolon*, 600 F.2d 7 (4th Cir. 1979), the court stated that the "gravamen" of the offense of wire fraud is "the misuse of interstate communication facilities to execute any scheme or artifice to defraud." *Id.* at 8.

Based on this analysis, which reveals that the transaction sought to be regulated by the wire fraud statute is the wire transmission itself, the Court concludes that the "focus" of a wire fraud for purposes of assessing whether a domestic offense has occurred is the misuse of a wire communication. *See Pasquantino v. United States*, 544 U.S. 349, 358 (2005) ("[T]he wire fraud statute punishes fraudulent use of domestic wires"). The wire fraud statute seeks to regulate the use of United States wires by preventing their use in furtherance of a fraud and seeks to protect individuals and parties in the United States from such fraudulent schemes. *Cf. WesternGeco*, 138 S. Ct. at 2137-38. Here, the Indictment has alleged in Counts Two, Three, and Four that Elbaz caused transmissions to be sent over wires to victims in the United States in order to further a scheme to defraud. A wire can form the basis of a wire fraud conviction even if it did

13

not involve a fraudulent communication; it need only further the scheme to defraud. *See United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013); *cf. S. Atl. P'ship of Tenn., LP v. Riese*, 284 F.3d 518, 531-32 (4th Cir. 2002) (noting that mailings in a mail fraud prosecution merely have to further the scheme to defraud, and that they need not themselves contain fraudulent misrepresentations). Thus, the charged wires received in the United States are sufficient to establish conduct in the United States relevant to the focus of the statute.

This conclusion is supported by cases in which courts have upheld wire fraud convictions of individuals outside of the United States who were engaged in a fraud scheme that utilized wires to the United States in furtherance of the scheme. In *United States v. Kim*, 246 F.3d 186 (2d Cir. 2001), a United Nations official stationed in Croatia was convicted of wire fraud and conspiracy to commit wire fraud when he used his position to approve fraudulently inflated baggage invoices for United Nations flights. *Id.* at 187-88. Based on faxes from a United Nations official to New York that resulted in wire transfers from a New York bank to pay an invoice, the court found that the crime was domestic in nature even though the fraud scheme occurred overseas. *Id.* at 189. The court reasoned that the purpose of the wire fraud statute is to "prevent the use of our telecommunication systems in furtherance of fraudulent enterprises," and Congress intended to prohibit foreign schemes that involved the use of U.S. wires. *Id.* at 190. Likewise, in *United States v. Gilboe*, 684 F.2d 235 (2d Cir. 1982), the court upheld a wire fraud conviction where a Norwegian citizen living in Hong Kong defrauded a ship owner and the Chinese government by falsifying a grain shipment from Argentina to China. *Id.* at 237. The court found jurisdiction based on telephone conversations with a ship broker in the New York office of the ship owner and several wire transfers from China to the Bahamas routed through New York banks. *Id.* at 237-38. As these cases illustrate, it does not matter if the bulk of the

scheme to defraud involves foreign activity. Because the focus of the wire fraud statute is misuse of U.S. wires to further a fraudulent scheme, the allegations that Elbaz caused such misuse are sufficient to support the conclusion that Counts Two, Three, and Four are permissible domestic applications of the wire fraud statute.

In contrast, Elbaz relies on recent cases that have rejected the notion that a single wire to or from the United States is sufficient to establish a domestic offense. *See Petroleos Mexicanos v. SK Eng. & Constr. Co. Ltd*, 572 F. App'x 60, 61 (2d Cir. 2014) (holding that a wire fraud scheme was extraterritorial despite having three financial transactions involving the United States); *United States v. Prevezon Holdings Ltd.*, 122 F. Supp. 3d 57, 72 (S.D.N.Y. 2015). In some of these cases, district courts have concluded that the "focus" of the wire fraud statute is the scheme to defraud, such that there needs to be "substantial" conduct in the United States that is "integral" to the scheme, not simply the use of a U.S. wire in furtherance of the scheme, to establish a domestic offense. *See United States v. Gasperini*, No. 16-CR-441(NGG), 2017 WL 2399693, at *8 (E.D.N.Y. June 1, 2017); *United States v. All Assets Held at Bank Julius*, 251 F. Supp. 3d 82, 102-03 (D.D.C. 2017). *Cf. Elsevier, Inv. v. Grossman*, 199 F. Supp. 3d 768, 783-84 (S.D.N.Y. 2016) (holding that the "focus" of mail fraud is the scheme to defraud).

However, these cases address the scenario in which a fraud scheme perpetrated by foreigners against other foreigners, with no U.S. nexus other than the incidental use of U.S. wires, is nevertheless charged as a domestic offense. *See, e.g.*, *Prevezon Holdings Ltd.*, 122 F. Supp. 3d at 72 (noting that both *Prevezon* and *Petroleos Mexicanos* involved a "foreign conspiracy against a foreign victim conducted by foreign defendants participating in foreign enterprises"); *Bank Julius*, 251 F. Supp. 3d at 93, 102-09 (considering a scheme in which the only identified victim was the Ukrainian Government, and the defendant committed his fraud

while serving as a government official of the Ukraine, through transactions that passed through U.S. financial institutions). None of these cases establish that a scheme that defrauds U.S. victims through the use of U.S. wires is not a domestic application of the wire fraud statute. Indeed, in *Gasperini* and *Elsevier*, the court found that there was a domestic offense because there were either U.S. victims or foreign victims with U.S. offices. *See Gasperini*, 2017 WL 2399693, at *6-9; *Elsevier*, 199 F. Supp. 3d at 783-84. Here, where the Indictment alleges that the specific victims of the charged wire fraud counts resided in the United States and received wires relevant to the scheme while in the United States, the Court finds that even if the scheme to defraud were deemed the "focus" of the offense, conduct relating to the scheme to defraud also occurred in the United States.

For similar reasons, the Court concludes that the Indictment has also alleged a domestic application of the wire fraud conspiracy statute, 18 U.S.C. § 1349. Elbaz argues that the "focus" of § 1349 is the entering of the conspiratorial agreement. In particular, Elbaz argues, without legal authority, that because a wire fraud conspiracy does not require an overt act, only the location of the agreement itself, not the location of any acts taken in furtherance of the conspiracy, is relevant.

Although case law does not provide a definitive answer to this question, it generally runs contrary to Elbaz's overly narrow position. In *Kim*, the Second Circuit made no distinction between jurisdiction over the substantive wire fraud counts and the conspiracy to commit wire fraud charge and found that where there were wire transmissions to or from the United States establishing a domestic wire fraud offense, there was likewise jurisdiction over a wire fraud conspiracy charge. *See Kim*, 246 F.3d at 191 n.2.

In the analogous context of whether there is venue for a wire fraud conspiracy, the Fourth Circuit has held that venue is proper in any district where an overt act in furtherance of the conspiracy was committed by any one of the conspirators, not merely where the conspiratorial agreement was made. *See United States v. Day*, 700 F.3d 713, 727 (4th Cir. 2012). *Day* belies the notion that the Fourth Circuit would view a wire fraud conspiracy, even without an overt act requirement, to have occurred only at the situs of the agreement. *See id.*

In another related context, the United States Court of Appeals for the District of Columbia Circuit considered and rejected a defendant's attempt to differentiate between the extraterritorial application of a substantive offense and a related conspiracy statute and held that where Congress has authorized extraterritorial application of the substantive offense, it followed that the conspiracy offense necessarily applies extraterritorially. *United States v. Ballestas*, 795 F.3d 138, 144-45 (D.C. Cir. 2015).

Elbaz's reliance on *United States v. Melgar-Hernandez*, 832 F.2d 261 (D.C. Cir. 2016), is misplaced. Although that case held that the "essential element" of a Maryland conspiracy statute without an overt act requirement was the unlawful agreement and thus was completed upon the entry of that agreement, it concluded only that Maryland had jurisdiction over a conspiracy to commit murder outside that state. *Id.* at 265. It did not decide that the "focus" of a conspiracy for purposes of domestic application—which is notably a term broader than the term "element" or "essential element"—was limited to the situs of the agreement. *Id.*

Significantly, Elbaz's overly narrow conception of the "focus" of a wire fraud conspiracy would lead to unreasonable results. Under her theory, drug dealers could avoid domestic liability for a drug conspiracy under 21 U.S.C. § 846, which also lacks an overt act requirement, simply by meeting in Canada or Mexico to reach an agreement, even if there were numerous drug deals

and other acts in furtherance of the conspiracy that occurred in the United States. A drug kingpin overseeing drug activity in the United States, but who entered into the conspiratorial agreement in Mexico, would be untouchable for that crime. Such a result illustrates the absurdity of the Elbaz's position. Accordingly, the Court concludes, as in *Kim*, that if wire fraud counts charge a domestic violation based on wires were sent to or from victims in the United States, the wire fraud conspiracy count also charges a domestic application of § 1349. *Kim*, 246 F.3d at 191 n.2.

Finally, Elbaz argues, without persuasive authority, that the application of the wire fraud and conspiracy statutes to her conduct violates due process. To establish a due process violation, Elbaz must show that the domestic nexus is so insufficient that prosecuting her under an American criminal statute would be "arbitrary or fundamentally unfair." *United States v. Murillo*, 826 F.3d 152, 156 (4th Cir. 2016). Notably, this is not a case involving foreigners defrauding foreigners in which there was incidental use of U.S. wires. The Indictment alleges that there were victims in the United States, specifically in Maryland, and that Elbaz caused wires to be sent to them in furtherance of a scheme to defraud. Thus, there is a significant U.S. interest in preventing the defrauding of U.S. persons.

Elbaz does not seriously dispute that point, but instead argues that she did not personally take actions that affected United States interests. However, the nature of a conspiracy is that co-conspirators are responsible for the reasonably foreseeable actions of each other. *See Snead*, 527 F.2d at 591. The Indictment alleges that Elbaz supervised and trained Representatives to make false statements to defraud investors, and some of those Representatives then directly engaged with Americans over U.S. wires. Under these circumstances, it is neither arbitrary nor unfair to prosecute Elbaz in a United States court. There is no due process violation.

Accordingly, the Court will deny the Motion to Dismiss on extraterritoriality grounds as to all counts.

### D.    Commerce Clause

In a related argument, Elbaz moves to dismiss the conspiracy charge in Count One of the Indictment based on the claim that Congress lacks the authority pursuant to the Commerce Clause to criminalize a wire fraud conspiracy that occurred outside of the United States among foreign nationals. Specifically, Elbaz argues that Congress's constitutional authority to regulate foreign commerce does not extend the application of 18 U.S.C. § 1349 to the conduct alleged in Count One.

Under the Constitution's Commerce Clause, Congress has the authority to regulate commerce "with foreign Nations, among the several States, and with the Indian Tribes." U.S. Const. Art. I § 8, cl. 3. The Supreme Court has interpreted the Commerce Clause as granting substantial deference to Congress, but this power is not without limits. *See United States v. Lopez*, 514 U.S. 548, 559 (1995) (striking down a criminal statute as outside congressional authority under the Commerce Clause). Under *Lopez,* Congress may regulate three broad categories of interstate activity: (1) the use of the channels of interstate commerce, (2) the instrumentalities of interstate commerce, and (3) activities that substantially affect interstate commerce. *Id.* Congress's power to regulate foreign commerce may be broader than the power to regulate interstate commerce. *Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 434 (1932); *see also Bd. Of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 56-57 (1933) (noting that Congress's authority under the Foreign Commerce Clause is plenary); *United States v. Bollinger*, 798 F.3d 201, 212 (4th Cir. 2015) (stating that "[t]he regulation of commerce with foreign nations . . . requires a unitary federal voice and expansive authority").

19

Here, Elbaz's claim that the conspiracy charge has no nexus to the United States or to foreign commerce misreads the Indictment. Paragraph 17 specifically alleges that over a three year period from May 2014 to June 2017, in the District of Maryland and elsewhere, Elbaz conspired to commit the federal crime of wire fraud, a crime which specifically involves the use of wire communications in interstate or foreign commerce. The fact that the conspiracy has, as its object, the transmittal of wire communications "in interstate or foreign commerce," for the purpose of executing a scheme to defraud, 18 U.S.C. § 1343, on its face implicates foreign commerce because it is an agreement to, in part, to use wires between states or between the United States and a foreign country to engage in fraud. By criminalizing conspiratorial agreements to misuse such wires for fraudulent activity, Congress operates well within its authority to regulate instrumentalities of foreign commerce, since phones and internet connections are plainly used to engage in such commerce.

From the additional description of the conspiracy in the Indictment, there is no question that the allegations specifically involve wires directly related to commerce between the United States and foreign countries. The alleged scheme involved the marketing of financial instruments, through the use of false statements, by an Israel-based company, through internet-based businesses (BinaryBook and Big Option), to victims which specifically included the individuals in the United States referenced in the Indictment. The marketing included using emails and phone calls to individuals in the United States to discuss potential transactions and notably identifies at least three specific wires to victims in the United States. The Indictment thus squarely alleges a crime that directly implicates commerce between the United States and foreign countries, not only commerce between two or more foreign nations, and thus alleges conduct squarely within Congress's authority to regulate.

Elbaz argues that the application of the wire fraud conspiracy statute here violates the Commerce Clause because the conspiracy "did not target the United States and is therefore, at best, only tangentially related to U.S. commerce." Mot. Dismiss (Commerce) at 6, ECF No. 59. Even if the conspiracy focused more on other countries, the Indictment clearly alleges a conspiracy directed in part at the United States by virtue of allegations that the marketing of the financial instruments was directed at U.S. customers and victims. The fact that the impact of a criminal scheme on the United States may have been less than on other countries does not provide a basis to conclude that Congress cannot regulate such schemes to protect American victims, however many there are as compared to foreign victims. The fact that Elbaz caused these transmissions from overseas, if anything, strengthens this argument by bringing the conduct within the scope of the more expansive foreign commerce power.

Elbaz's contention that the Indictment does not allege that she personally directed activity toward the United States, or was aware that it was being so directed, does not support her constitutional claim. In light of the seriousness of conspiratorial activity, Congress may deem a conspiratorial agreement to use wires between the United States and foreign countries to further a scheme to defraud as worthy of regulation by criminal statutes. *See United States v. Rabinowich*, 238 U.S. 78, 88 (1915) ("For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime."). As with other conspiracies, in order to combat the substantive criminal activity directed at the United States, it may hold members of the conspiracy liable for reasonably foreseeable acts in furtherance of the conspiracy, such as fraudulent statements to

U.S. customers, even if any particular co-conspirator does not have actual knowledge of those acts. *See Singh*, 518 F.3d at 253.

Here, the Indictment alleges that Elbaz supervised and trained representatives on using false statements to market financial instruments, and that the representatives' marketing activities included selling to customers in the United States, so it is entirely foreseeable that such contacts would occur. When knowledge of facts giving rise to federal jurisdiction—such as the use of a wire communication to the United States in furtherance of a fraud—is not an element of wire fraud, such knowledge is also not necessary to establish liability for conspiracy to commit wire fraud. *See United States v. Feola*, 420 U.S. 671, 696 (1975). Therefore, whether or not Elbaz had actual knowledge of a United States nexus, Congress could still fairly seek to hold Elbaz accountable because her actions within the conspiracy, in fact, contributed to the adverse impact on U.S. foreign commerce. Accordingly, the Court will deny the Motion to Dismiss based on the Commerce Clause challenge.

### E.    Venue

Elbaz's final argument for dismissal is the failure to allege proper venue. Elbaz asserts that the Indictment fails to allege that any specific conduct occurred in the District of Maryland and explicitly contends that the factual allegations of the conspiracy count, if true, would not establish that the criminal activity was continued or completed in the District of Maryland. Elbaz further argues that the communications into the District of Maryland were not foreseeable to her. Finally, she asserts that Counts Two, Three, and Four should be dismissed because they fail to proffer facts relating to wires that came from or passed through the District of Maryland in furtherance of the alleged fraud.

Under the statute addressing venue in criminal cases, a federal criminal offense "begun in one district and completed in another, or committed in more than one district," may be "prosecuted in any district in which the offense was begun, continued, or completed." 18 U.S.C. § 3237(a). With regard to conspiracy to commit wire fraud, venue is proper in any district where an overt act in furtherance of the conspiracy was committed by any one of the conspirators. *See Day*, 700 F.3d at 727; *see also United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995). Because acts by one co-conspirator in furtherance of the conspiracy can be attributed to all members of the conspiracy, a single conspirator's actions in a district can be sufficient to establish venue for other members of the conspiracy. *See Snead*, 527 F.2d at 591 (citing *Hyde v. United States*, 225 U.S. 347 (1912)).

Here, the Indictment specifically alleges, in paragraph 17, that Elbaz and others did, "in the District of Maryland and elsewhere," "knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, pictures, and sounds for the purpose of executing the scheme and artifice." Indictment ¶ 17. Any such transmittal would qualify as an overt act in the District. *See Engle*, 676 F.3d at 415 (holding that general language stating the location of the offense provides a sufficient basis to deny a pretrial motion to dismiss).

Beyond that allegation, the Court also can and will consider the illustrative overt acts described in paragraph 42. Although Elbaz argues that paragraph 42 cannot be considered for purposes of the conspiracy count because it was not expressly incorporated as part of the discussion relating to Count One, such rigid adherence of form over substance is not necessary. In *United States v. Duncan*, 598 F.2d 839 (4th Cir. 1979), the Fourth Circuit, faced with a similar scenario, considered language in a conspiracy count in assessing whether the indictment

23

sufficiently stated a cause of action in a separate substantive count. *Id.* at 849 & n.5. Such consideration is permissible so long as the issue at hand is not the absence of an essential element of the offense. *Id.* Where, as here, the language provides additional facts to illustrate the elements of conspiracy which have been explicitly stated in paragraph 17, the Court will consider it.

In paragraph 42, the Indictment alleges that Elbaz, "for the purpose of executing . . . the scheme to defraud, knowingly caused to be transmitted by means of wire communications in interstate commerce" three specific communications to victims in Maryland. Indictment ¶ 42. It does not matter that these wires were not necessarily themselves fraudulent in nature. In *Day*, the defendant was convicted of wire fraud, conspiracy to commit wire fraud, and other offenses relating to a scheme to defraud the Department of Defense by supplying defective spare parts for military equipment. *Day*, 700 F.3d at 716. The Fourth Circuit held that emails sent by the defendant's co-conspirators to government officials located in Virginia constituted overt acts sufficient to establish venue. *Id.* at 727. In so ruling, the court rejected the argument that the specific overt acts were "*de minimis* in context" and "completely legal," because the relevant question is whether an overt act furthers a conspiracy, not how much the overt act furthers the conspiracy. *Id.*

Here, as in *Day*, the Indictment does not allege that the identified communications with the victims in the District of Maryland included fraudulent statements, or that Elbaz was the sender or recipient of the wire communication. But where these wire communications were alleged to have been caused by Elbaz in order to further the conspiracy to defraud investors, *see* Indictment ¶ 42, they sufficiently allege an overt act that, under *Day*, establishes venue in Maryland. *Day*, 700 F.3d at 727. In light of such allegations, Elbaz's citation to unpublished

district court cases in which the court assessed whether such an overt act was alleged in the indictment does not alter the Court's conclusion. *See United States v. Jones*, No. 7:16-cf-30026, 2017 WL 1169754, at \*2-3 (W.D. Va. Mar. 27, 2017); *United States v. Shusterman*, No. WDQ-13-0460, 2014 WL 6835161, at \*3-5 (D. Md. Dec. 2, 2014).

To the extent that Elbaz argues that the Indictment must allege facts showing that such overt acts were caused by or reasonably foreseeable to Elbaz, the Indictment's allegations that Representatives of BinaryBook and BigOption worked under Elbaz's supervision, and that she trained and encouraged them to use false claims in order to increase investor deposits, are sufficient to support such a conclusion. Where Elbaz is alleged to have been part of the conspiracy, and a member of a conspiracy is responsible for the acts of others in furtherance of the conspiracy, *see Singh*, 518 F.3d at 253, she would still be responsible for wires sent by others in furtherance of the conspiracy, even if she was not specifically aware of or directly involved in their transmission. Therefore, the Court finds that venue for Count One has been sufficiently pleaded.

As for the substantive counts, Counts Two, Three, and Four, wire fraud is a "continuing offense," such that venue on a substantive wire fraud count is established when the defendant causes a wire communication to be transmitted in furtherance of the fraud. *United States v. Ebersole*, 411 F.3d 517, 527 (4th Cir. 2005). A wire transmittal occurs both "where it was sent and where it was received." *Id.*

Here, paragraph 42 alleges that Elbaz caused wires to be sent to Maryland for the purpose of executing a scheme to defraud. It does not matter that Elbaz was not the sender or recipient. *Ebersole*, 411 F.3d at 527. As discussed above, the allegations that Elbaz supervised and trained representatives to make false statements in order to induce more investor deposits supports the

allegation that she either caused or aided and abetted the sending of these wires for the stated purpose. The Court thus finds that venue for the substantive wire fraud counts has been sufficiently pleaded.

## II.    Motion to Strike

Elbaz has filed a Motion to Strike Paragraph 10 of the Indictment, which states:

> While some binary options were listed on registered exchanges or traded on a designated contract market that were subject to oversight by U.S. regulators such as the Securities and Exchange Commission and the Commodities Futures Trading Commission, neither BinaryBook nor BigOption sold binary options that were traded on a legal and regulated designated contract market in the United States.

Indictment ¶ 10. Elbaz argues that paragraph 10 has no probative value for Count One of the Indictment, is disconnected from Counts Two, Three, and Four, and risks prejudicing jurors against her. Elbaz argues that the allegation in paragraph 10 is unrelated to whether she entered into a conspiracy to commit wire fraud and does not help the Government prove that Elbaz committed wire fraud or aided and abetted the commission of wire fraud. Elbaz further argues that the Government only included paragraph 10 to trigger a negative reaction by the jury by implying that Elbaz's companies should have been registered with U.S. regulators.

Under Federal Rule of Criminal Procedure 7(d), courts "may strike surplusage from the indictment." Fed. R. Crim. P. 7(d). Courts should grant motions to strike surplusage "only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *United States v. Williams*, 445 F.3d 724, 733 (4th Cir. 2006) (quoting *United States v. Rezaq*, 134 F.3d 1121, 1134 (D.C. Cir. 1998)). A court can avoid any potential prejudice by not giving the indictment to the jury and specifically instructing the jury that the indictment is not evidence. *Williams*, 445 F.3d at 734.

26

The Court finds that Elbaz has failed to establish that the allegations are irrelevant. The Government asserts that paragraph 10 was included because the fact that the binary options sold by BinaryBook and BigOption should have been, but were not, listed on registered exchanges or traded on a designated contract market regulated by the SEC arguably made it more likely that there was a scheme to defraud, because a decision not to meet such a requirement may tend to reveal an intent to evade detection of the fraudulent scheme by federal authorities, and may also tend to increase the likelihood of the success of the fraud based on a lack of regulatory oversight. Although there may be other potential inferences from these facts, there is nothing impermissible about these inferences.

The allegations in paragraph 10 are neither inflammatory nor unduly prejudicial, where the failure to meet a regulatory requirement is far less inflammatory than the primary allegation of defrauding investors. Notably, in *Williams*, the court refused to strike from an indictment for a felon-in-possession charge the significantly more inflammatory allegation that the defendant was responsible for an uncharged murder. *Williams*, 445 F.3d at 733-34. The Fourth Circuit found that evidence of the uncharged murder was not unfairly prejudicial, was probative of the charged offense, and was mitigated by the fact that the jury was instructed to consider the evidence for the limited purpose of showing that the defendant possessed the firearm. *Id.*

As trial approaches, Elbaz is free to argue that the Indictment should not be shared with the jury, or to propose a limiting instruction to prevent the jury from drawing any inappropriate inferences from paragraph 10. As for the pending Motion, however, the Court will deny the Motion to Strike because paragraph 10 is relevant and not unduly prejudicial.

## III. Bill of Particulars

Elbaz seeks a bill of particulars on the grounds that because of the alleged deficiencies in the Indictment, and the Government's production of 2.5 million pages of discovery, more information is needed to allow her to prepare her defense. She requests that the bill of particulars include four classes of information. First, Elbaz seeks the identities of the individuals referenced in the Indictment as having performed acts in furtherance of the conspiracy, such as the Representatives who engaged in the three charged wire transmissions. Second, Elbaz seeks the identities of the alleged victims of the offense. Third, Elbaz seeks identification of the allegedly fraudulent statements that Elbaz made or caused to be made in furtherance of the scheme. Fourth, Elbaz seeks the identification of the location where the conspiratorial agreement was entered and of any overt acts in furtherance of the conspiracy committed in Maryland, in order to assess whether venue is proper.

The Federal Rules of Criminal Procedure require that the "indictment . . . be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). The defendant may "move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits." Fed. R. Crim. P. 7(f). "The purpose of a bill of particulars is to enable a defendant to obtain sufficient information on the nature of the charge against him so that he may prepare for trial, minimize the danger of surprise at trial, and enable him to plead his acquittal or conviction in bar of another prosecution for the same offense." *United States v. Schembari*, 484 F.2d 931, 935 (4th Cir. 1973). However, "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Medical Labs, Inc.*, 770 F.2d 399, 405 (4th Cir. 1985).

As to the first request, the Indictment does not identify Elbaz's co-conspirators except through pseudonyms. As discussed above, a conspiracy indictment does not need to name all co-conspirators because it is "the existence of the conspiracy, rather than the particular identity of the conspirators" that is the essential element of the crime. *Am. Waste Fibers Co., Inc.*, 809 F.2d at 1046. But where specific individual co-conspirators are referenced in the Indictment in relation to specific acts, including the substantive wire fraud counts, Elbaz would be unable to prepare her defense without knowing who these individuals are. The Government asserts that many of these individuals have already been identified through its voluminous document production. Although the Government has produced a smaller collection of documents specifically referenced in the Indictment and contends that those documents reveal the identities of most, but not all, of the Managers and Representatives referenced in the Indictment, Elbaz still asserts that she is not certain of the identities of some of these co-conspirators.

In a Supplement to the Government's Response to the Defendant's Motion for a Bill of Particulars, ECF No. 82, the Government reports that it has provided Elbaz with a key identifying the Managers and Representatives referenced in the Indictment. Based on this representation, the Court finds that there is no need for a Bill of Particulars on this point and will deny the Motion on this issue. *See United States v. Urban*, 404 F.3d 754, 772 (3d Cir. 2005) (noting that access to materials through discovery weakens the argument for a bill of particulars). If Elbaz disagrees that the identities of these alleged co-conspirators have been produced, it may renew its motion on this point.

Second, as to the identity of victims, the scheme as described in the Indictment may have had a very significant number of victims. The Government need not identify them all. *See Butler v. United States*, 317 F.3d 249, 256 (8th Cir. 1963). However, where the Indictment

29

specifically references three victims in Maryland, Elbaz should have those names in order to prepare her defense. In the absence of safety concerns, the Court will require the Government to state the names of Victims A, B, and C referenced in the Indictment. *See United States v. Magalnik*, 160 F. Supp. 3d 909, 918 (W.D. Va. 2015) (in a case charging the crime of harboring aliens illegally, requiring a bill of particulars stating the names of all foreign nationals allegedly harbored illegally).

Third, as to false statements made or caused to be made by Elbaz, the voluminous discovery makes it difficult for the defense to identify which statements by Elbaz will be at issue at trial. In *Magalnik*, the court ordered the Government to file a bill of particulars to list the specific documents out of 4,125 pages that "it intends to introduce at trial and explain[], in general terms, how each application is believed to be false or fraudulent." *Id.* In its Supplement, the Government reports that it has provided an index identifying all emails sent by Elbaz that have been produced, as well as two recorded statements. It has not reported how many emails are listed on that index. Although such disclosures are consistent with the discovery requirements of Rule 16, they do not address Elbaz's specific request for identification of the false statements made by or caused by Elbaz in furtherance of the wire fraud.

Given the volume of discovery and the broad time frame of the alleged conspiracy, the Court concludes that a bill of particulars is warranted. Although the Court will not require the Government to identify all false statements caused by Elbaz, it will direct the Government to include in its bill of particulars a list of the allegedly false statements made directly by Elbaz, if any, that it intends to introduce at trial, including the date of the statement and the person to whom it was made. *United States v. Rogers*, 617 F. Supp. 1024, 1029 (D. Colo. 1985) (requiring a bill of particulars on the allegedly false statements made by defendants).

Fourth, Elbaz's identification in a bill of particulars of overt acts performed in Maryland is not necessary. The Court has already determined, based on the facts alleged in the Indictment, that venue is proper.

## CONCLUSION

For the foregoing reasons, Elbaz's Motions to Dismiss are DENIED, the Motion to Strike is DENIED, and the Motion for a Bill of Particulars is GRANTED IN PART and DENIED IN PART. A separate Order shall issue.

Date:   September 7, 2018

THEODORE D. CHUANG
United States District Judge