IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *   Case No. 8:18-cr-00157-TDC |
| | * |
| LEE ELBAZ, | * |
| | * |
| | * |
| | * |
| | * |
| | * |

**MEMORANDUM OF DEFENDANT LEE ELBAZ IN RESPONSE TO THE
COURT'S ORDER CONCERNING INADVERTENT DISCLOSURE**

Defendant Lee Elbaz ("Ms. Elbaz") respectfully submits this memorandum in response to the Court's December 14, 2018 order regarding the Government Filter Team's putative inadvertent disclosure of privileged material to government counsel responsible for investigating Ms. Elbaz (the "Prosecution Team"). For reasons explained herein, given the Filter Team's unsatisfactory explanation of its privilege review process and how the inadvertent disclosure occurred, an evidentiary hearing is necessary to determine whether the Filter Team's review procedures adequately safeguarded Ms. Elbaz's rights.

**BACKGROUND**

On December 6, 2018, the Filter Team alerted Ms. Elbaz that privileged documents were inadvertently made "accessible" to the Prosecution Team. (*See* ECF 110, Ex. D (Ltr. from D. Stier to J. Chun, dated Dec. 6, 2018.)) Specifically, the Filter Team revealed that approximately 10,000 privileged documents had been made accessible to the Prosecution Team and that members of the Prosecution Team had "viewed" or "clicked on" at least twelve privileged documents. (*Id.* at 1.)

1

Of particular concern are "viewed" documents involving counsel from Orrick, Ms. Elbaz's former defense counsel, which discuss Ms. Elbaz, the investigations of the binary options market, and legal strategy. These documents are clearly protected by attorney-client privilege and attorney work product protections, and their inadvertent disclosure raises serious concerns about the review protocol used by the Filter Team. The Filter Team does not provide adequate explanation that the methods employed by the Filter Team have sufficiently protected Ms. Elbaz's rights, including her Sixth Amendment right to counsel. As such, Ms. Elbaz respectfully requests that the Court schedule an evidentiary hearing to examine the adequacy of the Filter Team's review protocol and to determine the full nature and extent of any prejudice to Ms. Elbaz resulting from this inadvertent production of privileged documents.

## ARGUMENT

### I. AN EVIDENTIARY HEARING IS WARRANTED TO EXAMINE THE ADEQUACY OF THE FILTER TEAM'S REVIEW PROTOCOL

Given the Filter Team's unsatisfactory explanation of its privilege review process and how the inadvertent disclosure occurred, an evidentiary hearing is necessary to determine whether the Filter Team's review procedures adequately safeguarded Ms. Elbaz's rights. "Whether an evidentiary hearing is necessary is left to the sound discretion of the district court judge." *Dukes v. United States*, No. CIV. RWT 09-135, 2010 WL 152048, at *1 (D. Md. Jan. 13, 2010). And when, as here, questions arise regarding the inadvertent disclosure of privileged and/or confidential documents, courts often exercise their discretion to hold a hearing, taking time to examine these critical issues closely. *See, e.g., United States v. Bundy*, No. 3:16-CR-00051-BR, 2016 WL 8856696, at *1 (D. Or. Sept. 14, 2016) (holding evidentiary hearing so that the government could "explain how the inadvertent disclosure of nonresponsive evidence occurred"); *United States v. Koerber*, No. 2:09-CR-302 CW, 2011 WL 2174355, at *1 (D. Utah

June 2, 2011) (evidentiary hearing "on topics including the efforts [defendant and his attorneys] made to respond to the IRS subpoena and the steps they took to prevent inadvertent disclosure of attorney-client privileged documents in that production").

In this case, an evidentiary hearing is necessary to provide Ms. Elbaz and the Court with adequate insight into the Filter Team's processes and procedures, which presently remain too opaque to gauge their adequacy. In such circumstances, an evidentiary hearing is an appropriate preliminary remedy because it is tailored to address the lingering questions raised by the Filter Team's review protocol and inadvertent production, and it does not infringe on any government interests. *See United States v. Morrison*, 449 U.S. 361, 367–68 (1981) ("Cases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests."). Indeed, although explanations in the Filter Team's Memorandum address *some* questions raised by the inadvertent disclosure of privileged materials, serious questions remain unanswered.

**First**, the Filter Team has not identified what search terms it used to create the master list of "Potentially Privileged Material" or to filter the subset of "Other Potentially Privileged Material." ECF 110, at 2–3 (Mem. of the United States of America (Filter Team) In Response to Court's Ord. Concerning Inadvertent Disclosure at 2.) The Filter Team asserts that, to create the list of Potentially Privileged Material, key word searches were used "to isolate communications involving known attorneys or law firms and to segregate communications that could contain information or material subject to a claim of attorney-client privilege or work-product protection," but in doing so provides no insight on *what* key words were used, *how* this list was created, and *what procedure* was employed to determine whether documents pinging those terms

would or could be subject to privilege or work-product claims. (ECF 110 at 2.) Similarly, the Filter Team also failed to provide the search terms used to filter the "Other Potentially Privileged Material" subset. Such information is vital to understanding the adequacy of the Filter Team's protocol because, based on the Filter Team's description of its process, it appears that if a document did not hit any search terms for either the "Potentially Privileged Material" or "Other Potentially Privileged Material," the document was produced to the Prosecution Team with no further review. If the Filter Team's search terms did not include any of Ms. Elbaz's former counsel, for example, this procedure would be woefully inadequate to prevent privileged information from reaching the Prosecution Team. And this concern is not unfounded, given that emails containing the names and email addresses of Ms. Elbaz's former attorneys at Orrick are among those documents that were inadvertently produced.

**Second**, the Filter Team does not fully explain what data fields these search terms were run through (*e.g.*, full text and meta-data fields; if both, what meta-data fields). No such information is provided for the creation of the master "Potentially Privileged Materials" list or the filtering of the "Other Potentially Privileged Materials" subset. Moreover, although the Filter Team provides certain information about the filtering used to create the "Elbaz Potentially Privileged Materials," such information reveals that the Filter Team's procedures were highly truncated. According to the Filter Team, they apparently only searched "to" and "from" data fields to identify privileged materials directly involving Ms. Elbaz, ECF 110 at 2, but such search strategy would likely miss privileged emails where Ms. Elbaz was a participant further down in the email chain or referenced in the body of the email.

**Third**, it is unclear from the Filter Team's Memorandum when it decided to run Hebrew search terms across the document collection. (*See* ECF 110 at 4, n.3.) As a threshold matter, it

4

54

is troubling that the Filter Team describes its use of Hebrew search terms as being done only "out of an abundance of caution," when such terms ought to have been part of its review plan as a matter of course, given the Government's knowledge that Ms. Elbaz lived and worked in Israel, and thus regularly communicated in Hebrew. Indeed, it is unclear from the Filter Team's memorandum whether it employed Hebrew search terms at the outset of its review or whether these terms were only used later after the Filter Team learned of problems with its review. If the Filter Team used Hebrew search terms only after learning of inadvertent disclosures, its review protocol would be plainly deficient in protecting Ms. Elbaz's rights, and Ms. Elbaz is entitled to know whether any similar inadvertent disclosures could have occurred.

Furthermore, although the Filter Team claims that "its procedures were described in a letter" to Ms. Elbaz's counsel (ECF 110 at 2), that letter does little more than inform counsel that the Filter Team is reviewing "various accounts from Google for communications with attorneys that were sent or received by Ms. Elbaz." (ECF 110, Ex. A (Ltr. from D. Stier to A. Spiro, dated July 6, 2018).) It provides no detail about how the review occurred or what safeguards were in place to ensure that privileged material did not reach the Prosecution Team. (*See id.*) Rather, the Filter Team simply declared that it "reviewed these documents to determine whether they were protected by the attorney-client privilege or the work product doctrine." (ECF 110 at 2.)

In short, these lingering questions regarding the methods and means used by the Filter Team raise serious concerns about the fundamental fairness of their review. That is important because courts give "at least some consideration to the taint team's effect on the 'appearance of fairness.'" *United States v. Jackson*, No. CR.A.07-0035(RWR), 2007 WL 3230140, at *5 (D.D.C. Oct. 30, 2007) (internal citation omitted); *see also United States v. Neill*, 952 F. Supp. 834, 841 n.14 (D.D.C. 1997) ("there is no doubt that, at the very least, the 'taint team'

procedures create an appearance of unfairness"); *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) ("The appearance of Justice must be served. . . . It is a great leap of faith to expect that members of the general public would believe that any such Chinese wall would be impenetrable; this notwithstanding our own trust in the honor of an AUSA."). The lack of transparency into the Filter Team's review process is particularly concerning where Ms. Elbaz's communications with counsel are entitled to the presumption of privilege. *See United States v. Pedersen*, No. 3:12-CR-00431-HA, 2014 WL 3871197, at *31 (D. Or. Aug. 6, 2014) (recommending that filter team guidelines "should forbid the intentional review of any presumptively privileged materials," including "any private communication between a defendant and members of his or her current or former legal teams").

In short, the Filter Team's explanations of its procedures and protocols for what search terms were run and when, how it filtered "Other Potentially Privileged Material," and how it determined whether documents were protected by attorney-client privilege or the work-product doctrine are not satisfactory. An evidentiary hearing is therefore required to determine whether the Filter Team adequately performed its duties.

## II. AN EVIDENTIARY HEARING IS WARRANTED TO DETERMINE THE EXTENT OF PREJUDICE CAUSED BY THE INADVERTENT DISCLOSURE OF PRIVILEGED MATERIAL

An evidentiary hearing is also warranted to determine what level of prejudice has been caused to Ms. Elbaz as a result of the Filter Team's inadvertent production.

"The paramount purpose of a taint team is to prevent the disclosure of privileged information to the government and to protect the attorney-client privilege." *Pedersen*, 2014 WL 3871197, at *29 (internal citation omitted). This is so because "if an investigating officer or a prosecutor receives a defendant's confidential trial strategy, the probability of prejudice from a Sixth Amendment violation is much higher than with other types of state intrusions into the

attorney-client relationship." *State v. Bain*, 292 Neb. 398, 412, 872 N.W.2d 777, 787 (2016); *see also Briggs v. Goodwin,* 698 F.2d 486, 494–95 (D.C. Cir. 1983), *vacated on other grounds* 712 F.2d 1444 (D.C. Cir. 1983) ("Mere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant.").

Indeed, a Sixth Amendment violation occurs when a defendant "suffers substantial prejudice [from the disclosure of privileged communications], such as where . . . the prosecution obtains the defense plans and strategy . . . ." *United States v. SDI Future Health, Inc.*, 464 F. Supp. 2d 1027, 1048 (D. Nev. 2006).  When determining whether an invasion of the attorney-client privilege has violated the Sixth Amendment, courts consider factors including:

> (1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was a result of other inadvertent occurrences; (2) whether the government obtained, directly or indirectly, any evidence which was used at trial as a result of the informant's intrusion; (3) whether any other information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and finally, (4) whether the details about trial preparation were learned by the government.

*United States v. Brugman,* 655 F.2d 540, 546 (4th Cir. 1981).  Here, given the vague information provided by the Filter Team regarding the inadvertent disclosure, it is impossible to determine to what extent Ms. Elbaz has been prejudiced by the Prosecution Team's learning details of her trial strategy.

As an initial matter, the Filter Team's explanation for the number of privileged documents that were "viewed" on its review platform is not satisfying.  (*See* ECF 110 at 5, n.6.) Although the Government explains that a document is "viewed" when it is "opened," the undersigned's understanding of review tools is that a document can be viewed on a review platform even without "opening" it, and, therefore, the Government may be understating the

number of privileged documents that were visible and reviewable by investigators (who could see the document on their monitors by clicking over to it, but without clicking on it to "open" it in a separate viewing pane) and the potential prejudice to Ms. Elbaz.

This issue is not merely an academic exercise, especially because it appears that a substantial number of privileged documents sent to or from Ms. Elbaz were provided to the prosecution, on top of thousands of putatively third party privileged documents. Of the 10,416 documents that the Filter Team believes were accessible to the Prosecution Team, approximately 9,500 were "Other Potentially Privileged Materials," meaning that approximately 1,000 documents were potentially privileged documents sent to or received by Ms. Elbaz (which the Government refers to as "Elbaz Potentially Privileged Materials"). (*See id.* at 6, n.7 ("The Filter Team also determined that a number of the documents were Other Potentially Privileged Materials and therefore also inadvertently produced to the Defendant. The Filter Team provided a list of those documents, around 9,500, and requested that the Defendant segregate them.").) Based on the explanation offered, it is not clear how many of the more than 10,000 privileged documents could have been visible to members of the Prosecution Team even if they did not technically "open" them on their computers, thus exposing Ms. Elbaz to additional prejudice. At an evidentiary hearing, the Government should be required to produce the testimony of its technical advisor to clearly explain the methods it used in determining the number of privileged documents that were "viewed" and whether other privileged documents were visible in any other way to government investigators.[1]

---

[1] As another example of the critical importance of this issue, consider the fact that among the Potentially Privileged Documents available to the Prosecution Team was a memorandum sent to Ms. Elbaz's counsel at Orrick from cooperating-counsel in Israel that contained specific responses to false accusations and/or erroneous statements of fact in the original Complaint filed in this action. (*See* DOJ-ELBAZ-0001666439.)

Moreover, it is not clear who comprised the so-called "Prosecution Team" and whether any of the inadvertently produced materials were visible to *other* individuals who nonetheless had access to and/or input (either directly or indirectly) on the development of Ms. Elbaz's case or related prosecutions. The Filter Team's memorandum of law indicates that the privileged documents were accessible to investigators apart from the Prosecution Team but does not identify everyone who had such access. The Filter Team asserts that no member of the Prosecution Team reads Hebrew, but what about other members of the broader team investigating binary options who had access to these privileged documents and could have been in a position to communicate their contents to the Prosecution Team either directly or indirectly? The Filter Team should be required to identify all investigative personnel who accessed the privileged documents, the dates on which they accessed the documents, their roles in the case, and whether the substance of their review of the privileged documents was communicated either directly or indirectly to the Prosecution Team.

What is more, the review of the documents known to have been accessed by the Prosecution Team created prejudice to Ms. Elbaz. While Ms. Elbaz is continuing to review these materials (23 documents in total, 11 of which were identified for the first time in the Government's submission yesterday, and 8 of which the Government previously asserted were subject to a third party privilege until yesterday),[2] of particular concern are the two documents with the subject line "Lee Elbaz – Common Interest Communication" that include communications from Ms. Elbaz's former counsel at Orrick to Israeli counsel. (*See* DOJ-

---

[2] The Filter Team also produced for the first time yesterday a full log of the 10,416 privileged documents.

ELBAZ-0001666632; DOJ-ELBAZ-0001666654 (ECF 110, Ex. G-6, G-7).)[3] These communications are clearly covered not only by attorney-client privilege but also but work-product productions. *See In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir. 2003) ("When the attorney-client privilege applies, 'it affords confidential communications between lawyer and client complete protection from disclosure.'") (internal citation omitted); *Black & Decker Corp. v. United States*, 219 F.R.D. 87, 91 (D. Md. 2003) ("The work product doctrine protects from disclosure documents 'prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative.'") (citing Fed. R. Civ. P. 26(b)(3)); *see also United States v. Nobles*, 422 U.S. 225, 236–38 (1975) (applying the work-product doctrine to criminal litigation).

The Filter Team admits that these documents were reviewed, at the very least, by one prosecutor assigned to the Government's binary options investigation. While the Filter Team contends that there is no prejudice to Ms. Elbaz because the prosecutor does not read or speak Hebrew, this position ignores the fact that the vital communications detailing Ms. Elbaz's former counsel's litigation strategy are in English. These communications "reflect[] an attorney's thoughts, such as impressions, theories, or conclusions" and are clearly protected from disclosure by the work-product doctrine. *Koch v. Specialized Care Servs., Inc.*, 437 F. Supp. 2d 362, 384 (D. Md. 2005) (internal citations and quotations omitted). Any access to these

---

[3] In its December 6, 2018 correspondence, the Filter Team identified an attachment to an inadvertently disclosed and reviewed Orrick communication. (*See* ECF 110, Ex. D at 1–2, n.1.) While the Filter Team claims this attachment was not viewed by anyone on the Investigative Team, it is not clear who comprised the so-called Investigative Team, whether this team is distinct from the Prosecution Team, and whether the substance of the attachment was reviewed by any non-Filter Team members. The attachment outlines Ms. Elbaz's former counsel's specific investigative work strategy, is highly prejudicial, and further demonstrates why an evidentiary hearing is necessary to resolve these unanswered questions. While the Filter Team did not provide this document with its submission, the undersigned will provide it for *in camera* review should the Court request.

10

privileged and confidential documents by non-Filter Team members is highly prejudicial to Ms. Elbaz. *See Brugman*, 655 F.2d at 546 (Sixth Amendment violation may occur when "details about trial preparation were learned by the government").

Although no Prosecution Team members may personally have "accessed" this privileged material on the document review platform, the Filter Team has not provided a sufficient explanation about what, if anything, happened to this privileged information after it was accessed by non-Filter Team members. The same concerns apply to the other privileged materials that were accessed by Prosecution Team members, including a paralegal and the Fraud Unit's Assistant Chief, Tracee Plowell. The Filter Team's assertion that these documents "do not appear to involve the solicitation or provision of legal advice and therefore do not appear to be privileged" provides little comfort when Ms. Elbaz has no visibility into the Filter Team's process, including how the Filter Team determined whether communications with attorneys were privileged. (ECF 110 at 15.) Thus, an evidentiary hearing is necessary to determine what prejudice has occurred as a result of the Filter Team's inadvertent disclosure.

Finally, an evidentiary hearing is also appropriate given that the Government questions that certain materials at issue here are covered by the "common interest" privilege. (ECF 110 at 15 (referring to Exs. G-6, 7 & H-6, 7 (email chains involving attorneys from both Orrick and Israeli law firms).) This privilege, an extension of the attorney-client privilege, "allows persons with a common interest in litigation to communicate with their attorneys and with each other without waiving the attorney-client privilege." *Prowess, Inc. v. Raysearch Labs. AB*, No. CIV. WDQ-11-1357, 2013 WL 509021, at *5 (D. Md. Feb. 11, 2013) (citing *In re Grand Jury Subpoenas 89–3 & 89–4*, 902 F.2d 244, 249 (4th Cir. 2005)). "[A] proponent of the joint defense/common interest privilege must establish that

11

*when* communications were shared among individuals with common legal interests, the act of sharing was part of an ongoing common legal enterprise." *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 416 (D. Md. 2005) (internal citation and quotations omitted). Here, the Defendant was in common interest with Yukom and Linkopia, including in October 2017, and her attorneys and those representing Yukom and Linkopia were, at least at that point, "sharing [information as] part of an ongoing common legal enterprise," with all involved sharing the "common legal interest[ ]" of avoiding criminal convictions under U.S. law related to their work in binary options. (*Id.*) Should the Government continue to dispute that reality (which should be plain to the prosecutors given their purported knowledge of the relevant facts in this matter), Ms. Elbaz stands ready to present evidence to the Court in order to establish this privilege's applicability.

## CONCLUSION

For the foregoing reasons, Ms. Elbaz respectfully request that this Court exercise its discretion to conduct an evidentiary hearing into the adequacy of the Filter Team's review protocol and any prejudice resulting from the inadvertent disclosure.

Date:  December 18, 2018

Respectfully submitted,

_____
Alex Spiro
John Chun
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000

*Counsel for Defendant Lee Elbaz*

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 18, 2018, I caused to be electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will notify counsel for the government of the filing.

_____
John Chun