# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| |
|---|
| UNITED STATES OF AMERICA |
| v. |
| LEE ELBAZ, |
| Defendant. |

Criminal Action No. TDC-18-0157

## MEMORANDUM OPINION

Defendant Lee Elbaz is charged with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and three counts of wire fraud, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2. Presently pending before the Court is Elbaz's Motion to Dismiss the Indictment or, in the Alternative, to Disqualify the Prosecution Team. After briefing, the Court held a hearing on the Motion on May 9, 2019. The parties then submitted supplemental briefing. At the Court's request, the Government filed affidavits from certain members of the Prosecution Team providing specific facts relevant to the Motion. For the reasons set forth below, the Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Relevant factual and procedural background information is recounted in the Court's September 10, 2018 Memorandum Opinion. *United States v. Elbaz*, 332 F. Supp. 3d 960, 966–67 (D. Md. 2018). Additional facts and procedural history specific to the Motion are provided below.

## I.     The Filter Process

In conducting its investigation into the binary options industry, the Government has obtained millions of documents relevant to their inquiry pursuant to search warrants and other

authorized means. Since it was understood that some of these documents may be protected under the attorney-client or another privilege, the Government established a team of attorneys and personnel from the United States Department of Justice ("DOJ") and special agents and other personnel of the Federal Bureau of Investigation ("FBI") (collectively, the "Filter Team"), to identify and separate the privileged materials from the nonprivileged materials before providing any of the documents to the DOJ attorneys and FBI special agents who have investigated the binary options markets and would prosecute Elbaz and other individuals involved in the alleged fraud (the "Prosecution Team"). After a tranche of documents completed the filter process, nonprivileged documents were provided to the Prosecution Team. Any potentially privileged documents identified in the filter process for which Elbaz held the privilege or was a recipient of the communication were provided to Elbaz and her attorneys. Any documents for which Elbaz did not hold the privilege and was not a party to the conversation were catalogued on a privilege log, which was then provided to Elbaz's counsel.

The process to separate privileged from nonprivileged material was designed to work in the following manner. After a set of documents was received by the Government, pursuant to a search warrant, subpoena, or otherwise, the Filter Team would take the original media on which the documents were produced, apply search terms to separate out all potentially privileged materials, and then release the remaining files to an FBI database accessible to FBI members of the Prosecution Team. The nonprivileged materials would then be copied from the FBI database to the DOJ's document database, which was housed on a platform named Relativity (the "Relativity database"), where they would be accessible to the DOJ members of the Prosecution Team. Meanwhile, documents separated out as potentially privileged based on the search terms

would be reviewed by the Filter Team and, if deemed nonprivileged, made available for review by the Prosecution Team.

Once discovery to Elbaz began pursuant to Federal Rule of Criminal Procedure 16, the Prosecution Team produced the nonprivileged documents to Elbaz after applying certain search terms to ensure that the documents were relevant to her case. The Prosecution Team did not manually review the documents before production, because, according to the Government, the volume was too large for it to both review each document and produce the files to Elbaz in accordance with the discovery schedule.

## II.    Failures in the Filter Process

In January 2018, the Government received one hard drive containing documents produced by the company Google pursuant to a search warrant (the "Google Hard Drive"). In the same time frame, it also received materials seized from the onsite execution of a search warrant at the company Spot Option in Israel, including the contents of a laptop belonging to the Chief Financial Officer of BinaryBook and related entities (the "Spot Option Hard Drive"). The Google Hard Drive was subjected to the standard protocol of applying search terms and uploading nonprivileged documents onto the FBI database. However, in June 2018, the Prosecution Team requested that the original Google Hard Drive, which contained the original documents prior to any filtering for privilege, be sent to the Prosecution Team to be processed for production to Elbaz and to be uploaded to the Relativity database. This transfer occurred at the direction of one of the trial attorneys on the Prosecution Team, who understood that an FBI review of the Google Hard Drive contents would not be complete before the agreed-upon discovery deadline and sought the original materials so they could be produced to Elbaz by that date. Although the FBI informed the

Prosecution Team in an email that the materials were unfiltered and could contain potentially privileged materials, the attorney failed to review the email carefully enough to recognize that fact.

As for the Spot Option Hard Drive, although most of the contents were subjected to the filter process, the contents of the BinaryBook laptop ("the Laptop Image") were not, because the Prosecution Team inferred, based on information received from the FBI, that it contained only financial information. Thus, in order for the Laptop Image to be produced in discovery before the agreed-upon discovery deadline, the Prosecution Team did not request that it undergo filtering before it was made available to the Prosecution Team in the Relativity database and to Elbaz. As a result, the unfiltered contents of the Google Hard Drive and the Laptop Image, consisting of approximately 20,000 documents, were uploaded to the Relativity database, with the result that the Prosecution Team had access to potentially privileged documents from the Google Hard Drive beginning in July 2018 and from the Laptop Image beginning in September 2018. Because relevant documents from these sources were copied and forwarded to Elbaz's counsel in discovery, Elbaz had access to the same potentially privileged documents, even though she did not hold a privilege in all of them. This mistake — uploading unfiltered materials to the Relativity database — occurred out of an effort to provide Rule 16 discovery in accordance with the agreed-upon schedule and out of a belief that the Laptop Image did not contain potentially privileged communications.

The Government did not realize that the Prosecution Team had access to these thousands of potentially privileged materials until approximately December 6, 2018. When it did, the Filter Team immediately informed Elbaz's counsel and suspended the Prosecution Team's access to the potentially privileged documents. The potentially privileged materials, however, had been accessible to the Prosecution Team for a period of approximately five months.

4

The Relativity database has an audit function whereby the Filter Team was able to identify which of the thousands of potentially privileged materials had actually been viewed, printed, or both by a member of the Prosecution Team. While the Relativity database does allow for documents to be "previewed" in a way that does not leave an electronic record of access to them, that feature was used by only one paralegal to locate documents other members of the Prosecution Team had previously identified, and any documents that were printed after review using the preview function would have been captured in the audit. Using the audit function, the Filter Team determined that members of the Prosecution Team accessed a total of 41 potentially privileged documents from the hard drives, constituting 22 unique documents or email chains.

After identifying the privilege issue, the Filter Team undertook a comprehensive review and discovered that the Prosecution Team had been granted access to additional materials that had not been screened for privilege. After Elbaz's arrest in September 2017, her cell phone was seized and later searched, and texts from the WhatsApp text message application were downloaded as part of that search. Although these text messages were never filtered for privilege, they were made available to the Prosecution Team. In their review, the Filter Team identified 10 WhatsApp chats as potentially privileged. Because the chats were not housed in the Relativity database due to incompatibility of file formats, no audit function exists to determine if any member of the Prosecution Team viewed or reviewed these chats. The Filter Team has therefore presumed that a member of the Prosecution Team has viewed them for purposes of this Motion.

The Filter Team also discovered that certain summary and full translations of material in Hebrew had not been filtered for privilege and contained potentially privileged information. Many documents obtained by the Government in the course of its investigation are in Hebrew. Although the emails in Hebrew generally contained English fields for the sender, recipient, and subject lines

to which the filter search terms were applied, the FBI database, where the filter terms were applied initially, did not have the capability to run search terms on the Hebrew text. Some documents in Hebrew were selected based on the English headings to be translated in summary or in full by an FBI linguist or outside vendor but were never subsequently filtered for privilege. In their recent review, the Filter Team identified 58 summary translations and five full translations that contain potentially privileged information. Like the WhatsApp chats, the translations were not stored in the Relativity database such that there is no electronic record of whether the Prosecution Team accessed these files. The Filter Team has presumed that the Prosecution Team viewed these translations for purposes of this Motion.

Upon discovering each category of potentially privileged materials, the Filter Team removed the Prosecution's Team's access to those documents. In total, members of the Prosecution Team accessed or are presumed to have accessed 137 potentially privileged communications, 103 of which represent unique communications or conversations, once duplicates or near-duplicates are excluded.

## III. Procedural History

On December 6, 2018, the Government disclosed to Elbaz's counsel that members of the Prosecution Team had access to some potentially privileged materials. On December 14, 2018, defense counsel raised the issue to the Court as part of Elbaz's motion for a continuance of the trial, which at the time was set for early January 2019. The same day, the Court ordered the Filter Team to submit a filing to brief the Court regarding the matter. On December 17, 2018, the Filter Team submitted its filing, and on December 18, 2018, the Court granted Elbaz's motion to continue the trial on other grounds. The Filter Team sought leave to provide an additional submission to

the Court on this matter, which was filed on February 4, 2019. On February 19, 2019, Elbaz filed the pending Motion.

## DISCUSSION

In seeking dismissal of the Indictment or, alternatively, disqualification of the Prosecution Team, Elbaz argues that her Sixth Amendment right to counsel has been violated by the Government's possession of and access to the potentially privileged materials. At a minimum, Elbaz requests an evidentiary hearing on the grounds that since privileged documents were housed on the Relativity database and the Filter Team cannot identify with absolute certainty which were accessed when and by whom, an evidentiary hearing is required to ascertain the scope of the disclosures, the Government's intent, and any prejudice to Elbaz. Where the Government has submitted two detailed memoranda with attachments briefing the Court on this matter, filed a memorandum in Opposition to the Motion with attachments, responded to the Court's inquiries at a hearing, and provided detailed affidavits from members of the Prosecution Team in response to the Court's request, the Court finds that it has received extensive information about the Filter Team's process, the errors leading to the inadvertent disclosure of potentially privileged information, and the degree to which any such information was accessed by the Prosecution Team. Accordingly, the Court finds that no evidentiary hearing is necessary to determine the extent of the disclosure of potentially privileged materials, whether the Government acted intentionally, and whether there has been any prejudice to Elbaz.

In her Motion, Elbaz identifies two categories of documents relevant to her claim. The first consists of emails and attachments involving her prior trial counsel, Jonathan Lopez, which were sent or received by him in October 2017, after Elbaz's initial appearance in this case (the "Lopez Emails"). The second consists of documents listed in Exhibits 20 and 22 to her Motion,

which include emails and attachments from 2015 and 2016 that were circulated among Elbaz and other individuals affiliated with Yukom Communications ("Yukom") and Linkopia Mauritius, Ltd. ("Linkopia"), two companies alleged to be involved in the fraudulent scheme, and, occasionally, counsel for those companies (the "Yukom/Linkopia Documents"). Because the categories present different legal issues, the Court will address each in turn.

## I.    Sixth Amendment

Elbaz argues that the Prosecution Team's possession of and access to the Lopez Emails constitutes a violation of her Sixth Amendment right to counsel. The Government concedes that the Lopez Emails are protected by the attorney-client privilege, but it contends that no Sixth Amendment violation has occurred.

### A.    Legal Standard

The Sixth Amendment right to counsel is intended to protect a criminal defendant during "critical confrontations" with the government. *United States v. Payne*, 954 F.2d 199, 203 (4th Cir. 1992). For there to be a violation of that right, it has to have attached, which takes place "[o]nly at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* The Government filed a sealed criminal complaint on September 14, 2017 charging Elbaz with conspiracy to commit wire fraud and two substantive counts of wire fraud. That same day, Elbaz was detained and then arrested at John F. Kennedy International Airport in New York, where she had arrived on a flight from Tel Aviv, Israel. On September 20, 2017, Elbaz had her initial appearance on those charges and was released on conditions. On March 22, 2018, a federal grand jury returned a four-count Indictment against Elbaz asserting substantially the same charges. She was arraigned on the Indictment on March 27, 2018. Because Elbaz had been charged in the criminal complaint when

she had her initial appearance on September 20, 2017, the formal, adversarial criminal proceedings began, and her Sixth Amendment right to counsel attached, on that date. *See Rothgery v. Gillespie County*, 554 U.S. 191, 199 (2008) ("[T]he right to counsel attaches at the initial appearance before a judicial officer."); *Payne*, 954 F.2d at 203.

The Sixth Amendment right to counsel protects the right to effective assistance of counsel, and so, necessarily, the "privacy of communication with counsel." *United States v. Brugman*, 655 F.2d 540, 546 (4th Cir. 1981). Therefore, when the government gains insight into those private communications between attorney and client, through electronic surveillance, an informant, a cooperating co-defendant, or other means, that right may be violated under certain circumstances. *See Weatherford v. Bursey*, 429 U.S. 545, 550–52 (1977); *Brugman*, 655 F.2d at 545–46. There is no "*per se* rule that whenever conversations with counsel are overheard the Sixth Amendment is violated." *Brugman*, 655 F.2d at 546. The United States Court of Appeals for the Fourth Circuit has identified four factors that a court must consider when evaluating whether the government has violated the Sixth Amendment by invading the attorney-client relationship: (1) whether the government's intrusion was intentional "in order to garner confidential, privileged information," or whether it was inadvertent; (2) whether the government directly or indirectly obtained evidence through the intrusion that it later used at trial; (3) whether the information gleaned by the government from the intrusion was otherwise used to the "substantial detriment" of the defendant; and (4) whether the government learned the details of the defendant's "trial preparation." *Id.* In the Fourth Circuit, the defendant must put forward "some showing of prejudice" to succeed on a claim for a Sixth Amendment violation based on an invasion of the attorney-client relationship. *United States v. Chavez*, 902 F.2d 259, 266 (4th Cir. 1990); *see United States v. Jenkins*, 178 F.3d

1287, 1999 WL 285910, at *3 (4th Cir. 1999) (unpublished) (holding that it is not proper for a court to "presume that prejudice occurred" in the context of a Sixth Amendment violation).

The Fourth Circuit's requirement that prejudice be shown arguably differs from the rule followed in some other circuits. The United States Court of Appeals for the Tenth Circuit presumes that the defendant has been prejudiced when the defendant can establish that the government intentionally intruded on the attorney-client relationship without a "countervailing state interest," because such intentional conduct "must constitute a *per se* violation." *Shillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995). Similarly, the United States Court of Appeals for the Third Circuit has held that there is a *per se* violation of the Sixth Amendment where "there is a knowing violation of the attorney-client relationship and where confidential information is disclosed to the government." *United States v. Levy*, 577 F.2d 200, 208 (3d Cir. 1978); *see also State v. Lenarz*, 22 A.3d 536, 542 (Conn. 2011) (holding that there is a rebuttable presumption of prejudice when the prosecution reads "privileged materials containing trial strategy," even when the prosecutor's conduct is unintentional). Notably, the Third and Tenth Circuits find a *per se* Sixth Amendment violation only where the government intentionally or knowingly accessed the privileged communications at issue, a condition which, as discussed below, Elbaz has not established.

Nevertheless, the Fourth Circuit has made it abundantly clear that it follows no such *per se* rule that once a prosecutor possesses confidential attorney-client communications containing defense strategy, a violation of the Sixth Amendment has necessarily occurred without a further showing of prejudice to the defendant. In *United States v. Allen*, 491 F.3d 178 (4th Cir. 2007), to reduce the likelihood of mid-trial objections, the district court ordered that the defense prepare and provide to the government a memorandum specifying which prior convictions it intended to use

in impeaching a key witness and citing legal authority supporting the use of those convictions. *Id.* at 192. The district court ordered that the document not be shared with the specific Assistant United States Attorney who would conduct direct examination of that witness. *Id.* After reiterating that "some showing of prejudice is a necessary element of a Sixth Amendment claim," the Fourth Circuit found that since there was no "prejudice clear from the record, there was no Sixth Amendment violation," because the district court had screened the document from the prosecutor who examined the witness. *Id.* Similarly, in *Jenkins*, the prosecutor had received a videotape of a short, private conference between the defendant and his attorney that occurred prior to the defendant's interview with county law enforcement. *Jenkins*, 1999 WL 285910, at *1. Although the government conceded that the recording was improper, and the officers present at the interview invoked their Fifth Amendment privilege when their testimony was sought in connection with a suppression hearing, the Fourth Circuit held that there was no Sixth Amendment violation because the defendant had not shown prejudice, and it declined to presume that prejudice had occurred. *Id.* at *1, *3. While in both *Allen* and *Jenkins* the prosecution actually possessed privileged material relating to the case at issue, and in *Allen* the material related directly to trial preparation and strategy, the Fourth Circuit concluded that prejudice had to be, but was not, established. In light of this precedent, the Court declines Elbaz's invitation to find that a *per se* violation of the Sixth Amendment has occurred simply upon the Government's possession of attorney-client confidential information about trial preparation or strategy. *See Allen*, 491 F.3d at 192. Thus, Elbaz's Sixth Amendment rights were not necessarily violated when the Lopez Emails were made available to the Prosecution Team on the Relativity database. The Court will next inquire whether, pursuant to *Brugman* and *Allen*, Elbaz has established that she was prejudiced by the Prosecution Team's access to the Lopez Emails such that her Sixth Amendment rights were violated.

11

## B.     The Lopez Emails

Approximately 100 emails to and from Elbaz's former defense counsel, Lopez, were uploaded to the Relativity database and consequently made accessible to the Prosecution Team. The Relativity database's audit function showed that two of those documents, which contain communications made as part of a single email chain, were viewed by a member of the Prosecution Team who the Filter Team has designated "Non-Trial Team Prosecutor A" ("Prosecutor A"). The Lopez Emails identify two individuals of interest to the defense attorney for purposes of preparing Elbaz's defense.

Prosecutor A joined the Prosecution Team in August 2018 as part of the broader investigation of the binary options markets and focused on targets other than Elbaz. Prosecutor A was not a member of the team that investigated or will conduct the trial of Elbaz's case, was not involved in the preparation for Elbaz's trial, and is no longer involved in the binary options investigation in any capacity. In a Declaration, Prosecutor A has stated that she does not remember seeing the Lopez Emails or any emails to or from Elbaz's current or prior counsel, that at the time she did not know the names of Elbaz's attorneys, that she did not provide the Lopez Emails to other members of the Prosecution Team, and that she did not recall discussing with any member of the Prosecution Team any communications referencing attorneys. Prosecutor A came across the Lopez Emails during her review of documents relating to another previously known target in the binary options investigation, and based on the Relativity activity log, she spent at most 17 seconds reviewing the two Lopez Emails. Her only conversation about her access to the Lopez Emails with a member of the Prosecution Team occurred immediately after the Filter Team discovered that she had accessed the documents, when she informed a then-member of the Elbaz trial team that she did not recall reading emails that referred to Elbaz's counsel and that, at the

time, she did not even know the name of Elbaz's counsel. Prosecutor A has not had any discussions about the Lopez Emails with any of the new members of the Prosecution Team who will conduct the trial of Elbaz.

The two former and three current members of the Elbaz trial team have submitted declarations to the Court regarding Prosecutor A's access to the Lopez Emails. The attorney with whom Prosecutor A spoke after the Filter Team identified the disclosure of potentially privileged material has confirmed that they did not discuss the substance of the Lopez Emails in that conversation. Otherwise, all five attorneys state that they did not receive any documents regarding Lopez, other than by communicating directly with him in the course of the case, or have any discussions regarding the Lopez Emails or their content with Prosecutor A. In addition, while Prosecutor A had conversations with other members of the Elbaz trial team in which Elbaz was referenced, those conversations generally related to other subjects and targets of, or documents relating to, the broader investigation and included discussions about whether certain individuals might be cooperating witnesses at Elbaz's trial. She has not had any such conversations with the attorneys who have recently been assigned to conduct Elbaz's trial.

Upon consideration of the *Brugman* factors, the Court finds that although a member of the Prosecution Team was exposed to certain details of Elbaz's defense strategy and thus her trial preparation, the remaining factors do not weigh in favor of a Sixth Amendment violation. The Court finds that the disclosure of the Lopez Emails to a member of the Prosecution Team was not intentional and was instead inadvertent. Based on the affidavits submitted by members of the Prosecution Team, which the Court credits as statements by officers of the court, the Prosecution Team requested expedited processing of the Google Hard Drive so that it could provide the Rule 16 discovery to Elbaz by the agreed-upon date, and in their haste they overlooked the possibility

that potentially privileged material would be present. In light of the discovery schedule, the Prosecution Team considered the likelihood that the Laptop Image would contain potentially privileged information, after some initial processing revealed that only one user accessed it mainly for accounting work, and mistakenly concluded that it contained only bookkeeping and financial information and did not need to be subjected to the filtering process.

This account is consistent with the manner and extent to which the potentially privileged documents in the Relativity database were accessed. The Prosecution Team viewed only two of the communications involving Elbaz's prior defense counsel. Out of thousands potentially privileged documents unrelated to Elbaz's defense counsel, for which another person or organization, not Elbaz, was the primary holder of the privilege, the Prosecution Team viewed only 101 unique documents. Had the Prosecution Team intentionally sought the unfiltered, potentially privileged documents on the two hard drives in order to invade Elbaz's attorney-client relationship, they likely could and would have done so by more targeted means, such as by having Prosecution Team members directly find and review most or all of those documents, which could be easily identified through specific word searches. Moreover, the Prosecution Team provided the potentially privileged documents to Elbaz during discovery even before they were accessible to the Prosecution Team. If the Prosecution Team had intentionally sought to access privileged materials relating to Elbaz's defense strategy, it is highly unlikely that it would have given Elbaz evidence showing that it had gained access to such documents. Finally, when the Prosecution Team's access to the privileged documents was discovered, the Filter Team promptly rescinded that access, informed Elbaz's counsel, and kept defense counsel apprised as it reviewed the Government's processes and discovered other categories of files that had been erroneously

provided to the Prosecution Team. The Government's conduct and self-reporting of the disclosures is inconsistent with intentional misconduct.

The Court also concludes that where the access to the Lopez Emails was limited to the viewing by Prosecutor A, the Government did not obtain evidence through access to those emails that will be used at trial, and the information from the Lopez Emails has not been and will not be used to the "substantial detriment" of Elbaz. *Brugman*, 655 F.2d at 546. Prosecutor A was never involved in the specific investigation of Elbaz or trial preparation for Elbaz's case, and she has since departed from the Prosecution Team altogether. The statements of Prosecutor A and the members of the Prosecution Team evidence that she did not show the Lopez Emails to or discuss them with anyone on the trial team, and she did not discuss information in those emails with others. Based on Prosecutor A's statement of her reason for conducting the relevant search of the Relativity database, the Government was already aware of and conducting inquiries into one of the individuals referenced in the Lopez Emails, such that it had an independent source for its interest in that individual. For these reasons, the Court finds that these two factors weigh against a finding of a Sixth Amendment violation.

For the same reasons, the Court finds that Elbaz has failed to make the required showing of prejudice. In *Allen*, the court found no prejudice when a member of the trial team had a memorandum detailing specific points that defense counsel intended to use in cross-examination of a key witness, because the court had ordered that the prosecutor who actually questioned that witness on direct examination not receive access to the memorandum or its contents. *See Allen*, 491 F.3d at 192. Like the prosecutor who was screened from the defense strategy in *Allen*, the members of the Prosecution Team who will conduct Elbaz's trial have not learned the contents of the Lopez Emails from Prosecutor A or used such information to Elbaz's detriment. *See Allen*,

491 F.3d at 192. Indeed, while the prosecutors in both *Allen* and *Jenkins* who became privy to the defense's strategy ultimately participated in the defendant's case through trial, Prosecutor A was not actually involved in the investigation of Elbaz specifically and has never been, and will not be, part of the trial team in Elbaz's case. *See Allen*, 491 F.3d at 192; *Jenkins*, 1999 WL 285910, at *3. For these reasons, Elbaz has not shown any prejudice, as required by Fourth Circuit precedent. Where there is no evidence establishing detriment to Elbaz, the Court will not presume that the presence of the Lopez Emails on the Relativity database or Prosecutor A's viewing of the Lopez Emails resulted in any prejudice. *See Jenkins*, 1999 WL 285910, at *3. Therefore, Elbaz's Sixth Amendment right to the effective assistance of counsel was not violated when Prosecutor A viewed the Lopez Emails or when other emails from Lopez were housed on the Relativity database.

Because Elbaz's Sixth Amendment rights were not infringed, dismissal of the indictment and disqualification of the Prosecution Team is not warranted. *See United States v. Morrison*, 449 U.S. 361, 362, 365 (1981) (holding that dismissal of the indictment was not warranted even when federal agents plainly violated the Sixth Amendment by deliberately speaking to the defendant about possible cooperation without the permission of her counsel, where there was no "demonstrable prejudice, or substantial threat thereof"); *United States v. Guild*, 341 F. App'x 879, 884 (4th Cir. 2009); *cf. United States v. Horn*, 811 F. Supp. 739, 741-42, 751-52 (D.N.H. 1992) (finding that where the prosecutor deliberately kept copies of documents identified by the defense counsel as relevant to cross-examination and the defense's trial strategy and made an additional set of copies in violation of a court order, disqualification of the prosecutor was warranted but dismissal of the indictment was not), *rev'd in part on other grounds*, 29 F.3d 754 (1st Cir. 1994); *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) (holding that disqualification of a prosecutor who had mistakenly reviewed attorney-client privileged and work product

information was not an appropriate remedy when the prosecutor did not tell other prosecutors of the contents and ensured that other prosecutors would not be able to access the material, and where the privilege was waived and the defendant offered "only vague and conclusory allegations of" harm).

Because Prosecutor A has already been reassigned and is no longer a member of the Prosecution Team, the Court need not determine whether she specifically should be formally disqualified from the case and the upcoming trial because she viewed the Lopez Emails. No disqualifications of other members of the Prosecution Team are necessary, particularly where the Government's voluntary decision replace the prior members of the trial team with three new trial attorneys with no earlier involvement in this case has eliminated any argument of prejudice to Elbaz.

Since the Lopez Emails contain privileged information, the Court will order that the Lopez Emails and any other communications relating to Lopez be excluded from the evidence at trial. *See Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). Where the Filter Team states that it has otherwise removed the Prosecution Team's access from the potentially privileged communications and taken steps to ensure such privileged materials are not made accessible to the Prosecution Team in the future, including adding new search terms in both English and Hebrew, assigning a Filter Team linguist to translate all Hebrew documents, applying English search terms to all translated documents, and reminding the Prosecution Team of the pertinent filter procedures, the Court finds no additional remedy is necessary at this point.

The Court cautions the Government that although it has found no Sixth Amendment violation, the Prosecution Team's request to have some of the contents of two hard drives containing thousands of unfiltered documents uploaded to the Relativity database was a significant

error in judgment not justified by a perceived need to meet discovery deadlines. Any concern about meeting deadlines should have been addressed through a motion to extend the deadline rather than engaging in shortcuts without considering the potential consequences. The Court trusts that the Government will take all necessary steps to avoid similar errors in the future and will hold the Government fully accountable for any additional lapses.

## II.    Attorney-Client Privilege

Elbaz also seeks dismissal or disqualification based on the disclosure of the Yukom/Linkopia Documents, which reference attorneys for one of those companies or legal advice provided by such attorneys. It is undisputed that the attorneys referenced were not representing Elbaz personally, such that she did not hold the privilege with respect to any of these documents. Nevertheless, Elbaz contends that their disclosure to the Prosecution Team breached the attorney-client privilege because she entered into a joint defense agreement with Yukom, Linkopia, and Yossi Herzog, the Chief Executive Officer of Yukom, after her initial appearance in this case, those parties considered these emails as relevant to their joint defense, and the documents were thus shared with Elbaz in conjunction with the joint defense.

At the hearing on the Motion, Elbaz acknowledged that the Yukom/Linkopia Documents do not present a Sixth Amendment issue, because they were created before Elbaz was charged with a crime and there is no evidence that the Government was made aware of any decisions to share them with Elbaz pursuant to a joint defense agreement as part of trial preparation. Indeed, the Yukom/Linkopia Documents do not contain prefatory or cover emails showing that they were shared with or distributed to Elbaz after September 2017. Elbaz does not assert that the Government knew that after she was charged, Elbaz believed the Yukom/Linkopia Documents were relevant to her defense. Under these circumstances and in consideration of the legal standard

outlined above with respect to the Sixth Amendment, the Court agrees that there is no Sixth Amendment violation arising from the inadvertent disclosure of these documents. Nevertheless, because the Yukom/Linkopia Documents are arguably subject to the attorney-client privilege, the Court will analyze them under that legal framework.

## A.     Legal Standard

The attorney-client privilege, while recognized by the Federal Rules of Evidence, is disfavored by federal courts because it interferes with the courts' truth-seeking function. *See In re Grand Jury Proceedings*, 727 F.2d 1352, 1355 (4th Cir. 1984). Consequently, the privilege is "strictly confined within the narrowest possible limits." *Id.* (quoting *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979)). The "mere relationship of attorney-client does not warrant a presumption of confidentiality." *Id.* at 1356. The party claiming a privilege bears the burden of showing that "(1) the attorney-client privilege applies; (2) the communications were protected by the privilege; and (3) the privilege was not waived." *United States v. Aramony*, 88 F.3d 1369, 1389 (4th Cir. 1996). An attorney-privilege applies when:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Subpoena*, 341 F.3d 331, 335 (4th Cir. 2003) (quoting *United States v. Jones*, 595 F.2d 1069, 1072 (4th Cir. 1982)). The privilege must be asserted on a "document-by-document basis"; a "blanket claim of privilege that does not specify what information is protected" is not sufficient to make a claim for privilege. *United States v. White*, 970 F.2d 328, 334 (7th Cir.

1992); *United States v. Cohen*, No. WDQ-14-0310, 2015 WL 2261661, at *19 (D. Md. May 7, 2015) (quoting *White*).

The attorney-client privilege applies only to those communications "intended to be confidential," in that both the attorney and client understand that the communication will remain confidential. *In re Grand Jury Proceedings*, 727 F.2d at 1355–56. "Communications are not privileged merely because one of the parties is an attorney or because an attorney was present when the communications were made." *United States v. Cohn*, 303 F. Supp. 2d 672, 683 (D. Md. 2003). Therefore, the privilege is waived where the client intends that the attorney provide the information to others, and when any "significant part" of the communication is disclosed to others, the waiver applies not only to the particular communication between the client and the attorney, but also to the "substance of the communications" and the "details underlying the data" that was to be shared with others. *In re Grand Jury Proceedings*, 727 F.2d at 1356. "[S]uch a disclosure not only waives the privilege as to the specific information revealed, but also waives the privilege as to the subject matter of the disclosure." *Hawkins v. Stables*, 148 F.3d 379, 384 n.4 (4th Cir. 1998).

The joint defense privilege, also called the common interest privilege, is an extension of the attorney-client privilege. *See Aramony*, 88 F.3d at 1392. To invoke the privilege, the party must show that there is a shared "common interest about a legal matter." *Id.* The parties to the common interest are not required to reduce their agreement to writing, so long as there are indicators of a "joint strategy" sufficient to establish that the parties are "clearly collaborating in advance of litigation." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 284–85, 287 (4th Cir. 2010). Conclusory claims that a common interest in litigation exists are not sufficient to establish the joint defense privilege in the absence of a showing that the parties were pursuing a

20

common legal strategy. *See In re Grand Jury Subpoena: Under Seal*, 415 F.3d 333, 341 (4th Cir. 2005); *Sheet Metal Workers Int'l Assoc. v. Sweeney*, 29 F.3d 120, 124-25 (4th Cir. 1994). The privilege protects documents shared among the parties after the common interest was formed, but not before. *Hunton & Williams*, 590 F.3d at 285.

## B.    Applicability of the Privilege

Even assuming that there was a joint defense agreement such that Elbaz can assert the common interest privilege over the Yukom/Linkopia Documents, Elbaz has failed to establish that the attorney-client privilege applied and was not waived as to most of the Yukom/Linkopia Documents. Although Elbaz references Exhibit 22 in her Motion, she has provided no specific argument to establish the applicability of the attorney-client privilege to those documents. Any claim of privilege must be "sustained on a document-by-document basis." *White*, 970 F.2d at 334. Yet Elbaz mentions Exhibit 22 only once in her opening brief to refer to the documents that the Filter Team initially deemed potentially privileged but later concluded were not privileged, and to agree that some of them were not privileged. In her Reply, Elbaz simply concludes that she "has set forth arguments as to why" the documents in Exhibit 22 "are, in fact, privileged," without referring the Court to the location of such argument or otherwise laying a foundation for her privilege in those documents. Def.'s Reply 15, ECF No. 148. In Exhibit 22 itself, Elbaz labels the documents as "contested" false positives and describes their contents, but advances no argument that the privilege applies, that the documents are confidential, and that the privilege was not waived. *See Aramony*, 88 F.3d at 1389. On this record, Elbaz has failed to meet her burden to establish the applicability of the privilege as to the documents identified in Exhibit 22. *See United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982); *United States v. (Under Seal)*, 748 F.2d 871, 876 (4th Cir. 1984) ("In practical terms, this burden requires the proponent to explain,

through *ex parte* submissions if necessary to maintain confidentiality, the significance or meaning of an otherwise cryptic document.").

Exhibit 20 lists seven documents: six emails and one WhatsApp text thread. As to the WhatsApp document, FILTER-EXH-00000179, the privilege does not apply. According to Elbaz, this document contains a text chain between Elbaz and Herzog in which they discuss whether to respond to an allegation made by a journalist about Yukom, and if so, how. At the end of the text chain, Elbaz mentions a person called "Dudu," whom Elbaz asserts is Yukom's attorney. Although the conversation suggests that Elbaz may speak to the attorney and respond to the matter based on the attorney's advice, the exchange does not reflect whether she or Herzog did so or what the attorney advised. Where there was no communication with an attorney reflected in the WhatsApp document, the privilege does not apply. *See Hawkins*, 148 F.3d at 384 ("Without a communication [with an attorney], there is nothing to which the privilege can attach.").

As for the six emails identified in Exhibit 20, two of the emails, FILTER-EXH-00000297 and FILTER-EXH-00000298, consist of an email and attachment Elbaz received from a Yukom lawyer, which Elbaz forwarded to Herzog, that reflect a proposed letter to customers dissatisfied with Yukom. The Filter Team, in their Opposition to the Motion, submitted a virtually identical version of that document sent by Elbaz to a person outside of Yukom. Thus, although this communication was exchanged between an attorney and a client, it was not privileged because it was intended to be shared with those outside the privilege and thus was not meant to be confidential. *See In re Grand Jury Proceedings*, 727 F.2d at 1356.

For the remaining four emails, even assuming that the joint defense privilege applies to them, the Government has provided a reasonable argument that any privilege was waived. First, FILTER-EXH-00000310, FILTER-EXH-00000317, and FILTER-EXH-00000324 are emails

between Yukom and Linkopia employees and, ultimately, an attorney in which they discuss a customer complaint. The records reveal that a draft response that went to the lawyer also was sent to the customer in essentially the same form, and that the attorney's ultimate advice to refund the customer's money was followed and thus was not confidential information. Any privilege underlying these communications would arguably have been waived when the information was shared with the customer. *See In re Grand Jury Proceedings*, 727 F.2d at 1356; *Hawkins*, 148 F.3d at 384 & n.4. As for FILTER-EXH-00000301, another email discussion about a customer complaint, the only legal advice referenced was to issue an email providing the same unspecified explanation given to the attorney. Where the specific explanation approved by the attorney was not disclosed in the documents and that explanation was ultimately provided to the customer, any applicable privilege in the response and the related communications was arguably waived by the disclosure of the explanation. *See In re Grand Jury Proceedings*, 727 F.2d at 1356; *Hawkins*, 148 F.3d at 384 n.4.

The Court need not decide whether the privilege was waived as to these final four emails or address the Government's argument that the crime-fraud exception applies, because even assuming the existence of a joint defense agreement, the applicability of the privilege, and the lack of waiver, the Court finds that the proper remedy for any breach of the privilege relating to the Yukom/Linkopia Documents would be their exclusion at trial. At the hearing, the parties agreed that no further remedy, such as a hearing pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972), at which the Government would be required to establish an independent source for any information referenced in the documents, would be warranted. *See Upjohn*, 449 U.S. at 389 (acknowledging that the attorney-client privilege is an evidentiary issue); *United States v. Squillacote*, 221 F.3d 542, 560 (4th Cir. 2000) (holding that a *Kastigar* hearing is not required for

23

violations of common law and evidentiary privileges). Here, where the Government has stated that it will not seek to introduce these records at trial, the Court will order, out of an abundance of caution, that the documents listed in Exhibits 20 and 22 be excluded from evidence at trial. With this agreed-upon remedy in place, the Yukom/Linkopia Documents provide no basis to require dismissal of the Indictment or disqualification of the Prosecution Team.

## CONCLUSION

For the foregoing reasons, Elbaz's Motion to Dismiss the Indictment or, in the Alternative, to Disqualify the Prosecution Team will be GRANTED IN PART and DENIED IN PART. The Motion will be granted to the extent that the Court will exclude the Lopez Emails and the Yukom/Linkopia Documents from the evidence at trial. The Motion will otherwise be denied. A separate Order shall issue.

Date: June 20, 2019

THEODORE D. CHUANG
United States District Judge