**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA

v.

LEE ELBAZ,
    a/k/a "Lena Green,"

       Defendant

Criminal Action No. TDC-18-157

**GOVERNMENT'S TRIAL BRIEF**

# TABLE OF CONTENTS

I.    FACTS TO BE PRESENTED AT TRIAL ............................................................. 1

    A.    Overview ............................................................................................................. 1

    B.    The Fraud Scheme & Defendant's Role ............................................................ 1

    C.    Fraudulent Tactics Designed to Undermine the Clients .................................... 4

II.   THE OFFENSES CHARGED .......................................................................... 5

III.  ANTICIPATED LEGAL ISSUES THAT MAY ARISE AT TRIAL .................. 6

    A.    Defendant's Post-Arrest Statements ................................................................. 6

    B.    Legal Opinions, Good-Faith, and Advice-of-Counsel Defenses ..................... 8

    C.    Admissibility of Co-Conspirator Statements Under Rule 801(d)(2) ............... 9

    D.    Evidence Obtained via Search Warrants to Google .......................................... 11

    E.    Emails Obtained by MLAT ............................................................................... 12

    F.    Financial Records from SpotOption Obtained via MLAT ............................... 14

    G.    Admissibility of Translated Documents and Transcripts.................................. 15

    H.    Admissibility of Statements by Non-Testifying Victims.................................. 17

    I.    Newspaper Articles Sent by Defendant to a Co-Conspirator ......................... 17

    J.    Testimony Regarding Irrelevant Matters ......................................................... 18

The United States of America by and through undersigned counsel, respectfully submits this trial brief for purposes of summarizing the legal and factual issues it believes will be relevant to the upcoming trial, set to begin on July 16, 2019.

## I.      FACTS TO BE PRESENTED AT TRIAL

### A.      Overview

From in or around May 2014 through in or around June 2017, the defendant, Lee Elbaz, directed a scheme to defraud binary options investors by lying to investors and misleading them about the nature of binary options trading and the defendant's business. Among other things, the defendant lied to clients about the gains victims should expect to receive; historical rates of return binary options investors received; the alignment of financial interests between the defendant's company and clients (*i.e.,* wrongly telling investors that they only made money when clients made money); the education, credentials, and experience of the defendant and her employees; and even their names and location. The defendant directed the scheme and exercised significant oversight of the scheme, both on a strategic and day-to-day level by hiring and training employees to tell the same lies to clients over and over, in order to induce clients to send money. The defendant also trained her employees to engage in fraudulent tactics to prevent clients from withdrawing funds from their accounts. Through this scheme, the defendant and her co-conspirators defrauded tens of thousands of victims worldwide, including thousands here in the United States, and caused tens of millions of dollars in victim losses.

### B.      The Fraud Scheme & Defendant's Role

On a high level, the scheme to defraud worked as follows. The defendant and her co-conspirators purchased client leads from companies that advertised wealth-investment schemes

online (with campaigns bearing names such as "Millionaire's Club").[1] After a lead was purchased, a victim-client was solicited to make a small investment — such as $250 — as a way to entice them to open a binary options account. If a client made that initial small deposit, he or she was passed along to a different agent (known as the "retention agent").[2] The retention agent's responsibility was first to obtain a significantly larger deposit — often thousands of dollars. To get that money, the agent would regularly contact the client by phone and email, pitching aggressive and fraudulent sales tactics, to encourage clients to invest more money. Conversely, when clients tried to withdraw money, the defendant and her co-conspirators would often use a variety of devices to prevent withdrawals, ranging from pretextual excuses to simply ignoring withdrawal requests.

The majority of the government's case will focus on the operations of a call center located in Caesarea, Israel and operating under the name Yukom Communications ("Yukom"). Yukom's employees were focused exclusively on the "retention" work described above (i.e., soliciting larger additional deposits) and operated primarily under two different client-facing brands: BigOption and BinaryBook. The government anticipates that multiple cooperating witnesses from Yukom's Caesarea offices will testify at trial, and each will acknowledge that employees solicited money from victim-clients through a multitude of lies. Each will testify that it was the direction from Yukom management that employees obtain money through false promises.

---

[1] After a time, the defendant and her co-conspirators expanded the operations and also generated their own leads in-house through similar campaigns.

[2] In the scheme's vernacular, the initial $250 deposit was solicited by "conversion" agents, many of whom were located in Mauritius. The subsequent larger, longer-running solicitation was done by "retention" agents. Agents in the Israel-based offices that reported to the defendant were focused exclusively on retention.

As she acknowledged in her post-arrest interview, the defendant held various managerial roles at Yukom, ultimately holding the title Chief Executive Officer. When the defendant started at Yukom in 2014, Yukom was new and employed only a few agents to solicit money; by 2016, Yukom had expanded to over 100 employees. The growth in employees corresponded in a growth in investor funds collected. Videos taken inside Yukom, for example, show the defendant congratulating Yukom employees in December 2014 for collecting around $2.5 million net that month. A March 2016 video shows her encouraging her employees to target $9 to $10 million for that month.

The government anticipates that cooperating witnesses will explain the tight control the defendant exercised over the company, and the long hours she spent on the call center's floor. According to these witnesses, not only did the defendant hear employees make false statements, she encouraged and trained them to do so. Physical evidence corroborates this testimony. Recordings of training sessions at Yukom feature managers practicing lies with new employees. Emails sent to the defendant contain call scripts given to employees, in which employees are instructed to make up credentials (such as business degrees) and falsely claim to have high historical trading success rates. In other emails, the defendant forwards recordings of calls between employees and clients, where the employees falsely promise guaranteed profits and lie about their historical rates of return. Testimony and other evidence will establish the defendant circulated these calls to train employees about what she thought a "good" call should sound like.

While the defendant retained management over the Caesarea office, she was also involved in parts of the scheme elsewhere in the world. Testimony and documentary evidence will show that the defendant traveled to other offices in Mauritius and Ukraine, where she was responsible for ensuring employees there engaged in the same high-pressure and fraudulent sales techniques

used in Caesarea.  Similarly, jurors will learn that in mid-2015, the defendant helped the scheme expand through a new office in Tel Aviv, Israel, which operated under the brand "Numaris." Testimony from cooperating witnesses, corroborated by internal emails and text messages seized from the defendant's phone, will show that the defendant was involved in hiring and training Tel Aviv employees.  The evidence will establish that the Tel Aviv office employed the same scheme to take money from victim-investors and that the defendant celebrated the office's success.

      **C.**      **Fraudulent Tactics Designed to Undermine the Clients**

In her video-recorded post-arrest statement, the defendant falsely told FBI agents that she hoped her clients won while trading and that it was good for her when that happened.  Similarly, the government anticipates that evidence at trial (including recorded calls) will establish that clients were falsely assured by account managers that their interests were aligned (through statements such as, "I make money when you make money").

In reality, testimonial and documentary evidence will show that the defendant and her co-conspirators were only paid commissions on net deposits — the difference between the amount victim-clients deposited into their accounts and the amount they withdrew.  A client's trading performance usually had no effect on any employee's compensation, and good trading performances (which were rare) could only hurt Yukom's compensation.  Similarly, to prove the falsity and materiality of statements about aligned interests, the government will introduce evidence of actions the defendant and her co-conspirators took to prevent the clients (1) from winning while trading and (2) withdrawing money from their accounts.

One tactic the defendant used to undermine clients was known as putting a winning client on "high risk."  SpotOption, an entity that hosted the platform (in effect, the software and trading data) on which BinaryBook and BigOption trading accounts operated, also controlled client "risk

settings." If a client was identified inside BinaryBook and BigOption as trading successfully, the defendant would contact SpotOption and arrange for the client's account settings to be adjusted such that it was less likely future bets would win. By stacking the deck against the client (without informing the client of the changes), the defendant prevented scenarios where clients would try to withdraw winnings.

Similarly, the defendant took significant actions to prevent clients from withdrawing any money (including their own deposits) from the accounts. For example, when the defendant anticipated a particular client might withdraw money, the defendant would instruct co-conspirators to place long-term trades into that client's account, a technique referred to as "exposing the client." After placing the trade, the account manager would tell the victim-investor that he or she was ineligible to withdraw any money until the trade expired.

Another way to prevent client withdrawals was a technique known as "bonus" deposits, in which the defendant or a co-conspirator would credit a trading account with a purported "bonus." After placing the bonus in the client's account, the defendant and her co-conspirators would inform the client that the bonus had terms-and-conditions that required an extremely high number of trades (often twenty-to-thirty times the bonus "value") to be placed before any money in the account could be withdrawn. Testimony at trial will confirm that "bonuses" were a common way to prevent withdrawals.

## II.    THE OFFENSES CHARGED

The Indictment charges the defendant with conspiracy, in violation of 18 U.S.C. § 1349 (Count 1) and wire fraud, in violation of 18 U.S.C. § 1343 (Counts 2-4). Each substantive count of wire fraud involves a victim-investor who resides in the state of Maryland.

# III.    ANTICIPATED LEGAL ISSUES THAT MAY ARISE AT TRIAL

The government herein identifies various legal issues that may arise during trial. Many involve the admissibility of certain evidence. A district court has broad discretion in determining the admissibility of evidence. *See Tome v. United States*, 513 U.S. 150, 174 (1995). As the Fourth Circuit has explained, "[j]udgments of evidentiary relevance and prejudice are fundamentally a matter of trial management, for trial judges are much closer to the pulse of a trial." *United States v. Benkahla*, 530 F.3d 300, 309 (4th Cir. 2008); *see also United States v. Siegel*, 536 F.3d 306, 325 (4th Cir. 2008).

## A.    Defendant's Post-Arrest Statements

Shortly after her arrest on September 14, 2017, the defendant agreed to be interviewed by agents from the Federal Bureau of Investigation ("FBI"). The defendant received *Miranda* warnings — both verbally in English and written in Hebrew — and signed a written waiver before the interview. The government promptly provided the defense with a copy of the video, which, to date, the defense has not sought to suppress or exclude. The government intends to offer relevant excerpts of the defendant's interview, as these statements are admissible as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2)(A), and are highly probative of the ultimate issues in this case. *See United States v. Wills*, 346 F.3d 476, 489 (4th Cir. 2003) (concluding defendant's statements "were admissions by a party-opponent" and "admissible pursuant to Federal Rule of Evidence 801(d)(2)(A)"). As discussed *infra*, transcripts of these excerpts of the defendant's statements are also proper to aid jurors during trial and deliberations.

Among other things, during her interview, the defendant admitted that 95% of clients who sent money to BinaryBook and BigOption lost money, and falsely claimed that she disclosed this fact to victim-clients. The defendant also acknowledged that she used an alias while working at

Yukom (which she called a "stage name") and that Yukom employees were paid a commission based on net deposits — client deposits minus withdrawals. The defendant falsely denied that bonuses were just a tool to prevent clients from withdrawing money and told investigators that any client who requested a withdrawal could get their money back, unless the client was subject to bonus turnover requirements. The defendant also falsely denied ever requesting a change to a client's risk settings to increase the likelihood that a client would begin losing trades. Finally, the defendant also falsely claimed that she was unaware of managers encouraging Yukom employees to lie to clients.

While the government may offer relevant excerpts of the defendant's post-arrest interview, the Federal Rules of Evidence and the law of the Fourth Circuit prevent the defendant from admitting potentially exculpatory portions of her post-arrest statement. At the outset, a defendant generally may not offer her out-of-court hearsay statement into evidence. *United States v. Harry*, 816 F.3d 1268, 1279 (10th Cir. 2016). With respect to any argument that the defendant's statements may be admissible under the "rule of completeness," as the Fourth Circuit has explained, the rule of completeness, does not "render admissible the evidence which is otherwise inadmissible under the hearsay rules." *United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008). Moreover, the rule of completeness does not "require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party." *See id.* at 526 (internal quotation omitted); *see also United States v. Lutz*, 153 F.3d 723, 1998 WL 486345, at *5 (4th Cir. 1998) (affirming exclusion of "additional testimony" that was "replete with a number of self-serving and irrelevant statements which go beyond clarifying or explaining the testimony offered by the prosecution").

Rather, the rule of completeness only applies "when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion." *United States v. Ellis*, 121 F.3d 908, 921 (4th Cir. 1997) (internal quotation omitted). As this Court has recently explained, the rule of completeness "should only come into play when it is clear that the incomplete version" is "unfairly misleading" and even then, "only information that is essential to dispel the misleading impression should be admitted." *United States v. Bailey*, 322 F. Supp. 3d 661, 674 (D. Md. 2017). Here, the government seeks to introduce portions of the defendant's post-arrest interview that are clear and do not require additional context or explanation. As such, this Court should decline to admit any portions of the defendant's post-arrest statement identified by the defense.

**B.      Legal Opinions, Good-Faith, and Advice-of-Counsel Defenses**

As this Court is aware, and as the government has recently set forth in its Motion *in Limine* to Preclude Defendant's Use of Undisclosed Communications or Writing Involving Attorneys (D.E. 221) and its Motion to Compel Production of Documents (D.E. 232), the defense has notified the government that "her intent to commit fraud or absence of such intent, and whether she was acting in good faith, will be at issue at trial" and "[t]o the extent that she saw legal opinions or had them described to her, she plainly is entitled to put on evidence about those opinions and communications." D.E. 226 at 7. The government relies on its prior submissions on this point and will not rehash them here. Rather, the government reiterates its argument that the defendant, who has known about and had access to these opinions for years, should not be permitted to cherry-pick legal opinions at the eleventh hour and rely on them as the basis for a good faith defense. *See United States v. Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) ("Defendants' decision on whether to assert the advice-of-counsel defense may impact the scope of discovery otherwise

permitted or ordered, and thus risks unnecessary interruption and delay if asserted at trial.") (internal quotation and alterations omitted); *see also United States v. Mubayyid*, No. CRIM 05-40026-FDS, 2007 WL 1826067, at *2 (D. Mass. June 22, 2007) ("[Advice-of-counsel defenses] are ordinarily fact-intensive defenses that are likely to create substantial problems of fairness and efficiency if raised for the first time during the trial.").

### C.     Admissibility of Co-Conspirator Statements Under Rule 801(d)(2)

The government intends to introduce prior statements of the defendant's co-conspirators, primarily made while working at Yukom, Numaris, or one of the other implicated companies.[3] Co-conspirator statements in this case include (a) internal company emails; (b) emails and recordings in which co-conspirators communicated with (and made false representations to) victim-clients; (c) recordings made during Yukom training sessions; (d) videos extracted from the defendant's cellphone that show operations inside Yukom; and (e) text messages recovered from the defendant's cellphone. Such statements are not hearsay because they will be "offered against an opposing party" and were "made by the party's coconspirator[s] during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E); *United States v. Pratt*, 239 F.3d 640, 643-44 (4th

---

[3] These co-conspirators include Yossi Herzog, Yakov "Kobi" Cohen, Ori Maymon (a/k/a "Patrick Accardo"), Elad Bigelman (a/k/a "Michael Goldberg"), Nissim Alfasi (a/k/a "Nick Onasis"), Ronen Roytman (a/k/a "Alexander Goldman"), Liora Welles (a/k/a "Lindsay Cole," "Lindsay Taylor," and "Lindsey Wells"), Yair Hadar (a/k/a "Steven Gold"), Shira Uzan (a/k/a "Emily Laski"), and Austin Smith (a/k/a "John Reid"). The government does not intend for this to be an exhaustive list, as the defendant supervised dozens of employees during her time at Yukom, and trained and directed those individuals to lie to clients in furtherance of the scheme to defraud. However, the government has identified here a list of the defendant's co-conspirators (and their "stage names") that are most likely to appear on emails the government intends to offer as evidence at trial, including the names of the five individuals who have pleaded guilty to conspiracy charges in connection with the defendant's scheme and the three individuals who have been named as the defendant's co-conspirators in the partially unsealed *Herzog* Indictment. *See United States v. Herzog, et al*, Case No. 8:19-CR-77(PX).

Cir. 2001).   Moreover, "[t]he statement need not be made by one conspirator to another conspirator." *United States v. Manfre*, 368 F.3d 832, 837 (8th Cir. 2004).

Under Rule 801(d)(2), the government must show "(1) that there was a conspiracy involving the declarant and the party against whom admission of the evidence is sought and (2) that the statements at issue were made during the course of and in furtherance of that conspiracy." *United States v. Blevins,* 960 F.2d 1252, 1255 (4th Cir. 1992).   In determining whether this burden has been met, the Court is free to consider the statements itself as well as any other evidence, "bound only by the rules of privilege." *Bourjaily v. United States*, 483 U.S. 171, 178 (1987).

Courts construe the "in furtherance" requirement broadly "lest the purpose of the exception be defeated." *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999).   The statement must be "intended to promote the conspiracy's objectives, whether or not it actually has the effect." *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994).   Furthermore, the statement need not be "exclusively, or even primarily, made to further the conspiracy," if there is "some reasonable basis" for concluding that it was designed to further the conspiracy. *Id.* at 444 (internal quotation omitted).   In addition, "[s]tatements are made in furtherance of a conspiracy if they can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Miller*, 738 F.3d 361, 374 (D.C. Cir. 2013) (internal quotation omitted).   "Such statements include those that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members." *Id.* (internal quotation omitted).   The statement at issue "need not have been exclusively, or even primarily, made to further the conspiracy'" and may be "susceptible of alternative interpretations." *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989).

The court need not decide the ultimate admissibility of the co-conspirator statements prior to trial; instead, the statements may be conditionally admitted. The Fourth Circuit has rejected the formalistic requirement that there must be a hearing to determine the existence of a conspiracy before statements can be admitted under Rule 801(d)(2)(E). Instead, this Circuit "allow[s] a trial court to conditionally admit co-conspirators' statements subject to the subsequent satisfaction of the requirements for their admission." *Blevins*, 960 F.2d at 1256 (internal citation omitted).[4]

### D. Evidence Obtained via Search Warrants to Google

The government intends to offer emails obtained through court-authorized searches of accounts hosted by Google, Inc. ("Google").[5] In advance of trial, the government has provided the defense with the relevant certifications from Google under Federal Rule of Evidence 902(11) and engaged in discussions with the defense about stipulating to the authenticity of these documents. In the event the parties are unable to reach a stipulation as to authenticity, the government respectfully submits that these records, which were obtained from legally valid search warrants served on Google are self-authenticating under Rule 902(11) and otherwise admissible. *See United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014).

---

[4] In addition to Rule 801(d)(2)(E), many of the documents in question also admissible under Rule 801(d)(2)(D), as statements "offered against an opposing party" and made by the opposing party's "employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2). As the Fourth Circuit has explained, statements are admissible under Rule 801(d)(2)(D) whenever an employee makes a statement about a matter within the scope of her employment, even if she is not authorized to speak on the matter." *United States v. Poulin*, 461 F. App'x 272, 2012 WL 130753, at *7 (4th Cir. 2012) (internal quotations omitted). "[A] statement of illegal activity can still be within the scope of employment and can be admissible under 801(d)(2)(D)." *United States v. Riley*, 621 F.3d 312, 338 (3rd Cir. 2010) (citation omitted).

[5] While many of these accounts have domains such as "bigoption.com" and "binarybook.com," the accounts were hosted by Google.

Pursuant to Federal Rule of Evidence 902(11), certified domestic records of regularly conducted activities are self-certifying and admissible without the testimony of custodial witnesses under Federal Rule of Evidence 803(6)(A)-(C), if the custodian furnishes a written declaration that: (A) the records were "made at or near the time by — or from information transmitted by — someone with knowledge"; (B) the records were "kept in the course of a regularly conducted activity of a business;" and (C) "making the record was a regular practice of that activity." FED. R. EVID. 803(6). Here, the Google search warrant materials satisfy these requirements. Accordingly, while the government is prepared to provide additional bases for authentication of these emails at trial if necessary, including calling a custodian from Google, or a custodian from the FBI to testify as to the unique SHA-256 hash number that each of these documents possesses, the government believes the 902(11) certification satisfies the issue of authenticity, such that a custodial witness would cause unnecessary delay. *See United States v. Peninger*, 456 F. App'x 214, 217 (4th Cir. 2011) (concluding Rule 902(11) certification "obviates the need for the Government to authenticate business records at trial").

### E. Emails Obtained by MLAT

In addition to the emails obtained from Google, the government will offer a smaller subset of emails obtained by the Israel National Police during an authorized search of the Tel Aviv offices of the technology company SpotOption (the search was requested pursuant to the Mutual Legal Assistance Treaty ("MLAT") protocols).[6] Among the documents produced through the MLAT were emails between the defendant, her co-conspirators, and SpotOption employees, in which the defendant and her co-conspirators directed SpotOption to put certain BinaryBook and BigOption

---

[6] Employees of the FBI, including a case agent in this investigation, were present for the search.

accounts on "high risk" (as discussed, this "high risk" setting made it more difficult for investors to trade successfully). In addition to producing these documents to the defendant, the government has also produced certificates from officers of the Israel National Police responsible for taking custody of the items at SpotOption.

The government intends to offer these documents pursuant to the provisions outlined in the Treaty Between the Government of the United States of America and the Government of the State of Israel on Mutual Assistance in Criminal Matters, U.S.–Isr., Jan. 26, 1998, T.I.A.S. No. 12925 (hereinafter "MLAT").[7] Article 15 of the MLAT governs searches and seizures requested under the treaty. Article 15(2) provides that:

> Upon request, and to the extent possible, every official who has custody of a seized item shall certify, in the manner specified by the Requesting State, which may include the use of Form C appended to this Treaty, the continuity of custody, the identity of the item, and the integrity of its condition. No further authentication or certification shall be necessary for a certification under this paragraph to be admissible in evidence to prove the truth of the matters asserted therein.

Ex. A at 10. The MLAT also provides the template Form C, which is a template attestation with respect to seized articles. Ex. A at 16.

The certificates executed by the Israel National Police are modeled the requirements of Form C appended to the MLAT (discussed below); indeed, the executed certificates are entitled "Form C." Therefore, these certificates satisfy the MLAT's requirements, and seized documents that were produced pursuant to this MLAT — including the emails involving the defendant — are admissible under the provisions of the MLAT. *See, e.g.*, *United States v. Odeh*, 815 F.3d 968, 981 (6th Cir. 2016) (affirming admission of documents obtained pursuant to Israeli-U.S. MLAT).

---

[7] For ease of reference, a copy of the MLAT is attached as Exhibit A.

## F. Financial Records from SpotOption Obtained via MLAT

In addition to the emails recovered during SpotOption search, the Israeli government also produced certain business records created and maintained by SpotOption. Some of these documents were financial records that tracked the deposits and withdrawals of certain brands operating on the SpotOption platform. Among these records, the government identified records showing the deposits and withdrawals of customers using BinaryBook and BigOption accounts (i.e., the brands operated by the defendant and her co-conspirators). These records show loss suffered by victims in this scheme. According to the records, by late 2017 victim-clients had deposited approximately $185,000,000 into BinaryBook and BigOption accounts but had withdrawn less than $50,000,000, amounting to net deposits of just under $150,000,000. The same records show that the same BinaryBook and BigOption clients had less than $37 million remaining, meaning that the clients had already recognized losses of over $113,000,000.

Like the emails above, these documents were obtained via MLAT and are covered by the certificates executed by an officer of the Israel National Police. Therefore, these documents should be admissible under Article 15(2) of the MLAT. *See Odeh*, 815 at 981. Additionally, the government has produced to the defendant a declaration, executed under 18 U.S.C. § 3505, from an executive of SpotOption attesting that the documents in question were in fact SpotOption business records made and kept in the ordinary course of business.

Much like Federal Rule of Evidence 902(11) certifications for domestic business records, 18 U.S.C. § 3505 provides that foreign business records are admissible in criminal proceedings if they are "record[s] kept in the course of regularly conducted business activity," that were made "at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters." 18 U.S.C. § 3505(a)(1)(A); *see United States v.*

*Osorio*, 854 F.2d 1318, 1988 WL 83427, at *1 (4th Cir. July 26, 1988). Section 3505 provides that foreign records can be authenticated through a signed certification. *See* 18 U.S.C. § 3505(a). Accordingly, the SpotOption records are admissible without need for calling a custodian to provide live testimony to authenticate the documents. *See United States v. Strickland*, 935 F.2d 822, 831 (7th Cir. 1991) (admitting records and noting Congressional intent to "streamline" admission of foreign business records through § 3505 certification); *United States v. Al-Imam*, No. 17-cr-00213 (CRC), 2019 WL 2358365, at *4-*6 (D.D.C. June 4, 2019).

## G. Admissibility of Translated Documents and Transcripts

Among other evidence, the government intends to offer (1) Hebrew documents that have been translated into English; (2) audio and video recordings containing Hebrew that have been transcribed and translated into English; and (3) audio and video recordings in English that have been transcribed. The government intends to offer as substantive evidence the English translations of Hebrew documents, recordings, or videos. This is in accord with Fourth Circuit precedent and is necessary to allow the jury to properly evaluate foreign-language evidence. With respect to transcripts of English recordings and video, the government intends to offer these materials solely for the aid of the jury and the Court, not as substantive evidence.

First, the government intends to offer certified English translations of documents containing Hebrew. In advance of trial, the government has produced the translations to the defendant, along with certifications attesting (1) that the translator is competent to translate the document; and (2) that the translation is true and accurate to the best of the translator's abilities. To date, the defense has not disputed the accuracy of any of these transcriptions or proposed revisions or alternative translations. These certified translations are therefore admissible.

Second, as for English transcripts of Hebrew audio and video files, the Fourth Circuit has squarely concluded that "English transcripts of foreign language conversations" are admissible. *See United States v. Borda*, 178 F.3d 1286, 1999 WL 294540, at *9 (4th Cir. 1999) (citations omitted); *see also United States v. Kifwa,* 868 F.3d 55, 60 (1st Cir. 2017) (concluding "transcripts containing translations" of recordings in foreign language "may be admitted").  Such transcripts may be used in place of the original recording, though here the government intends to offer the English translation transcripts of Hebrew audio and video alongside the original Hebrew files.  *See United States v. Anyaehie*, 34 F.3d 1067, 1994 WL 446801, at *1 (4th Cir. 1994) ("Foreign language tapes need not be played before the jury when a transcript in English has been properly admitted into evidence.") (citation omitted).  The government has provided the defense with the transcripts of translations of foreign language recordings that it intends to offer at trial.  To date, the defense has not disputed the accuracy of any of these translations.

Third, the jury should be permitted to review transcripts of English audio and video files — including excerpts from the defendant's post-arrest statement and recorded calls between Yukom employees and clients — during trial and deliberations.  The government does not seek to admit these transcripts as substantive evidence, rather only as demonstrative aids.  Because these transcripts will greatly assist jurors at trial and during deliberation, the Court should permit their use.  *See e.g., Wills*, 346 F.3d at 489 ("We decided some years ago that such transcripts are admissible."); *United States v. Turner*, 37 F. App'x 701, 702 (4th Cir. 2002); *United States v. Williamston*, 14 F.3d 598 (4th Cir. 1993); *United States v. Collazo*, 732 F.2d 1200, 1203 (4th Cir. 1984).  To avoid any potential that the jurors would rely on the transcripts as substantive evidence, the parties have proposed a jury instruction reminding the jurors that such transcripts "were given

to you as an aid or guide to assist you in listening to the tapes" and "are not in and of themselves evidence." (ECF 231, Proposed Instruction 16).

## H. Admissibility of Statements by Non-Testifying Victims

The government intends to offer emails that non-testifying victims sent to Yukom employees. These emails, which, among other things, include complaints from clients about being misled by the defendant's employees, unauthorized transactions on their accounts, not being able to withdraw funds, and other fraudulent activity, are not being offered for the truth of the matter asserted therein. Rather, the government will offer these emails as evidence that the defendant was on notice of these complaints. *See United States v. Boswell*, 530 F. App'x 214, 216 (4th Cir. 2013) (concluding text messages received by defendant were not hearsay when not offered to prove whether or not the defendant actually undertook the conduct implicated in the messages); *United States v. Edelen*, 561 F. App'x 226, 234-36 (4th Cir. 2014). Nor do these emails implicate Confrontation Clause concerns as they are not testimonial. *See United States v. Udeozor*, 515 F.3d 260, 268 (4th Cir. 2008). Accordingly, these emails are not hearsay and should be admitted.

## I. Newspaper Articles Sent by Defendant to a Co-Conspirator

The government intends to offer an email that the defendant sent to a co-conspirator including links to series of articles reporting fraud in the binary options industry. As discussed above, the email itself is authentic, relevant, and admissible. The linked articles, which the government intends to offer as evidence that the defendant and her co-conspirators were on notice of rampant fraud in the industry, are admissible non-hearsay. *See United States v. Romer*, 148 F.3d 359, 368 (4th Cir. 1998) (concluding newspaper article defendant mentioned in a recorded conversation was admissible, "because it was not offered to prove the truth of its contents, but rather to place in its proper context the conspirators' taped discussion about the article").

**J.      Testimony Regarding Irrelevant Matters**

Finally, the defendant should be precluded from introducing evidence or eliciting testimony relating to the filter litigation in this case or relating to the existence of the partially unsealed indictment in *United States v. Herzog, et al*, Case No. 8:19-CR-77(PX).  These matters are not relevant under Federal Rule of Evidence 401 and testimony about them would unnecessarily confuse and mislead the jury, and thus be inadmissible under Federal Rule of Evidence 403.

First, the *Herzog* Indictment is irrelevant, as the existence of an indictment in a related case has no bearing on the defendant's guilt and "an indictment is not evidence."  *Taylor v. Kentucky*, 436 U.S. 478, 480 (1978).  The *Herzog* Indictment not only lacks probative value, mention of the indictment also presents great "potential for 'unfair prejudice, confusion of the issues, or misleading the jury.'"  *See United States v. Mitchell*, 435 F. App'x 174, 177 (4th Cir. 2011) (quoting Fed. R. Evid. 403); *see also FDIC v. Harry Brown & Co.*, No. 2:13-cv-350-PGB, 2016 WL 503057, at *2 (M.D. Ala. Feb. 5, 2016) ("[E]vidence of criminal indictments and guilty pleas of persons not parties in this case is of limited probative value and is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury . . . .").

Second, any information relating to the government's filter review protocols or litigation related thereto is similarly irrelevant and inadmissible.  These issues have no bearing on the defendant's guilt or innocence of the crime charged, and thus would not make any fact of consequence "more or less probable."  *See* Fed. R. Evid. 401(a).  Courts have repeatedly recognized that such investigative and procedural matters are irrelevant and inadmissible.  *See, e.g.*, *United States v. Lecco*, 438 F. App'x 187, 191 (4th Cir. 2011) (affirming exclusion of allegations of police conduct during the investigation as irrelevant); *see also United States v.*

*Reyes*, 18 F.3d 65, 71 (2d Cir. 1994) ("[T]he history of the investigation was not relevant to the guilt or innocence of the defendant.").  Such matters are not only irrelevant, discussion of them would also confuse the issues and mislead the jury, and are therefore inadmissible under Federal Rule of Evidence 403.  *See United States v. Reevey*, 364 F.3d 151, 157-58 (4th Cir. 2004) (testimony regarding alleged misconduct during defendant's arrest inadmissible because "such evidence may have confused the issues or misled the jury").

Dated:  July 8, 2019

Respectfully submitted,

ROBERT A. ZINK
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

By:        /s/
L. Rush Atkinson, Trial Attorney
Caitlin R. Cottingham, Trial Attorney
Henry P. Van Dyck, Deputy Chief
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Ave. N.W.
Washington, D.C. 20530

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2019, I electronically filed the foregoing with the Clerk of

the Court by using the CM/ECF system, which will notify counsel for the defendant of the filing.


By: _____/s/_____
Caitlin R. Cottingham
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice