**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA

v.

LEE ELBAZ,                                                     Criminal Action No. TDC-18-157
     a/k/a "Lena Green,"

Defendant

**GOVERNMENT'S POSITION ON MULTIPLE CONSPIRACY AND WILLFUL
BLINDNESS JURY INSTRUCTIONS**

The government, by and through undersigned counsel, respectfully submits this brief to

address the use of jury instructions for multiple conspiracies and willful blindness in this case.  As

set forth below, the government respectfully submits that based on the evidence presented at trial,

(1) a multiple conspiracies jury instruction is not appropriate and (2) a willful blindness instruction

is warranted.  In support of this position, the government submits as follows:

**I.      An Instruction on Multiple Conspiracies is Not Warranted in this Case.**

The government respectfully submits that an instruction on multiple conspiracies is not

appropriate in this case because the evidence presented at trial has established the existence of only

one overall conspiracy.    As the Fourth Circuit has explained, "[a] court need

only instruct on multiple conspiracies if  such  an instruction is  supported  by  the  facts."    A

"multiple conspiracy instruction is  not  required  unless  the  proof  at  trial  demonstrates  that

[defendant was] involved *only* in separate conspiracies *unrelated* to the overall conspiracy charged

in the indictment."  *United States v. Bartko*, 728 F.3d 327, 344 (4th Cir. 2013) (emphasis added)

(internal quotation marks omitted); *United States v. Squillacote*, 221 F.3d 542, 574 (4th Cir. 2000).

Put differently, the instruction is only appropriate "when there is some evidence that multiple

conspiracies may have existed, and a finding that multiple conspiracies existed would constitute a material variance from the indictment."  Model Crim. Jury Instr. 8th Cir. 5.06B (2018); *see* Sand, Modern Federal Jury Instructions, 19-5, Multiple Conspiracies, Comment ("[T]he multiple conspiracy charge need not be submitted to the jury if substantial evidence has demonstrated the existence of a single, ongoing conspiracy, since the possibility of a 'variance' does not exist.").  Courts have further cautioned that a multiple conspiracies instruction is rarely "appropriate in the trial of a single defendant."  *Id.*; *see also United States v. Richardson*, 532 F.3d 1279, 1291 (11th Cir. 2008) ( "[I]t seems clear that the instruction is intended for use in cases charging *multiple* defendants with a single conspiracy.") (emphasis in original).  And, "even if one overarching conspiracy is not evident, the district court's failure to give a multiple conspiracies instruction is reversible error only when the evidence of multiple conspiracies [was] *so* strong in relation to that of a single conspiracy that the jury probably would have acquitted on the conspiracy count had it been given a cautionary multiple-conspiracy instruction."  *United States v. Cannady*, 924 F.3d 94, 101 (4th Cir. 2019) (internal quotation marks omitted).

The Fourth Circuit has instructed that "'[w]hether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals.'"  *United States v. Eccleston*, 615 F. App'x 767, 789 (4th Cir. 2015) (quoting *United States v. Stockton,* 349 F.3d 755, 762 (4th Cir.2003)); *see also Bartko*; 728 F.3d at 344-45 (concluding multiple conspiracies instruction was not warranted where the actors in the conspiracy were identical, and "methods of investor recruitment and the handling of their money" and "goals of raising money for investing and personal gain were the same.").  That is, "a single conspiracy exists where there is 'one overall agreement,' or 'one general business venture."  *Eccleston*, 615 F. App'x at 789 (quoting *United States v. Leavis,* 853 F.2d 215, 218 (4th Cir.1988)).  Moreover, there is "no requirement that every

member must participate in every transaction to find a single conspiracy." *United States v. Dieguez*, 633 F. App'x 106, 109 (4th Cir. 2015). And, the fact that the defendant may not have been aware of *all* the activities of her co-conspirators does "not prevent the jury from determining that a single conspiracy existed." *Squillacote*, 221 F.3d at 574; *see United States v. Banks,* 10 F.3d 1044, 1054 (4th Cir.1993) ("[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence."); *United States v. Johnson,* 54 F.3d 1150, 1154 (4th Cir.1995) (concluding that evidence established a single conspiracy even if the members of the conspiracy did not know each other or had limited contact with each other).

Here, there is no factual basis for a multiple conspiracies instruction because there is no evidence of any conspiracy separate from the conspiracy charged in the Indictment. The Indictment charges that the defendant and her co-conspirators engaged in a scheme to "defraud binary options investors in BinaryBook and BigOption" and to obtain money and property "by means of materially false and fraudulent pretenses, representations and promises." D.E. 37, Indictment, ¶ 17. The Indictment further alleged that the purpose of the conspiracy was "to obtain the maximum deposit from investors and to take steps to ensure that investors lost the money in their accounts—thereby making money for themselves and their brand in the process." *Id.* ¶ 18.

The evidence at trial has established precisely such a single conspiracy, with the defendant, as Yukom's CEO, at the center. Three of the defendant's co-conspirators and employees, Shira Uzan, Liora Welles, and Yair Hadar, testified that the defendant trained them to solicit deposits from customers using false materially misleading statements about (1) their experience; (2) their success as binary options traders; (3) historic and expected rates of return; and (4) whether they (and Yukom) had any financial incentive to make clients money. In addition, Numaris (Tel-Aviv)

employee and co-conspirator Austin Smith testified that Numaris employees made the same misrepresentations to clients and were provided with the same training materials (scripts, templates, and audio recordings of client calls).  The defendant herself sent roughly a dozen calls — recordings of Yukom employees lying to clients about experience, success rates, guaranteed rates of return, and other information — to Numaris management, including Ronen Roytman, to be used in training for Numaris employees.[1]  The testimony of cooperating witnesses, as well as other evidence, established that the defendant's employees in Caesarea and Tel Aviv largely used similar techniques and misrepresentations to further the scheme, through the precise lies varied by employee and client.

In short, the evidence presented at trial has established that there was a single conspiracy with the sole objective of defrauding clients and that the conspirators used the same techniques to perpetrate the scheme.  There has been no evidence to suggest a "separate" conspiracy *"unrelated to the overall conspiracy charged in the indictment"* and thus a multiple conspiracy charge is not appropriate in this case.  *See Bartko*, 728 F.3d at 344.  To the extent the defendant wishes to argue that certain acts were outside the scope of the conspiracy, she can rely on Proposed Instruction 53 – Acts and Declarations of Alleged Co-Conspirators.  This instruction accurately states the law, including the requirements that the jury must find beyond a reasonable doubt that the defendant "was a member of the conspiracy charged in the Indictment" before she can be found liable for the

---

[1] Exhibits 616T, 618T, 619T, 620T, 621T, 629T, 630T (with attachments).  *See also* Exhibit 615T (with attachments); Tr. Tans. July 26, 2019 (PM) at 25-26, Austin Smith Direct Examination ("Q What was the office suppose to take from these recordings?  A That these were calls in which -- that would be considered successful. That were used to either save withdrawals to use certain techniques in order to take more money from the individuals on the other end of the phone.  Q Did those techniques include lying?  A Yes.  Q After August 26, 2015, how common was it to hear calls with clients in the Tel Aviv office where these same lies were told to clients?  A Every single call. I do not recall one conversation where lies were not said on the phone.").

actions of her co-conspirators and that if acts or statements "were not done or said in furtherance of the conspiracy," then they may not be considered as evidence against the defendant.  Thus, the jury will be adequately instructed that it must find that the defendant was a member of the conspiracy charged in the Indictment, as opposed to some other scheme, and no additional instruction on multiple conspiracies is warranted.  *See United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (rejecting request for multiple conspiracy instruction and noting that instructions "addressed" defendant's concern "that the jury be informed that it had to acquit [defendant] unless it found that he was a member of the conspiracy charged in the indictment."); *United States v. Powell*, 982 F.2d 1422, 1433 (10th Cir. 1992) (concluding "trial court need not instruct on multiple conspiracies as long as the jury instructions adequately convey[] that the government had the burden of proving beyond a reasonable doubt the single conspiracy as alleged.") (internal quotation marks omitted).

## II.     An Instruction on Willful Blindness is Appropriate in this Case.

The government respectfully submits that a willful blindness instruction is appropriate in this case, in light of the defendant's assertions that despite being CEO of Yukom, she was unaware of the fraud taking place around her.  As the Fourth Circuit has explained, "[t]he principle that willful blindness will satisfy a knowledge element in criminal law is premised on the idea that defendants should not be permitted to escape the reach of criminal statutes that require proof that a defendant acted knowingly or willfully by deliberately shielding themselves from clear evidence of critical facts that are strongly suggested by the circumstances." *United States v. Hale*, 857 F.3d 158, 168 (4th Cir. 2017).  To establish willful blindness, two requirements must be met:  "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 168.

It is appropriate to "instruct the jury on willful blindness when the defendant claims lack of guilty knowledge in the face of evidence supporting an inference of deliberate ignorance." *Hale*, 857 F.3d at 168 (internal quotation marks omitted). Put differently, a willful blindness instruction "is appropriate where the evidence supports an inference of deliberate ignorance—that is, where the defendant was presented with facts that placed him on notice that criminal activity was particularly likely, yet intentionally failed to investigate." *United States v. Davis*, 901 F.3d 1030, 1034 (8th Cir. 2018) (internal quotation marks omitted). The Fourth Circuit has made clear that "[f]or a district court to give a willful blindness instruction, all that is necessary is evidence from which the jury could infer deliberate avoidance of knowledge." *United States v. Logan*, 593 F. App'x 179, 185 (4th Cir. 2014) (internal quotation marks omitted).

Here, the primary argument advanced by the defense is that Ms. Elbaz was aware of some, but not all, the lies told by her employees and, therefore, was not aware of the fraud perpetrated by her employees. In opening, the defendant conceded that she knew employees were lying about their names and their level of experience.[2] However, the defendant has claimed not to know that her employees were lying to clients about (1) their success as binary options traders; (2) historic and expected rates of return; (3) whether Yukom had any financial incentive to make clients money; and (4) whether and when clients could withdraw their money.[3] *See United States v. Ali*,

---

[2] *See* Tr. Tans. July 16, 2019 (PM) at 48, Defense Opening Statement ("[S]some of them would say I have experience, I worked in the financial industry for 15 years even if it wasn't true."). However, the defendant appears to have conceded that she later learned that Yukom employees could not lie to clients about their experience as traders. *See id.* at 49 ("[Y]ou couldn't say I have 15 years of experience in the financial industry unless that was true.").

[3] *See id.* at 48-49 ("Ms. Elbaz understood from day one that it was Yukom policy not to allow any misrepresentation about the product. You couldn't lie about your results. You couldn't lie about the risks. You couldn't lie about the binary options.").

735 F.3d 176, 188 (4th Cir. 2013) (holding willful blindness instruction is appropriate where defendant "ignored warning signs from his employees").

Here, however, the government has introduced ample evidence at trial to establish that the defendant actually knew her employees were lying to clients about these material facts and she trained many of them to lie to clients in precisely this manner.[4]  The defendant also lied directly to clients about rates of return, her success and experience as a trader, and whether her interests were aligned with the client's.[5]  Moreover, there is substantial evidence in the record that the defendant was a vigilant manager who was frequently at the office — evidence shows the defendant tracked her employees, regular monitored customer deposits and withdrawal attempts, and directly managed customer risk settings.[6]  In addition, the defendant recorded employee calls

---

[4] *See, e.g.,* Exhibit 37.2. 37.2S, 37.3, 37.3S, 37.4, 37.4S, 37.6, 37.6S, 37.8, 37.8S, 37.9, 37.9S (excerpts of recording of training session conducted by Lee Elbaz); Tr. Tans. July 16, 2019 (PM) at 54-55, Direct Examination of Shira Uzan ("Q:  Ms. Uzan, during your training, did Ms. Elbaz talk to you about how to speak with clients about their success?  A:  Yes.").

[5] *See* Exhibit 22T, 22.1, 22.1S, Email from Lena Green to Alexander Goldman, Jonathan Darmond, Andy Cameron, Jessy Rob with attachment, "John Loris VS Thomas Kristiansen - 296820."  In this call, the defendant introduces herself as Lena Green, "almost the CEO," 22.1S at 6:22, and someone who does not handle clients "less than 250K." 22.1S at 14:10.  The defendant further tells the client, You must work with me step by step, hand in hand, and I need you to be my partner. I need you to be my husband for the next six months. We gonna do it together." 22.1S at 14:10.  And, the defendant promises the client that she will recover the client's $50,000 losses from the stock market based if he invests $10,000.  22.1S at 15:34, 17:35, 18:41.

[6] *See, e.g.,* Tr. Trans. July 18, 2019 (AM) at 35, Direct Examination of Shira Uzan ("Q: So starting with the first building, how often was Ms. Elbaz in the office would you say?  A: Every day.  Q:  And how often was Ms. Elbaz in the office in the second building?  A: Every day."); Tr. Trans. July 19, 2019 (AM) at 102, Direct Examination of Liora Welles ("Q:  When she was your direct supervisor, how often would you speak with Ms. Elbaz?  A: On a daily basis."); *id.* at 107 ("A. She was always in the office. She was in full control of what was going on. You know, she - - even if we were like a few minutes late to the shift, she would make sure to call. She was very involved with the employees on a daily basis, making sure that everybody, you know, was doing their job."); Tr. Trans. July 26, 2019 (PM) at 58-59, Direct Examination of Yair Hadar ("Q:  How often was Ms. Elbaz in the office?  A:. She was in the office from morning until night almost.");

with clients and later used them for training purposes.[7]  Yet, the defendant has suggested that she did not open training scripts containing misrepresentations or actually listen to the client/employee calls that she forwarded as exemplars for training purposes.[8]  This argument is precisely why a willful blindness instruction is appropriate in this case.  The government is entitled to argue (and the jury may conclude) that if the defendant, as CEO, did not see what was going on around her, it is because she was deliberately and willfully blind to her surroundings.  *See United States v. Jinwright*, 683 F.3d 471, 478–79 (4th Cir. 2012) ("[T]the doctrine of willful blindness permits the government to prove knowledge by establishing that the defendant deliberately shielded himself from clear evidence of critical facts that are strongly suggested by the circumstances."); *see also United States v. Hansen*, 791 F.3d 863, 868 (8th Cir. 2015) (instruction appropriate where "evidence was sufficient for the government to prove that if Hansen had no actual knowledge of his misrepresentations, then this was only because he chose to bury his head in the sand").[9]

---

see also Exhibits 4, 5T, 12, 14, 15, 23, 24, 383, 418 674T (defendant directing changes to client risk settings).

[7] *See* Exhibits 22T, 618T, 619T, 620T, 621T, 628T, 630T (emails from the defendant to other Yukom and Nuamris employees attaching client calls).

[8] *See* Tr. Trans. July 24, 2019 (PM) at 31, Cross-Examination of SA Gregory Fine (Well, as part of your investigation, did you do an analysis, a computer forensic analysis to determine whether or not Ms. Elbaz even ever opened this attachment?"); *id.* at 32 ("Okay. On this one, did you do the forensics to determine whether or not Ms. Elbaz ever even opened the attachment?"); *id.* at 60 ("Again, did you do any forensic analysis to determine whether Ms. Elbaz ever opened the audio files and listened to the calls or whether she just simply got the calls from the IL coordinator of Binary Book and forwarded them on to Mr. Roytman?"); Tr. Trans. July 25, 2019 (AM) at 58 ("Both in 27 and in 36, there's no response from Ms. Elbaz indicating whether or not she has even opened the attachments.  Correct?").

[9] While the government maintains that the defendant knew her employees and co-conspirators were lying to clients in furtherance of the scheme to defraud, this argument and evidence of the defendant's direct knowledge does not "preclude [the government] from seeking a willful blindness instruction." *Jinwright*, 683 F.3d at 479; *see also United States v. Vinson*, 852 F.3d 333, 357 (4th Cir. 2017) (affirming willful blindness instruction even where "there was ample evidence that Vinson knowingly and intentionally engaged in fraudulent activities").

Accordingly, the government respectfully requests that the Court include a willful blindness instruction in its charge to the jury and will provide a proposed instruction based on the pattern by separate filing.  This proposed instruction accurately characterizes the applicable law and is appropriate given the facts of this case.

Dated:  July 29, 2019

Respectfully submitted,

ROBERT A. ZINK
Acting Chief, Fraud Section

By:            /s/
L. Rush Atkinson, Trial Attorney
Caitlin R. Cottingham, Trial Attorney
Henry P. Van Dyck, Deputy Chief
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Ave. NW
Washington, D.C. 20530

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 29, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will notify counsel for the defendant of the filing.

By: _____/s/_____

Caitlin Cottingham
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice