```
                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
                        SOUTHERN DIVISION


- - - - - - - - - - - - - - x
                             :
                             :
UNITED STATES OF AMERICA,    :
                             :       Criminal No. 18-00157-TDC
     v.                      :
                             :
LEE ELBAZ,                   :
                             :
          Defendant.         :
                             :
- - - - - - - - - - - - - - x     July 29, 2019


                                  Greenbelt, Maryland
```

**STATUS CONFERENCE CALL**

BEFORE:   THE HONORABLE THEODORE D. CHUANG, Judge

APPEARANCES:                JENNIFER FARER, Esq.
                            DAVID STIER, Esq.
                            United States Department of Justice
                            1400 New York Avenue
                            Washington, D.C.  20530
                              On Behalf of the Government

                            JESSICA A. ETTINGER, Esq.
                            Robbins, Russell, Englert, Orseck,
                            Untereiner and Sauber, LLP
                            2000 K Street N.W., 4th Floor
                            Washington, DC  20006
                              On Behalf of the Defendant

                            BARRY JOEL POLLACK, Esq.
                            Robbins, Russell, Englert, Orseck,
                            Untereiner & Sauber, LLP
                            1801 K Street, N.W. Suite 411L
                            Washington, DC  20006
                              On Behalf of the Defendant

Audio Operator:             Jessi Hibbs

Transcription Company:      CompuScribe
                            P.O. Box 789
                            Cheltenham, Maryland  20623-9998
                            (301) 577-5882


Proceeding recorded by electronic sound recording, transcript
produced by transcription service.

1                  P R O C E E D I N G S

2          (Whereupon, at 4:05 p.m., the telephone conference

3     began.)

4               THE CLERK:  -- counsel, please identify yourselves

5     for the record.

6               MS. FARER:  This is Jennifer Farer, from the

7     Government's filter team, and my colleague, Dave Stier, is

8     with me as well.

9               THE COURT:  Good afternoon.

10              MS. ETTINGER:  This is Jess Ettinger, for the

11    Defense, and with me is Barry Pollack.

12              THE COURT:  Okay.  Good afternoon.  This is a status

13    conference of sorts.  But I suppose, if we had more time, I

14    might --- findings I want to make on the record.  And so,

15    Ms. Ettinger, are you comfortable waiving Ms. Elbaz's presence

16    for today?

17              MS. ETTINGER:  Yes, we are.

18              THE COURT:  At least now.  You can always change

19    your mind later if you feel like there is something we need to

20    save for her.  Is that okay?

21              MS. ETTINGER:  Yes, Your Honor.

22              THE COURT:  Okay.  So I just wanted to, in the

23    interest of time, given where we are in the trial, just cover

24    a little ground.  Some of it more -- I also have some

25    questions for you all from an argument standpoint.

1              First off, as you saw -- first of all, Ms. Farer,

2    what happened with the certified translations of the documents

3    that I referenced in the Saturday order?

4              MS. FARER:  They are currently in progress, Your

5    Honor.  We anticipate they will be coming in on a long basis

6    between now and tomorrow.  It just takes a while for these,

7    and with the --- there were a number of ---

8              THE COURT:  Right.  I understand.  So anyway, I

9    issued an order this afternoon, hopefully you saw it, which

10   basically -- so the documents that the Defense did not object

11   to, I authorized their disclosure.  I also -- and I want to

12   explain this now.

13             I also authorized the disclosure of the documents in

14   tranches two and three that the Defense said they had no

15   objections to based on the uncertified translation but wanted

16   to reserve and not actually -- or they still were objecting

17   because they hadn't seen the actual certified translation.

18             My view on that and why that order was different

19   than the one on Saturday is having seen more of these in this

20   category and more of the documents I am -- I concluded that in

21   those cases, even if there were some slight mistranslations,

22   that it was very clear from those that they were -- they

23   related to the subject matter that we are discussing as having

24   been raised, and so I do not -- I don't see a change in that

25   decision based a certified translation.

1              I certainly would not -- I mean, I think we can

2     cross that bridge when we get to it, in terms of using the

3     document.  If we want -- when we need a certified translation,

4     to use it.  But just in terms of ruling on the privilege, if

5     you pleaded that, then that is not necessary for those.

6              Now what that means is documents for which there is

7     an objection in general or there is this category one refers

8     to as involving another company and -- first off, this issue

9     with the other company, and I don't know what to extent -- if

10    there is some issue here where I am asking you to say

11    something that you have a problem saying in front of the

12    filter team, Ms. Ettinger, you can tell me.

13             But I really think their -- and I wanted their input

14    on process issues, as well as if they had any knowledge on

15    certain points --- I have seen some documents, and from

16    looking at the Defense's report on July 27th, and then on page

17    three, starting with filter wave 4178 and down to 8862 where

18    the objection was they pertained to a company that has not

19    been discussed at any point during the Government's case and

20    which the Defense anticipate discussing in its case in chief.

21             I wasn't 100 percent sure what you meant by that,

22    Ms. Ettinger, but I did look at those, and it seems that there

23    are emails going to and from a company called Alpha Binary*.

24    But if I am not mistaken, I believe -- and then you have got

25    -- all of these are forwarded by one of the people who is

1  affiliated with the companies involved in this case.

2          So maybe you can explain to me a little bit better

3  why you think those are outside the scope of the waiver or are

4  not relevant.  And the relevance again -- all I am deciding

5  here is privilege.  Relevance is the next step if anybody else

6  she wants to use this.

7          But why is that --- perhaps because you think it

8  involves different companies than the ones at issue here?

9          MS. ETTINGER:  I think that --- Your Honor just

10  described.  The company that we were referring to is Alpha

11  Binary.  That company hasn't come up in the course of the

12  litigation.  We don't anticipate that it will come up in the

13  course of the litigation, and we don't understand it to be an

14  affiliate of the companies that are involved in the litigation

15  in the same way as perhaps other companies seem to be related.

16          So we understood it to be outside the scope of Your

17  Honor's order.

18          THE COURT:  Well, am I correct though that the

19  emails -- and there were some filed in tranches two and three

20  as well.  Am I correct that these emails do end up in the

21  hands of Mr. Herzog* --- forwarded by another person?

22          MS. ETTINGER:  Yes, Your Honor.  That is correct.

23  There is some correspondence, but that doesn't reach Mr.

24  Herzog I don't believe.  But the advice is being given to

25  Alpha Binary, and so the focus of the correspondence seems to

1   be about legal opinions that Alpha Binary itself is obtaining

2   versus legal opinions that the entities at issue in this

3   litigation are obtaining.

4           THE COURT:  Okay.  Although it does seem that as

5   part of this Mr. Herzog seems to be collecting information on

6   these topics.  And if I am not mistaken, at least one of the

7   law firms is one that we have seen already.  The Australian

8   firm?

9           MS. ETTINGER:  That is correct, Your Honor.

10          THE COURT:  Do you have information that you can

11  proffer as to how these two companies are related or not

12  related?  Do you know anything about them and the facts that

13  would help assure me they are not affiliated in any way?  Or

14  you just don't know anything about them?

15          MS. ETTINGER:  The short answer, Your Honor, is that

16  I don't know the answer to your question exactly, of whether

17  the companies are related to one another.  It is possible that

18  Mr. Herzog may have an ownership interest in Alpha Binary, but

19  I am not certain about that fact.

20          Regardless though, I would emphasize that because

21  the advice is being obtained by Alpha Binary, even if it is

22  being shared with Mr. Herzog, it is still specific to the

23  Alpha Binary company versus Yukom or the other companies.

24          THE COURT:  Well, okay.  Maybe I am asking a

25  different question, which is if Alpha -- it seems to me if

1   Alpha Binary is affiliated with Yukom, then this may well be

2   covered.  If Alpha Binary is unaffiliated, then why isn't this

3   whole --- just waived by the fact that it is shared with

4   Mr. Herzog?  Waived by Alpha Binary.

5            MS. ETTINGER:  It is possible they have a common

6   interest, Your Honor.

7            THE COURT:  Well, I mean, I am not sure what the

8   common interest -- it is possible that you are not asserting

9   it.  You know, the fact that -- I mean, once they have a

10  common interest, I mean, it seems to me everybody else who has

11  a common interest is basically a part of this whole --- Yukom

12  --- Lincopia*.

13           So again, the common interest -- it seems to me

14  there have been -- would have been -- that we just put this

15  into the realm of something that is --- now.  Anyway, okay.

16           Just so I understand, this individual, I think the

17  first name is Yose*.  But it is different than Mr. Herzog.

18  Again, you don't know about him, as to whether he has any

19  interest in Yukom or Lincopia or the other way around, that

20  Mr. Herzog has any interest in his company?

21           MS. ETTINGER:  Correct, correct.  My understanding

22  is that it is possible Mr. Herzog might have an ownership

23  interest in Alpha Binary, but I cannot say that with

24  certainty.  And I do not believe that the other, Yose, has an

25  ownership interest in Yukom or Lincopia.  But again, that is

1   my understanding.

2           THE COURT:  Okay.  I understand.  That is helpful.

3   So I am going to want to go back and look and see just to see

4   exactly why these --- our universe.  But I believe they all

5   end up getting forwarded to Mr. Herzog.  Maybe it is somebody

6   else in this universe, but I will check on that.

7           Let me just tell all of you where I stand on the

8   other documents that the Defense has objected to.  So first

9   off, with respect to -- I will just go ahead in order,

10  starting with ECF 258.  The Alpha Binary documents I will call

11  them.  On page three from the DOJ --- 4178 --- 8668.

12          I am going to go back and check and make sure ---

13  but to the extent that they were provided to Mr. Herzog or

14  someone else on the Yukom side or --- Yukom, I am going to

15  find that these are -- I am going to authorize disclosure of

16  these documents for two reasons.

17          One is to the extent there is an affiliation between

18  Mr. Herzog and these individuals, and particularly --- using

19  the same law firm at one point, these do feel as the same

20  subject matter.  In particular, there are emails about, I

21  believe, --- he helped customers in the United States, among

22  other topics that are on the issue of waived categories.

23          And to the extent that there is an argument that

24  these are completely separate companies, --- the privilege has

25  been waived by having shared it with Mr. Herzog.  There is no

1   evidence of any kind of common interest here, and so --- of

2   those documents.

3          If there is anything -- for some reason it didn't go

4   outside of that relationship, then I may pull those off the

5   list.  So --- but that is where I expect to be on that issue.

6          As for the --- in which there is more of a general

7   objection, --- on documents listed on page four of ECF Number

8   258, I agree with the Defense that most, if not -- most of

9   those are not subject to production because they deal with

10  other subject matters not related to the areas of -- that I

11  --- have occurred.

12         The one exception is ECF Number 103 which, upon my

13  review, appears to be not privileged at all.  But I invite

14  you, Ms. Ettinger, if you want to tell me whether you think

15  there is an argument that it is privileged.  This is an email

16  chain, I think, involving Danny from Dutka*, wnklaw.com.il.

17  And although it is in two different languages, it looks like

18  it is someone from a -- basically making a statement about

19  Mr. Herzog being involved in -- I think moving the arrow of

20  wealth recovery international, and it does not look as if it

21  is advice between Yukom individuals and --- attorneys.

22         It looks like it is written by an outside attorney

23  or a person making allegations, which would not be privileged.

24  Do you agree with that?  Or do you have a reason to think that

25  that is not correct?

1          MS. ETTINGER:  I read the document a little bit

2     differently, Your Honor.  I read the document to be -- and to

3     make sure I am on the same document, it ends in 103.  It is

4     correspondence with between Mr. Herzog and his attorneys

5     concerning wealth recovery, and his attorneys have

6     communicated information to him about -- I agree a copy and

7     paste of what other people are saying about wealth recovery

8     and Mr. Herzog himself.

9          But I --- in the context of a lawsuit with Yukom,

10    which you can see on the page 105 where there is a web link to

11    lawsuit-Yukom.  So the way I read the document was it was a

12    communication between Mr. Herzog and his attorneys in

13    connection with ongoing litigation, and the attorneys were

14    communicating information to him pertinent to the lawsuit.

15         THE COURT:  So this paragraph says, "We believe that

16    Yukom --- Israel was coming behind --- binary option ---

17    including binary ---," et cetera.  Who are you saying wrote

18    that?

19         MS. ETTINGER:  The way I read the document I believe

20    Danny who is sending that email from the --

21         THE COURT:  Do you know anything about him?  Is he a

22    lawyer from Mr. Herzog or is he something else?

23         MS. ETTINGER:  I recognize the name in the first --

24    within the "to" line as an attorney from Mr. Herzog.  And

25    Danny, by way of his email address, as being an affiliate or

1   another attorney at Mr. Frit's* firm.  And I know ---

2   represented Mr. Herzog.

3          When I read that paragraph, the one within the

4   Google Translate version, begins with "my emphases."  Danny

5   has copied and pasted what I believe was at one point posted

6   somewhere perhaps publicly, but then has added emphases to

7   those paragraph pertinent to his client and to which he wants

8   to draw his client's attention.

9          THE COURT:  So you are just saying that even though

10  the article itself is probably not a privileged article, the

11  fact that Danny is forwarding it --- relationship is either

12  implicitly providing some advice or is in the context of

13  providing to Mr. Herzog?

14         MS. ETTINGER:  Yes, Your Honor.  And I would go one

15  step further just in the fact that -- because Danny, the

16  attorney, has selected these passages in particular.  He is

17  not only communicating information, but he is communicating it

18  in a way to -- almost akin to a work product; that he is

19  drawing his client's attention to particular portions of that

20  fact based information.

21         THE COURT:  I mean, I think that -- I don't know if

22  the filter team has anything they want to add on this, but --

23         MS. FARER:  We would add, for all of these documents

24  relating to complaints and lawsuits, Your Honor, that they go

25  directly to the Defendants and the -- you know, the company

1   and employees and --- notice of alleged violations, the

2   information that they provide to attorneys concerning opinions

3   on such alleged violations and any good faith reliance on

4   those opinions.

5            THE COURT:  Well, you are saying it is not

6   privileged or it is waived?

7            MS. FARER:  I think privilege is waived, Your Honor.

8            THE COURT:  Because of my prior ruling or because it

9   is without --- confidential relationship?

10           MS. FARER:  It is waived because it falls within the

11   scope of --- it is not a waiver.

12           THE COURT:  Well, leaving aside the question of

13   whether just forwarding someone's information to be work

14   product or attorney/client privilege, I think -- you know, out

15   of an abundance of caution lawyers are always making that

16   argument.  I think the line is not probably as conservative as

17   that.

18           But given where we are, I don't think it is really

19   appropriate --- in a position to delve into exactly where that

20   line is.  so I am going to accept now for the moment the

21   argument that --- forwarded by the attorney, that it may well

22   be attorney/client privilege and work product.

23           So then the question really is the waiver question

24   and I suppose there is an argument involving the reference to

25   American authorities.  But I think the topic I had covered on

1   this issue was really more of whether customers from the

2   United States can use this service or whether they can do

3   business in the United States.  So I think that is a different

4   topic.

5           My initial thought on this is it was not privileged,

6   and so, accepting Ms. Ettinger's view on that, I will agree

7   that it is not within the scope.  So I will not order the

8   production of 103.  So that means that 103 down to 6722, which

9   are the ones on page four of ECF 258, I would agree with the

10  Defense objections on those.

11          MS. FARER:  Your Honor, this is Jennifer Farer, from

12  the filter team.  We would just like to call your attention to

13  a document within that universe, 3961.  Within that document

14  it specifically addresses the extraterritorial application of

15  laws to United States citizens and --- reflects discussion

16  about compliance with CFTC regulations --- for the company,

17  Lintopia, which the Court has accepted as an affiliate of

18  Yukom and the companies --- .

19          THE COURT:  3961.  Let me see if I can find it.

20      (Pause)

21          THE COURT:  Okay.  This is one of our primarily ---

22  documents.

23          MS. FARER:  I know the portion of the email in which

24  Mr. Cohen advises an attorney that he and Mr. Herzog have a

25  legal opinion and would like to understand the fuss about --

1  regarding bodies that work --- opinions in countries in which

2  they operate.

3        Basically they are asking why the laws of another

4  country force out or cancel the laws of the active countries

5  in which they operate.  So they are specifically going to the

6  heart of the issue here about the extraterritorial application

7  of American laws.

8        THE COURT:  Yes.  I think this one is a close call.

9  There is this issue about the extraterritoriality of legal

10 systems, which is not quite the same point I think.  I did

11 notice that, and it is a little different than saying that you

12 are not allowed to do business or brokers in that country are

13 allowed to do business with you or require a license.

14        But basically, I think the question was whether or

15 not you can -- if the laws of one country will fly in another.

16 But I don't know if it is directly connected to the question

17 of these companies doing business or the fact that they are

18 doing business only subject to a particular provision or, in

19 this case, criminal law or otherwise.

20        I saw that as slightly -- or close to the line but

21 not necessarily over it.  Now there is this other portion

22 about the CFTC.  How do you read that?  This is on -- I am not

23 sure I can really help you with page numbers.  I am looking at

24 your --

25        MS. FARER:  Yes.  I think the entire chain, when

 1  writing context, Your Honor, and particularly with other

 2  documents that we have provided, essentially the companies are

 3  evaluating sort of the allegations or whether they are in

 4  compliance with CFTC regulations, whether they need to have

 5  licenses within these other countries where they are not

 6  physically based.

 7          So for those reasons, we think that this particular

 8  document falls squarely into the waiver rulings about whether

 9  brokers with which Yukom works are required to have a license

10  under the law of any foreign country and whether Yukom

11  Communications can do business with customers from any foreign

12  country.

13          And the portion on the CFTC they are discussing

14  whether a settlement should be sought with the CFTC.  Some of

15  the documents that we have provided the company -- at least

16  one of the company affiliates received a notice from the CFTC

17  enforcement, and so they are trying to figure out how to

18  resolve this issue, which again sort of goes to the heart of

19  their question about how and why the CFTC should be regulating

20  and evaluating their practices.

21          MS. ETTINGER:  Your Honor, if I may respond to that?

22  This is Jessica Ettinger.

23          THE COURT:  Yes, go ahead.

24          MS. ETTINGER:  The way I read this document is that

25  it is privileged correspondence between the Barnaya* Law Firm,

1    Mr. Cohen and Mr. Herzog regarding whether or not they should

2    be considering a voluntary disclosure to the CFTC, which is a

3    fact based inquiry and at the heart of privileged

4    communications between attorneys and clients, which is outside

5    the scope of the Court's order concerning more broadly whether

6    various forms of options trading are barred or regulated by

7    the CFTC.

8              So I just view it as correspondence different in

9    kind from the subject matter waiver that Your Honor found on

10   July 17th.

11             THE COURT:  Are you saying that -- at this point are

12   they taking the position that they are subject to CFTC

13   regulation and they just want to figure out how they want to

14   deal with that?  Or where do you see them chronologically on

15   that question at this point in time on May 29th?  Or May 30 of

16   2016.

17             MS. ETTINGER:  I see them early in the process in

18   trying to determine what the facts are and how the facts

19   specifics to their companies might be implicated by existing

20   regulations for the CFTC.  So I view it as an early

21   correspondence within the attorney/client relationship.

22             MS. FARER:  And we would disagree with that

23   interpretation.  It is at this time where the company is on

24   notice that the CFTC is looking at them, and so -- I mean,

25   discussion about "a disclosure" --- voluntary disclosure in

1    the first instance as one might think of making a disclosure

2    of an identified issue, but rather, what facts to provide in

3    discourse with the CFTC.

4          We understand that the language barrier here makes a

5    distinction a little bit more complicated to glean in the

6    first instance, but we do believe that this particular email

7    is directly -- held squarely within the scope of the waiver

8    and the companies' and the individuals' notice that they are

9    not appropriately following the laws of the United States.

10         MR. STIER:  Your Honor, apologies.  This is David

11   Stier.  I would draw your attention to the May 30th 1:36 a.m.

12   email from Mr. Barnaya which, from the Google Translate

13   version, he seems to indicate that he would be happy to

14   receive a copy from the spoken opinion.  This is from

15   Mr. Cohen.

16         And my understanding and my read of that is that

17   Mr. Cohen and Mr. Herzog have advised this law firm that they

18   have, either in the pipeline or received, likely from

19   Mr. Bueton*, a legal opinion that says they need not comply

20   with the laws of the United States or other countries.

21         The next sentence indicates the seriousness with

22   which Mr. Barnaya takes that, saying, "Please note, the

23   application of most legal systems is territorial, and this is

24   particularly serious when it comes to what goes into the

25   securities office framework."

1            I think the extent to which they obtain that

2    information from a law firm and acted on it or did not with

3    respect to the legal opinion that they had in the pipeline or

4    that existed is highly relevant and falls within the scope of

5    the waiver.

6            THE COURT:  When you say --- opinion, do you think

7    that relates back to any of the opinions that they have seen?

8            MR. STIER:  I do, Your Honor.  I think this is in

9    the month or months following issued by Mr. David Bueton about

10   the applicability of requiring a license in a foreign country.

11           THE COURT:  --- been the spoken opinion --- written

12   opinion --- ?

13           MR. STIER:  I am not certain of that, Your Honor.

14   But I do believe that this is referring to the opinion.

15           THE COURT:  ---

16           MR. STIER:  It may be lost in translation.  But if

17   Mr. Barnaya is asking for a copy of the spoken opinion, it

18   seems that at some point it was either committed to writing or

19   envisioned to be committed to writing.

20           MS. FARER:  And, Your Honor, this is Jennifer Farer.

21   Around the same time as well the company is engaging with

22   other U.S. law firms and it seems to -- so it just seems to be

23   all this simultaneous --- activity they are trying to evaluate

24   and working the evaluation of this issue and obtaining memos

25   and opinions relevant to the questions presented in this email

1   discussion.

2          THE COURT:  Okay.  Well, first of all, let's try to

3   keep it to one attorney per document at least.  But on this

4   one which part of my order are you saying this falls within?

5   Or orders.  The July 17th and the July 11th orders I think it

6   was.

7          MS. FARER:  We believe, Your Honor, that it falls

8   with into the scope of whether brokers with which Yukom works

9   are required to have a license under the law of any foreign

10  country.  Also, whether Yukom Communications can do business

11  with customers from any foreign country.  In the July 17th

12  waiver ruling, whether they are required to have -- whether

13  various forms of options trading are barred or regulated by

14  the Commodities Futures Trading Commission.

15         MS. ETTINGER:  Your Honor, this is Jess Ettinger.

16  If I may add?  The subject line is that it -- the email is

17  Lincopia.  So I don't read this email as being specifically

18  addressing Yukom.  If at all, it is focused on Lincopia.

19         To Mr. Stier's point, I don't think a spoken opinion

20  makes much sense for it to be one of the written opinions.

21  Perhaps something is lost in Google Translate, but I don't --

22  I don't understand the phrase spoken opinion to be the same as

23  one that has been committed to writing.

24         And just a last point, the fact that somebody seeks

25  out an attorney's counsel in connection with a voluntary

1  disclosure doesn't --

2           THE COURT:  Where are you getting the voluntary

3  disclosure from?  Show me the language that tells you that is

4  what is going on.

5           MS. ETTINGER:  Sure.  So I am looking at the email

6  just before the one that Mr. Stier pointed you to.  So it is

7  also on May 30th, but it is at 12:41 a.m., about an hour

8  earlier.  And the theme of --- clear period in the Google

9  Translate version.

10          The question is what information should be disclosed

11 in a voluntary turn and where it can roll and whether this is

12 the right step.

13          THE COURT:  Then it says -- this is the one that

14 then says why are the laws of another country specifically

15 imposed or obscured by the laws of the country of operation

16 and whether there is a criminal aspect or it is purely a civil

17 matter.  That is the same email?

18          MS. ETTINGER:  Yes, Your Honor.

19          THE COURT:  Okay.  Well, let me think about this

20 one.  Anything else on that list, I guess from the filter

21 team?  I don't want to go through all of them, but if there is

22 anything else you feel like it is a clear problem that I just

23 didn't understand what was going on?

24          MS. FARER:  I am just taking another look, Your

25 Honor.

1          MR. STIER:  Yes.  I am going to do the same, Your

2    Honor.  Thank you.

3       (Long pause.)

4          MS. FARER:  Your Honor, this is Jennifer Farer from

5    the filter team.  It does look like document ending 4550 also

6    relates to attorney/client communications regarding the

7    regulation of the CFTC and whether their conduct is barred by

8    those regulations.

9          THE COURT:  4550?  Just tell me, is that in English

10   or Hebrew right now?  Because I have got it in different

11   places here.

12          MS. FARER:  In English.

13      (Pause)

14          THE COURT:  Okay.  Right, okay.

15          MS. FARER:  And I think that also sort of gives a

16   little bit more context to 3961, Your Honor.

17          THE COURT:  So is this before or after or around the

18   same time?  A little after?  So does either side know what was

19   going on from what they have been reading, because I don't

20   have much context?  I mean, it seems like someone is saying

21   there is some kind of CFTC investigation.

22          There are references to these carbon letters, which

23   I did see through some of these.  They are apparently with a

24   law firm called --- Lincopia, various --- does anyone know

25   what was happening at this time?

1          MS. FARER:  If you would just give us one moment,

2     Your Honor.  The company did receive notice from CFTC

3     Enforcement around this same time period.  We will track that

4     down.

5          (Pause)

6          MR. STIER:  If I may, Your Honor?  It is David

7     Stier.  The company did receive notice from CFTC on April 21,

8     2016.  This is DOJ filter wave 3704 through 3708.  I believe

9     at least 3708 has been cleared by the Court in the -- 3704 and

10     3705 have been -- I think the Defendant does not object.

11          The notice indicates that Binary --- needs to be

12     registered with the CFTC.

13          THE COURT:  So that notice I am assuming is not

14     privileged.  At least maybe not that document.  That is not

15     priority information if --

16          MR. STIER:  That is correct, Your Honor.

17          THE COURT:  I mean, the prosecution may already know

18     that fact.  I think my though process in this area, now that I

19     am looking at 4550, even though I -- it seemed as if there was

20     either an enforcement action or the beginnings of one or at

21     least some discussion about it was that it wasn't clear what

22     the violation was.

23          But it did seem as if this was not about whether a

24     broker needs to be licensed or whether you could do business

25     with the United States, but whether they had violated any

1   particular laws or so forth, which is not exactly the same

2   thing, because the opinion was basically you can do business

3   with this country.

4         And I don't know whether, in looking at these

5   things, anyone is saying that the violation was they shouldn't

6   have been doing business at all or whether the violation is

7   that -- and even then it is not clear that that is about legal

8   advice.  That is about someone coming in and saying that you

9   are --- not really in the context of that advice.  At least as

10  I look at 4550, where it is really just one of these things

11  where it is forwarded among people.

12        Well, I guess this is sort of what information you

13  want to collect to deal with this.  But there is some

14  attorney/client work product associated with that.

15        I think what my thought process was, was, yes, it

16  has some of these buzz words, like CFTC and so forth, but that

17  it doesn't seem like this is in the context of anyone advising

18  them on a jurisdictional question, with the possible exception

19  of this portion that Ms. Farer pointed me to where it is sort

20  of an aside.

21        But anyway, that is why I thought that 4550 was

22  different, unless someone has a view on, again, the nature of

23  that enforcement action and why it would be clear that these

24  communications relate to any advice on their ability to do

25  business with the United States --- or for --- brokers ---

1             MS. FARER:  Yes, Your Honor.  So this is Jennifer

2    Farer.  I think this is all occurring around the same time

3    period.  They are obtaining the Paton* opinion and creating a

4    code of legal ethics that Defense has put at issue.  They

5    received notice from the CFTC that they are in violation of

6    regulations because they are not licensed and sort of

7    evaluating the license for both America, Israel and a variety

8    of countries, as reflected in the Paton opinion.

9             And so then you get these additional emails, the

10   Lincopia email at 3961, you know, sort of the question

11   surrounding that at 4550.  There are a number of documents

12   with United States firms Greenberg and Katten regarding the

13   same issue.  And so, it is our position that these all go to

14   the very heart of whether they need to be licensed when

15   operating with American customers; whether they are in

16   violation of U.S. laws, including CFTC regulations.

17            And this is all further bolstered by not only the

18   fact that they received a notice of potential violation by the

19   CFTC but the Carmen law firm complaints and other customer

20   complaints, whether informal through company channels or

21   externally through law firms and lawsuits sort of reflecting

22   the same issue and going to the heart of their violation of

23   these other laws, including licensing requirements.

24            THE COURT:  What in these documents tell us that

25   they are being advised there were licensing requirements,

1    there was U.S. jurisdiction over their activities or there is

2    going forward, as opposed to just what kind of information do

3    we need to fight off this enforcement action?  Which doesn't

4    really get into that question.

5           MS. FARER:  Well, the enforcement action itself says

6    that they are in violation of the licensing requirements, and

7    then, as they are evaluating it, the Lincopia email references

8    that.  And then there are later opinions from U.S. law firms

9    on this very point, evaluating sort of the nature of the

10   product that is being marketed and sold to American customers,

11   which goes to the issue of the licensing requirements and

12   compliance with U.S. laws.

13          And again, this is all sort of being done in

14   parallel around the same time with their evaluation of this

15   issue under Israeli law, et cetera, as put at issue by the

16   Paton opinions.

17          THE COURT:  Do you disagree with those factual

18   viewpoints, Ms. Ettinger, at all?

19          MS. ETTINGER:  Your Honor, I disagree with the way

20   Ms. Farer has characterized the waiver, I think more

21   generally, because as I listened to her over the last couple

22   of minutes in describing these documents, she is describing

23   almost a time period waiver, rather than something that is

24   subject matter specific as the Court's order states.

25          My understanding specific to the CFTC issue in these

1    documents is that there was -- they did seek out counsel, as

2    reflected in the documents, in relation to the enforcement

3    action.  They ultimately decided the CFTC didn't have

4    jurisdiction and then, nonetheless, decided to stop accepting

5    American customers.

6           That inquiry though of seeking out counsel and

7    having privileged communications about the facts specific to

8    those companies is core privileged material, and I don't think

9    it falls within the scope of the Court's order concerning

10   generally whether various of options tradings are barred or

11   regulated by the CFTC.

12          MS. FARER:  Your Honor, this is Jennifer Farer.  I

13   respectfully disagree with that.  I think that the time period

14   that I described goes -- give additional context that is

15   necessary to review all of these documents, because it goes to

16   the -- it sort of defines the scope of the subject that they

17   are evaluating, and they are very much evaluating the

18   licensing and the requirements of the CFTC regulations, which

19   are put at issue in a number of these documents and go to the

20   heart of sort of the issues and opinions raised by the

21   opinions that Defense counsel put at issue.

22          The point that Ms. Ettinger noted about whether or

23   not they ceased marketing or doing business with American

24   companies goes to the very heart of the very issue of good

25   faith reliance on legal opinions, and so these documents all

1  reflect the discussions and the context of those legal

2  opinions and whether the counsel was given the correct facts

3  and sort of the analysis that the opinions went through and

4  how they evolved and were presented to the company and its

5  employees on these issues.

6           THE COURT:  When was the CFTC notice about -- and I

7  am not sure what it was called again.  What kind of notice did

8  they issue and when did they issue it?

9           MS. FARER:  It was, I believe, February of 2016 and

10  really began to kick off all of these inquiries.  Similarly,

11  around the same time they had a complaint from a customer who

12  reported to the British Securities Commission.  We will be

13  submitting production in response to additional requests by

14  the prosecution team relating to that issue --- some of those

15  documents.

16           So all of this is happening at the same time.  So

17  the time period is relevant because it informs the scope of

18  the subject matter waiver and what the --

19           THE COURT:  It is in February that the CFTC issues

20  this notice.  And it goes to Yukom or who does it go to?

21           MS. FARER:  It gets circulated.  It definitely goes

22  to Herzog and Cohen.  I can try to pull it up.  I believe

23  Defendant also received a copy.  It does get circulated among

24  the relevant individuals here.

25           THE COURT:  And what does it say?  I don't know if

1    there is a way I can get a copy.  I mean, it must be a

2    non-privileged notice that just went out.  But what are they

3    accusing them of having done?

4              MR. STIER:  Your Honor, I think the notices that DOJ

5    -- sorry.  This is David Stier.  DOJ filter wave 2066, 2-0-6-

6    6.  I think that may be the notice we are referring to, and we

7    would have included the non-privileged notice just for

8    context.

9              THE COURT:  2066?  Okay.  Here we go.

10        (Pause)

11             MS. FARER:  And, Your Honor, the Lincopia referenced

12   is the engagement of New York lawyers on this issue.

13             THE COURT:  This document is undated though?  Like

14   how do I know when it was issued?

15             MR. STIER:  The cover email, Your Honor, which

16   starts at 2063, I believe is dated February 3rd of 2016.

17             THE COURT:  I see.  I don't know why people issue

18   these things without a date on it.  Okay.  So you are saying

19   this is issued before the March 3rd opinion by Mr. Bueton?

20             MS. FARER:  Yes, Your Honor.  You will see

21   subsequent documents contained in our production where they

22   are evaluating the extraterritorial application, including --

23   specific to this notice and the CFTC is referenced in a

24   Lincopia email, but also the documents relating to U.S. law

25   firms.  But we believe that is sort of at the heart of the

1   Paton opinion.

2            They are trying to have sort of a global catchall

3   that they are not required to have such licenses for other

4   countries.

5            MS. ETTINGER:  Your Honor, this is Jess Ettinger.  I

6   would point out that the first sentence of the letter to which

7   the filter team has drawn your attention at 2066 says that the

8   CFTC has received complaints regarding Binary Book in

9   connection with trading in "Forex and/or binary options."  So

10  that context is important.

11           And I understand the filter team's focus on the

12  dates.  But the fact that an entity were to receive this

13  letter in connection with maybe binary options or maybe Forex

14  trading and seek legal advice about it is not the same as

15  having received a written issued opinion about the CFTC.

16           And that privileged correspondence that is specific

17  to the CFTC is separate and apart from the legal opinion

18  letter issued by a different law firm that is more squarely

19  within the Court's order and which has not been -- versions of

20  which we have not objected to producing.

21           THE COURT:  I am just looking at the --

22           MS. FARER:  Your Honor, this is Jennifer Farer from

23  the filter team again.  I think, as both we and the

24  prosecution team has briefed on the issue of waiver, there

25  can't just be selective waiver of, you know, picking and

1    choosing certain opinions, as identified.

2            These are all coming -- and all of these discussions

3    and opinions are involving the same issues.  They are all

4    coming at the same time and giving context to one another for

5    reasons of whether the attorneys have been provided full

6    information; are or providing legal advice containing full

7    information.  You can't parse out all of these documents in a

8    vacuum.

9            THE COURT:  Okay.  I am actually trying to read

10   these and no one is stopping the argument.  So I am going to

11   stop the argument on these now.  We will move on to something

12   else.  I will get back to these either at the end or, after we

13   hang up, I will study them a little more carefully.  So I

14   believe that covers the first tranche documents.

15           As far as the second tranche documents are

16   concerned, and third, as we said, I have already released,

17   authorized the release, of the ones for which there was no

18   objection, with or without the language question.  I would

19   find again that the documents at the bottom of page five, from

20   4258 to 8880, which related to the Alpha Binary documents, I

21   would allow the release for the same reasons stated for

22   tranche one.

23           And then, for the documents for which there are more

24   objections, I have a handful that I disagree with the Defense

25   on.  So if I don't address it, that means that I agree with

1  the Defense's position on it.

2          First off, 5301 I believe, and 5303 I believe, are

3  subject to release because they relate to opinions regarding

4  stage names or the equivalent.  5304 is subject to release

5  because it relates to brokers licenses and the ability to do

6  business with them.

7          5565 I see as subject to release because it is not

8  privileged.  But as with the last one, if someone can point

9  out to me why it is privileged, I will certainly consider

10  that.  And 6318 I see as subject to the question of whether

11  business can be done with customers from a foreign country.

12  And so those five I would overrule the objections to ---

13  release.

14          8707 I have a question about.  It looks very similar

15  to the other opinions that we have seen that are similar to

16  the WSB and the --- but it deals with a different company.  I

17  think it is Zolax* or Zolarex*.  And I want to get anyone's

18  views on whether that company is or is not affiliated with ---

19  in some way.

20          I did notice there were other similar opinions that

21  I think no one objected to which also dealt with other

22  companies, but they weren't -- some with which I wasn't

23  particularly familiar with either.  So I don't know if anyone

24  can confirm that that company is or is not --- which would be

25  the key question.

1              MS. ETTINGER:  Yes, Your Honor.  This is Jess

2      Ettinger.  On that last question, our objection was that at

3      the time I did not know what the relationship was, if any,

4      between Zolarex and WSB, and I have since learned that Zolarex

5      was owned by the same person as WSB and held a brand name that

6      received services from Lincopia and Yukom.  So I think it can

7      be considered an affiliate, or at least an entity that did

8      business.

9              THE COURT:  Are you withdrawing the objection to

10     8707?

11             MS. ETTINGER:  Yes.

12             THE COURT:  Okay.  So that will be those six in

13     tranche two.  And then on tranche three, 4131 I see as subject

14     to release because it provides and relates to advice on --- on

15     whether options -- forms of trading are barred or regulated by

16     the CFTC I believe, if my notes are correct.  Or maybe it is

17     just being able to do business with the folks from the United

18     States.

19             And there is also information regarding some money

20     laundering.  So I think it falls into one or more of those

21     categories.

22             And then 8868 also relates to doing business with

23     those in the United States, the legality of that.  And 8877,

24     which -- is 8877 on anyone's list anywhere as either objected

25     to or not objected to?  I lost track of that.

1            MS. ETTINGER:  Your Honor, this is Jess Ettinger.  I

2    believe 8877 is attached to 8875 and is part of the same

3    document.

4            THE COURT:  Okay.  It is separately broken out in

5    the spreadsheet.  I am not going to say that that is

6    controlling, but --

7            MS. ETTINGER:  I saw that as well, Your Honor.

8            THE COURT:  You said it is connected to 8875?

9            MS. ETTINGER:  Yes.  I believe it is the attachment

10   to that email.

11           MS. STIER:  I think that is correct, Your Honor.

12           THE COURT:  Because I see 8877 as dealing with U.S.

13   licensing and trading with those in the United States, as well

14   as St. Vincent, which is also specifically mentioned

15   elsewhere.  I don't know if that means that those rise and

16   fall together because I saw 8877 as being connected to --- and

17   subject to waiver.  And so the cover emails as well, would be

18   as well.  Unless for some reason there is a difference.

19           And then 8884 I see it as relating to Alpha Binary

20   in the same way.  And again, I will just check to make sure

21   because it went outside of Alpha Binary to Mr. Herzog or the

22   -- and then I think those are the only ones I have.  Although,

23   8350 I could not easily locate.  Although now that -- I have

24   the card copy.  Maybe I can find it this other way.

25           MS. FARER:  Your Honor, this is Jennifer Farer from

 1   the filter team.  That is the document we were led to address,

 2   is 8350.

 3            THE COURT:  8350?  Do I have it or do I not have it?

 4            MS. FARER:  Mr. Stier would probably be able to --

 5   you should have it.

 6            MR. STIER:  Yes, Your Honor.  This is Mr. Stier.  It

 7   may be a Hebrew document, in which case we can email you the

 8   certified translation again.

 9            THE COURT:  Are you sure --- 8350?  Because it is

10   not in the -- I didn't see it in the electronic version.  I

11   don't see it in the paper version that you sent me either.

12   But, in any event, what do you want to say about 8350?

13            MS. FARER:  So this document, Your Honor, goes

14   directly to an opinion regarding American customers opening

15   accounts with option countries incorporated in a country that

16   does not require a license.  I mean, it ties directly to the

17   language regarding the Court's language about the waiver about

18   licensing and the application and violation of American laws.

19            THE COURT:  I mean, that may be.  My biggest issue

20   is I haven't seen it.  So I am not agreeing or disagreeing at

21   this point.  Let me see if I can find another way to look for

22   it among the multiple ways.

23       (Long pause.)

24            MS. FARER:  If it is easier, Your Honor, we can send

25   an email right now that includes the certified translation.

1            THE COURT:  I guess you can do that.  I mean, I

2    guess I am told there might have been something sent over by

3    email not docketed.  I know you all were not there on Friday,

4    but I made it very, very clear to your colleagues that these

5    things needed to be docketed, even if under seal, because of

6    some of the computer issues in the courthouse over the weekend

7    about what we can access and what we can't access.

8            So whatever you sent by email yesterday, I haven't

9    seen it.  I have only seen what was docketed, as well as the

10   binary you have just given me.  So I don't know if that has

11   anything to do with it, but -- I mean, I am looking at your

12   spreadsheet-like document, and I am still not seeing 8350.

13           MS. FARER:  I think it does have to do with the

14   docketing issue versus the production issue.  This is a

15   document that was emailed separately, Your Honor.

16           THE COURT:  Again, I don't know in what court system

17   people think sending an email is docketing.  I mean, this is

18   -- I mean, there are some litigants, like pro se litigants,

19   who don't get the difference.  I usually expect that the

20   Government knows the difference.

21           And again, why is it not in the spreadsheet.  Or I

22   am calling it the spreadsheet.  Why isn't it even in your

23   chart?

24           MS. FARER:  I think it was inadvertently -- it was a

25   document that was inadvertently excluded from the last

1  production in processing, and so it was sent separately as an

2  isolated document.

3          THE COURT:  Okay.  We are just going to have to

4  leave that one off to the side then.  Oh, wait.  Maybe I have

5  it on this email.  Let me see.

6      (Pause)

7          THE COURT:  So, Ms. Ettinger, maybe the issue was

8  the same that I had, because you do have a note in your fling

9  that there is no translation provided.  But just in taking a

10  quick look at it, it does seem like it is subject to the

11  waiver.  Have you seen it yet or not?

12          MS. ETTINGER:  Your Honor, I was pulling it up.

13  This is Jess Ettinger.  As you were by email.  So I am looking

14  at it now.  And I understand it to be an email between

15  Mr. Herzog and jay@bigoption.com without attorneys.  But I am

16  looking at it quickly because, as Your Honor noted, I did not

17  have an opportunity to see a translation in the spreadsheet.

18      (Pause)

19          MS. ETTINGER:  I would agree, Your Honor.  It does

20  not contain legal advice.  It references obtaining an opinion,

21  but it does not seem to reference a particular opinion, just

22  thoughts about some ambiguous opinion.

23          (Simultaneous discussion.)

24          THE COURT:  I am sorry.  I cut you off.  Go ahead.

25          MS. ETTINGER:  I did the same, Your Honor.  I

1  apologize.

2          I was just going to say, looking quickly because I

3  have only had a couple of minutes to look at it, it does seem

4  to be non-privileged correspondence about something perhaps

5  related to an opinion concerning American clients.

6          THE COURT:  So that one again I think you put it

7  there because you didn't have access to it.  And now that you

8  have both taken a look at it, I am going to find that it is

9  subject to waiver or it is not privileged or both.

10          So I think that covers everything that I have, which

11  is -- I can put these in a written order.  The only two things

12  I am going to check on are I am going to confirm --- these

13  Alpha Binary, as to who they went to.  And then we have -- I

14  believe it is 4451 and -- is it 8725?

15          MS. FARER:  I believe you are looking at 3961 and

16  4450.

17          THE COURT:  One second.  Yes, 3961 and 4450 on the

18  subsequent pages.  So those are the only two.

19          Anything else that we should discuss while we are

20  here now?

21          MS. ETTINGER:  Your Honor, this is Jess Ettinger.

22  Just one point of clarification, please.  In the first of your

23  two orders the language in your order says that the waiver was

24  found as to documents or legal opinions about stage names that

25  were sent to, received by or reviewed by Ms. Elbaz.  And so

1  the stage name related documents that you had just highlighted

2  from our second status report in tranche two as being waived

3  and subject to release were ones that Ms. Elbaz had not sent,

4  received or reviewed.

5         And so I wanted to understand whether your order

6  extended, with respect to stage names, the documents that

7  Ms. Elbaz had not seen, reviewed, sent or received.

8         MS. FARER:  Your Honor, this is Jennifer Farer.  We

9  would take the position that subject matters waivers broader

10  than "to, from, cc" -- and the prosecution team should be

11  entitled to ask about all opinions on this subject, but

12  particularly given that many of these are around the same time

13  and dealing with the same companies and conduct.

14         THE COURT:  Okay.  I think you are both right in one

15  sense or another.  The order does refer to --- review time ---

16  but it was done in the context of stating what Ms. Elbaz

17  needed to produce, which Mr. Pollack had said were what they

18  had already -- they had already identified the documents that

19  were sent to, received by or reviewed by Ms. Elbaz.

20         Those are the documents that are really the

21  operative.  I have been using that same paragraph as my

22  definition of what I saw as the subject matter.  Not the Elbaz

23  part, but the A, B and C part.

24         And it is paragraph three that actually technically

25  defines the waiver and says that there has been a waiver as to

1    documents described back in paragraphs 2A through C above,

2    regardless of whether those documents were reviewed by Elbaz.

3            So I think they are covered by that, even though it

4    may not be completely -- even though it is different from the

5    way the order is drafted.  So I apologize for that.  I do

6    think you did identify the right paragraph, Ms. Ettinger.  But

7    I think, Ms. Farer, you are right that the waiver in paragraph

8    three covers all of that.

9            MS. ETTINGER:  This is Jess Ettinger.  Thank you for

10   that clarification, Your Honor.

11           THE COURT:  Okay.  So what I will expect to do is --

12   hopefully you crossed some of those numbers.  But we will deal

13   with it more --- half hour or so, if I can just check those

14   last two or three things, and --- for the production of these

15   remaining documents to the prosecution team.

16           Am I correct, Mr. Stier and Ms. Farer, that you

17   don't have any further productions today, given that tomorrow

18   is the day that testimony is likely going to be needed on both

19   sides?

20           MS. FARER:  Your Honor, we were thinking additional

21   requests from the prosecution team over the weekend and have a

22   small production of approximately 18 additional documents, 6

23   of which I believe are different iterations of one email

24   chain.  The remainder primarily deal with or relate to

25   customer complaints similar to those contained in some of the

 1  prior productions.

 2          Some of the emails -- the emails that are various

 3  versions of one email chain relate to the complaint and advice

 4  relating to the complaint that was raised with the Board of

 5  Securities Commission that I referenced earlier.

 6          THE COURT:  Okay.  So when are you going to provide

 7  those?

 8          MS. FARER:  Unfortunately, it is unlikely to get

 9  there before the court closes.  But we are happy to provide

10  both you and defense counsel the documents and production via

11  email, and then you will receive a hard copy first thing

12  tomorrow morning.

13          THE COURT:  Well, how many pages are you talking

14  about?

15          MS. FARER:  Mr. Stier, do you have that number

16  offhand?

17          MR. STIER:  Your Honor, with respect to just the

18  emails, I think it would be around 20 pages.  There are some

19  attachments, which our position is they are not privileged

20  customer complaints or demands letters, and those make the

21  page count slightly larger because they are 15 to 20 pages

22  each.

23          But again, our position is those are non-privileged,

24  and we would be providing them simply for context for Your

25  Honor.

1            THE COURT:  Well, certainly you can send us a hard

2    copy tomorrow.  But I don't see why you couldn't docket an

3    entry under what was -- have this attached as PDFs so that it

4    easily printed out in a numerical order.  Are any of these in

5    Hebrew?

6            MR. STIER:  There are a handful, Your Honor, that

7    are in Hebrew.

8            THE COURT:  Then maybe you could send the actual

9    documents in PDF.  It could be one PDF with all the documents.

10   I think might actually be easier.  In numerical order.  And

11   then, if you want to provide one of these charts as you have

12   been doing that has the translated versions, that could be a

13   second document.  Then we have these two attachments to your

14   filing, and we could look for them that way.

15           Again, I know you were trying to do it in what you

16   thought was the most helpful way, but this dynamic of the

17   families and so forth created both technical issues because

18   apparently you need a higher of software to read things in

19   that format.  And then also, just in terms of finding the

20   right number --- if it is not that much, you could just file

21   it that way where it is just in numerical order.

22           And if you want to have all of these charts that

23   also have the translation --- that is probably the way to go.

24   And it probably makes more sense just to make one PDF or

25   perhaps two if they don't fit into one.  So it is just easier

1   to print out or to use --- rather than having to have 20 or 30

2   PDFs.  Can you do that?

3           MS. FARER:  Yes, Your Honor.

4           MR. STIER:  This is David Stier, Your Honor.  Of

5   course we can do that.

6           MS. ETTINGER:  Your Honor, this is Jennifer Farer

7   again.  The one document that we just wanted to raise is

8   ending 5615.  It appears to relate to advice about withdraw on

9   the other issues in the opinions at issue here.

10          THE COURT:  5615?  Which tranche is that?  Three?

11          MS. FARER:  Let me see here.

12          MR. STIER:  Yes, Your Honor.  I believe it is

13  tranche three.

14          THE COURT:  It is from Mr. Bitton to Ms. Elbaz as

15  valued clients.  It doesn't have anything else there, but

16  there is an attachment.  Right?

17          MS. FARER:  Yes.

18          THE COURT:  So what is the argument to why this is

19  waived?

20          MS. FARER:  The attachment.  We believe there is a

21  waiver over the attachment; with the draft letter.  It appears

22  to be a draft letter to clients, so they are going to send it

23  out or post it on the site, relating to the withdraw of the

24  funds, which goes to the heart of some of the allegations and

25  opinions at issue here and sort of the company practices.

1              THE COURT:  I mean, I saw that.  I don't disagree it

2     is relevant to the case.  It wasn't clear to me how it was

3     covered by the waiver though.  There wasn't any opinion

4     regarding how to handle withdrawals or anything like that.

5              MR. STIER:  Your Honor, with apologies.  It is David

6     Stier.  This is one of the documents that was subject to the

7     litigation that was resolved in May and June with respect to

8     dismissing the indictment and disqualifying the prosecution

9     team.

10             And I believe in Your Honor's June 20, 2019 opinion

11    you found that -- you didn't --- the time that this document

12    would have been waived because Ms. Elbaz sent a nearly

13    identical version to a third party, to an attorney for a

14    customer, shortly after she received this from Mr. Bitton.

15             You did, however, say that you didn't need the ---

16    letter that was raised because it would be excluded.  I think

17    part of our argument here is that because this has become

18    relevant to the case, to the trial, we would be asking to

19    revisit whether you think in fact this document is waived.

20    And we would --

21             THE COURT:  I honestly don't -- I am missing the

22    connection again.  You are saying that this was one of the

23    documents that was sent -- inadvertently accessed by the

24    prosecution team, correct?

25             MR. STIER:  That is correct, Your Honor.

1            THE COURT:  Or I made available to them.  And that

2    it was a draft document.  Again, in this context, looking at

3    it now, I don't see whether it went out to someone else in the

4    same form.  But you are saying in the earlier motion this same

5    document came up in addition to a version that went out?

6            MR. STIER:  Yes, Your Honor.  And the filter team

7    had provided you, in its briefing, with a new identical copy

8    of the version that went out to a third party.  As I said,

9    Your Honor, in your June 2019 opinion you did not necessarily

10   rule that this had been waived.  I think you did so on the

11   basis that you thought it would be excluded for trial in any

12   event.  So you needn't determine whether --- was waived.

13           THE COURT:  Because the defense -- the filter team

14   -- well, actually the prosecution team, frankly, agreed they

15   weren't going to use any of these documents.  Right?

16           MR. STIER:  Unless Ms. Elbaz put them at issue.  I

17   think that was my understanding at least, Your Honor.

18           Well, if this is the very same document, or at least

19   -- you know, if this is the same document that --- motions --

20   I mean, you are saying this attachment is the same attachment

21   that were among the ones that were inadvertently produced to

22   the Government or made available to the prosecution team.

23           And as part of sort of overall decision I said all

24   those documents are out basically because the Government --

25   among other reasons.  But the Government said they weren't

 1  going to use them.  So they were willing to agree to that.

 2  Correct?

 3          MR. STIER:  Correct, Your Honor.

 4          THE COURT:  Well, if that is the case, then I think

 5  it is out.  I mean, they made the judgment, the prosecution

 6  team, that this wasn't significant enough to matter.  I don't

 7  think that -- I definitely know there was no caveat that,

 8  well, if she decides to make them relevant, then we can come

 9  back.

10          I think they made an assessment, in looking at the

11  documents and knowing their case, that they didn't think it

12  was worth fighting for to the point of drilling to the very

13  end on whether there is an argument to keep it or not.  And

14  so, having made that determination, I think they have to live

15  with it.

16          And it certainly wasn't anything where they were

17  hedging and saying, well, if the defense has agreed not to

18  talk about certain things or not get into certain issues and

19  if they violate that agreement, then we will revisit it.  I

20  don't think there was any such understanding.  Was there,

21  Ms. Ettinger?

22          MS. ETTINGER:  Your Honor, this is Jess Ettinger.

23  No, not to my recollection was there that kind of caveat.  And

24  I would just add, for clarity, the document that Mr. Stier is

25  talking about, 5615 and its attachment, appeared as Exhibits

 1 | 13 and 14 to Ms. Elbaz's motion and they were described in

 2 | Exhibit 20.  And Your Honor's order excluded the documents in

 3 | Exhibit 20 in ruling on that motion.

 4 | This is also related to one other document, Your

 5 | Honor, 6318, which is in tranche two, to which we had

 6 | objected.  And that document, at least a portion of it, was

 7 | Exhibit 17 to that same defense motion and described in

 8 | Exhibit 20.  So it is categorically similar in that Your Honor

 9 | excluded it, at least in part, from being used.

10 | It relates to Mr. Goodman, which is a name the

11 | filter team has used during this conversation.  Not only in

12 | connection with --

13 | THE COURT:  What number are you talking about?

14 | MS. ETTINGER:  6318 in tranche two.

15 | THE COURT:  Well, this might be a slightly different

16 | argument.  The issue with 5615 and 5616 is -- I don't see that

17 | as covered by the waiver at all.  It is obviously of interest

18 | now perhaps.  But it deals with when and how you can withdraw,

19 | which is not anything that the waiver addresses.

20 | So the only argument now would be, well, let's go

21 | back and revisit the question of whether it actually was

22 | waived for other reasons, meaning the ones in the motion of --

23 | that was used by -- used outside the attorney/client

24 | relationship.

25 | Now 6318.  You are making the same argument that it

1  came out of the motion, and I wasn't comparing that.  That

2  wasn't something I was focused.  But you are saying this is

3  something that was one of the allegedly potentially privileged

4  docs that were made available to prosecution team?  Is that

5  right?

6            MS. ETTINGER:  The threat overlaps, Your Honor.

7  This is Jess Ettinger.

8            So if you were to go back to look at Exhibit 17 to

9  our motion, the subject line of that document, Exhibit 17, is

10  the same as the subject line here in 6318.  And I understand

11  Your Honor's point about it being different in kind from 5615,

12  but I would still argue that 6318 is outside the scope of the

13  Court's finding of subject matter waiver because this

14  correspondence in 6318 is about responding to a customer

15  complaint.

16            And the fact that there is a reference to Canadian

17  customers doesn't pull it within the scope of the Court's

18  order on subject matter waiver.

19            The tenor of the conversation is one about seeking

20  legal advice in responding to a single customer complaint, not

21  a broad seeking of legal advice about whether or not the

22  company can accept end user clients that are outside of

23  Israel.

24            THE COURT:  Well, is that the only argument you are

25  making?  Or are you also to argue that it is out because of

1  the prior ruling before the -- on the motion to dismiss?

2            MS. ETTINGER:  Both arguments, Your Honor.

3            MS. FARER:  Your Honor, this is Jennifer Farer.

4  This is not the document, I don't believe, that was included

5  in the prior briefing.  And just because there are maybe a

6  number of documents that have the same subject line, doesn't

7  mean that they should all be excluded.

8            THE COURT:  Okay.  Well, I will take another look at

9  this question of whether it is actually covered by the waiver.

10 I think my view was that, among other things, it says, "We do

11 not accept clients in Canada."  And then there is advice from

12 lawyers saying right, that Canadian clients cannot trade in

13 this platform, which basically is on that question.

14            And so even though there may be other issues being

15 discussed, that is my understanding of what -- I mean, that is

16 actually part of the legal advice, is don't -- effectively,

17 don't let the Canadians trade on this.  And so that would be a

18 view on whether it can do business with individuals from

19 certain countries, which is covered.  So that is the basis for

20 it.

21            I understand there are other materials in here.  So

22 that is an argument.  But I think, in the context of all this,

23 that is one of the main pieces of legal advice.

24            As for whether this would now be excluded just

25 because of a ruling on the motion, I do think it is in a

1  different category, and I don't think that the prior ruling,

2  even if it was the exact same document, would apply here.  I

3  mean, at that time there was no expectation there would be a

4  waiver of the privilege.

5       In fact, the impression was that there wouldn't be,

6  but I understand circumstances change.  But in that sense, you

7  are basically opening the door to this type of issue, and so I

8  do think it is a different category.  In the absence of the

9  waiver, this obviously would have been protected.

10      But it would be completely unfair, even though I

11  know this isn't what you were trying to do.  But if that

12  principle were to apply, then one could have taken all the

13  documents that were subject to that determination and kept

14  them out of the case, even if they were necessary context to

15  an argument based on waived information.

16      So again, this is about completeness, and once you

17  have opened the door to legal advice in this context, I think

18  it is a different situation.  I do think it is different than

19  the other one that really wasn't implicated by subject matter

20  waiver.  But I understand the argument.

21      Anything else that we should discuss while we are

22  here today?

23      MS. FARER:  Nothing from the filter team, Your

24  Honor.

25      MS. ETTINGER:  Not from the Defense, Your Honor.

feb                                                                                      50

1          THE COURT:  When are you going to send over the

2    materials, filter team?

3          MS. FARER:  We will get it on file as soon as we are

4    off this call, Your Honor.

5          THE COURT:  So, Ms. Ettinger, do you think you will

6    be in a position to -- or would you be in a position --- your

7    position on this document?  It sounds like there is 20.

8          MS. ETTINGER:  Your Honor, respectfully, it is not

9    possible this evening since we are preparing for the case

10   tomorrow.  Possibly by later tomorrow evening.  But certainly,

11   of course, we are in court all day with you, Your Honor.

12       And so realistically, just because of the hours in the

13   day, I don't anticipate being able to get a response to the

14   Court and the filter team before the evening hours of tomorrow

15   evening.

16          THE COURT:  Well, your client --- rest tomorrow I

17   think.  So --- the clock?

18          MS. ETTINGER:  Yes, Your Honor.  Given the schedule

19   and the hours, I don't anticipate that we could respond before

20   tomorrow evening.  That said -- just a moment, Your Honor.

21          THE COURT:  I mean, I don't like this process any

22   more than you do, Ms. Ettinger, and I am trying not to -- you

23   know, --- the filter team.  They didn't make this schedule

24   either.

25          I am of the view that we are in this case.  I know

1   Mr. Pollack from the beginning has said that it is unfair to

2   tell him that any of the schedule is on you all because of

3   when you disclose this information --- but the reality is we

4   have been dealing with this filter team process for months

5   now.

6          Everybody understands how it is set up.  Everyone

7   understands that --- going to plan to waive the privilege at

8   some point, that this is the kind of thing that could happen.

9   And given the volume of material, I think this is entirely

10  predictable.  So I am not accepting the idea that you can't do

11  anything, but I am not going to order to file any objections.

12          I am going to say that I will make a determination

13  by 9:00 tomorrow morning, with or without your position.  So I

14  would prefer to have your position so we can kind of even

15  things out and not have to -- I will know what is contested

16  and what is not contested.  But I am just going to make a

17  determination by 9:00 tomorrow morning.

18          So if you want to weigh in, you are welcome to.  If

19  you don't, that is okay too.

20          MS. ETTINGER:  Certainly, Your Honor.  We will make

21  an effort to review the documents at the time upon which we

22  receive them.  But as Your Honor has noted, the timeline is

23  incredibly difficult.

24          MS. FARER:  Your Honor, this is Jennifer Farer from

25  the filter team.  It will take a little bit of time to convert

1   it to a filing.  But for ease of everyone's reference, I know

2   you want all this on the record, but we can certainly email

3   this out immediately so that people can start reviewing and

4   then just put it on the record for purposes of having it on

5   the record.  That may help things a little bit.

6          And as I said, the category of emails that are

7   different iterations of the emails all relate to that chain

8   that we were just discussing, the 6318, and then the rest

9   relate to customer complaints.  And I think there is only one

10  document that are going to fall into those two categories.  So

11  it is our view that it hopefully wouldn't take that long

12  categorically to see whether they fall into the waiver or not.

13         And we appreciate everyone's patience with this

14  process.  It has been difficult for us too, and we know that

15  there is an extra burden on our case team; the timing in which

16  they can review the documents and prepare to use them or not

17  at trial.

18         THE COURT:  Right.  Okay.  Well, we will all do our

19  best.  You say you are in a position to send those out, it

20  seems like even informally, by 6:00 even if you can't get the

21  docketing in right away.  Then that gives everyone this

22  evening.  And again, I will take a look at it myself.

23         I will say that the useful objections really should

24  be in by 9:00.  Better late than never too.  So I am not

25  precluding them even up to tomorrow morning.  I am just saying

1   that I may start making decisions before then.  At least

2   provisions decisions.

3         That will make it more useful, but again, I

4   understand there is a lot going on.  For instance, if you all

5   were to have --- privilege --- so I understand that.

6         Okay.  Well, thank you very much for time.  We will

7   issue an order tomorrow as to the decisions I made and adding

8   in the two or three issues that I left undecided.  But I will

9   include those in there.  I may be able to provide some

10  explanation.  If not, I may try to do it on the record

11  tomorrow morning, if there is a way to do it that is

12  appropriate in front of the prosecution team.  I will

13  determine that.

14        Okay.  Thank you all very much.  Have a good day.

15        MS. ETTINGER:  Thank you, Your Honor.

16        MS. FARER:  Thank you, Your Honor.

17        MR. STIER:  Thank you, Your Honor.

18     (Whereupon, at 5:31 p.m., the telephone conference

19  concluded.)

20

21

22

23

24

25

feb

<u>C E R T I F I C A T E</u>

I hereby certify that the foregoing is a correct transcript from the duplicated electronic sound recording of the proceedings in the above-entitled matter.

*Fabiana Barham*   09-11-19
_____
Fabiana E. Barham                    Date
Certified Transcriber
Certification No.: CET**213