**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LEE ELBAZ,<br>     a/k/a "Lena Green,"<br><br>Defendant | Criminal Action No. TDC-18-157 |

**JOINT SUBMISSION OF THE PARTIES IN RESPONSE TO THE COURT'S
DECEMBER 9, 2019 ORDER**

Counsel for the United States and Counsel for the defendants respectfully submit this Joint Submission in response to the Court's December 9, 2019 Order.

**Summary of Government's Position**

As set forth below, the government's position is that it has conducted a loss analysis based on data provided by the defendant, which, consistent with the Court's Order, reflects losses incurred by investor victims between May 2014 and June 2017. The government submits that the appropriate calculation for both loss and restitution is $137,057,353. The government further submits that this figure, which is based on Spot Option data provided by the defendant, is the appropriate calculation for several reasons. First, consistent with the Court's Order, by using the data set previously submitted by the defendant, the calculation now includes only amounts for investors for the period between May 2014 and June 2017. Second, the calculation is for losses limited to "Yukom, Numaris, and Linkopia," as evidence at trial established that nearly all investor victims were funneled through Linkopia before being distributed as "leads" to other offices. Thus including all BinaryBook and BigOption investor victims – which is the data set used for the government's revised calculation – is appropriate. Third, in any event, the defendant oversaw and conducted training for the branches of the fraudulent enterprise, and thus losses for investors who

had contact with retention agents at all branches were reasonably foreseeable to the defendant. Accordingly, the government submits that $137,057,353 is an appropriate loss award in that it is limited to (1) losses suffered by BinaryBook and BigOption investor victims, the two brands the defendant oversaw, and for which nearly all investor victims flowed through Linkopia; (2) losses caused by retention agents working in branches that were known to the defendant, and where she had oversight and training responsibilities; and (3) losses incurred between May 2014 and June 2017.

I.    **Government's Position**

   A.    **Almost All Investor-Victims Flowed through Linkopia**

   As an initial matter, the government's loss figure described above, is appropriate and reflects the activities of Yukom, Numaris, and Linkopia because, as the evidence at trial showed every BinaryBook/BigOption investor was almost always routed through Linkopia as the first step in the scheme.  (Trial Tr., 7/19/2019 PM, at 117) ("Linkopia did all of the conversion . . ."); (Trial Tr. 7/18/2019 AM, at 24) ("Before I talked to a client, the client was contact by the conversion department and people that were sitting -- employee that was sitting in the conversion department in a country, it's called Mauritius and they spoke to the client, first of all, and then the client got into us, the employee in Israel in Caesarea.")  *Id.* at 25 ("Before a client came to your desk, had they already made a deposit?  A Yes, they did."); (Trial Tr., 7/26/2019 PM, at 41) ("Q. Did that mean that the clients had already deposited an initial sum of money?  A. Yes."); *see also* Trial Exhibit A – Full Organization Chart.

   B.    **In Any Event, the Defendant Managed and Controlled the Fraudulent Enterprise and Binary Book and Big Option Brands, Including Ukraine, Turkey, and Other Branches.**

   In addition, it is particularly reasonable to include investor losses from the other offices in Elbaz's loss calculation because Elbaz had an active role in those offices' operations.

During the course of the conspiracy, Elbaz and her co-conspirators opened offices in Ukraine and Netanya, Israel.  (Trial Tr. 7/19/2019 PM, at 118-119).  Elbaz and her co-conspirators also operated a small office in Turkey (which focused on Turkish investors) and a short-lived office in Australia.  The evidence shows that these offices operated as one network overseen by Elbaz and other managerial co-conspirators, including Kobi Cohen and Yossi Herzog.

- On August 1, 2015, Elbaz emailed Herzog, Cohen, Nissim Alfasi, Elad Bigelman, and Or Maymon net deposit totals for July 2015.  Elbaz reported that "group total" of net deposits was $6,657,015 for the month.  Elbaz also reported results for the different branches, writing that "[t]he Ukraine branch ended with $83,000," the Turkish branches took in "$100,000 (approximately), the retention desk in Mauritius took in $340,000, and "Tel Aviv started two weeks ago."  (Ex. B.1).

- On September 25, 2015, Herzog emailed Elbaz and Cohen with regarding "goals until the end of the year."  In the email, Herzog instructed Elbaz to "[d]ivied please the quantity of FTD's [first-time depositors, i.e. new leads] and the nets [net deposits] between Turkey, Ukraine, Ronen [i.e, the Tel Aviv office], Caesaria, and Mauritius in a precise and individual manner by the recruitment and training objectives in all the places."  Herzog also instructed Elbaz to "send me please and Kobi the exact operation plans until the end of this month."  (Ex. B.2).

- On March 8, 2016, Elbaz and Cohen received an email asking to approve the purchase of "the needed 6 computers for our partners in Netanya."  The email explained that "[w]e will pay for it and it will be deducted from the payment to them."[1]  (Ex. B.3).

---

[1] As Austin Smith explained during the trial about the Tel Aviv office, the different offices had revenue sharing agreements.  Trial Tr., 7/25/2019 PM, at 73 (Testimony of Austin Smith).

- On March 30, 2016, Elbaz emailed Herzog and Cohen with the subject "The Ukraine." In the email, Elbaz provided an update on the Ukrainian office and her role in managing it. She wrote in part, "I train them all the time, and today was already a marked improvement from 8 thousand dollar per day within the last week and a half to yesterday in which they brought [in] net 16 with a third of the employees, and today net 25 again with a third of the employees." At the end, she requested permission to return "in six weeks for one week to continue maintenance and training." (Ex. B.4).

- On July 11, 2016, Herzog, Cohen, and Elbaz all exchanged emails about the performance of the branches. Herzog wrote:

> The situation at the branches is really not good since the beginning of this month. My understanding is that last month, Caesarea brought in net [$]6.5 [million]. If we deduct approximately and additional net 1.5 million from conversion, it means that Mauritius, Tel Aviv, Ukraine, Netanya and Turkey together brought in on net [$]1.5 [million]. Who runs the branches day-to-day and see to their development?

Elbaz responded, "The branches brought in 1.8 [million.] ***Thus far, I have been doing it[.] I train them, provide them with service, I distribute leads and take care of them regularly***." (Ex. B.5 (emphasis added)).

Evidence at trial also established Elbaz's managerial responsibilities in the offices outside of Mauritius, Tel Aviv, and Caesaria. For example, on one audio recording recovered from Elbaz's cellular telephone, she describes traveling to the other offices:

> I did not have holidays, I did not have weekends, I did not have special days, I was all day long… in the craziness of life, on weekends ***I would travel abroad, to Romania, to Ukraine, doing trainings, to Turkey***… I busted my ass, I busted my ass… and then, after, after working so hard, Kobi informed all the partners that I was to become a non-investing partner, meaning that no matter what, I receive money, I'd get 0.5%; when I left in November, I

4

>continued to get money, I continued to get money until the middle of January.

(Ex. 59.1 (emphasis added). Similarly, Liora Welles testified that she and Elbaz traveled to the Nentanya, Israel and gave a training session to new employees. Trial Tr., 7/19/2019 PM, at 118-119 (Testimony of Liora Welles).

Other emails recovered during the investigation show Elbaz and others managers in Caesaria communicating with employees and managers of the Ukrainian, Turkish, and Nentanya offices. For example:

- On June 10, 2015, Elbaz, Cohen, and Herzog received an email from Shimon Ben Arye, the head of the Ukrainian office. The subject of the email was "Ukraine desk opening day," and included three photos from a reception. (Ex. B.6).

- On July 1, 2015, Elbaz, copying Herzog and Cohen, sent an email to all offices operating under the BigOption brand with the subject "We Did It." (Ex. B.) In the email, Elbaz wrote that "[w]e have reached an amazing result of 4,535,000$ net!!!," referring to the fact that all offices had taken in $4.5 million in net deposits for the prior month. At the end of the email, Elbaz wrote, "Ukraine team, welcome aboard to one of the strongest companies in the world. We did it and it is just the beginning." *Id.* (Ex. B.7).

- On September 22, 2015, Kobi Cohen emailed the "All BigOption" and "All BinaryBook" distribution lists with specific instructions not to mention SpotOption when talking to clients. The same day, the head of the Ukraine office responded all, "Got It and On It . . . Andy and the Ukraine desk."[2] (Ex. B.8).

---

[2] Other emails collected during the investigation confirm that employees in the Ukraine office were included in the "All BigOption" and "All Binarybook" distribution lists during the course of the conspiracy, thereby receiving updates from Elbaz and other managers. The Ukrainian office also had its own office-specific BinaryBook distribution list (ua@binarybook.com).

5

- On October 13, 2015, an employee in the Caesarea office, copying Elbaz, sent an email addressed to the distribution lists for the Caesarea (il@binarybook.com), Ukraine (ua@binarybook.com), Mauritius (retentionMU@binarybook.com), and Turkey (tr@binarybook.com) offices. The email included bank instructions for all employees to collect investor wires. (Ex. B.9). Similarly, on November 26, 2015, the same employee sent an email addressed to the distribution lists for the Caesarea, Ukraine, Mauritius, and Turkey offices with instructions to no longer use a Cypriot bank account and to only have wires sent to a Polish bank account. (Ex. B.10).

- On March 13, 2017, Elbaz forwarded an email with the subject "Turkey Deposit Reports – 3 months" to Ronen Roytman (head of the Tel Aviv office). The email, sent originally by the head of the Turkish office, included an Excel file containing the net deposit figures for Turkey for December 2016 through February 2017. (The numbers are less than $43,000 for the period). (Ex. B.11).

These examples, and other evidence from trial, show that all offices operating under the BinaryBook and BigOption brands—in Israel, Mauritius, Ukraine, Turkey, and elsewhere—operated as a single scheme, with Elbaz exercising control and managerial decision-making over all operations, regardless of office. Financial loss suffered by investors—no matter where the office—was therefore reasonable to Lee Elbaz no matter the office where it occurred, and therefore should be included in the loss calculation.

    **C.**    **The Government's Revised Loss Figure Accurately Captures Losses from BinaryBook and BigOption Investor Victims that Were Foreseeable to the Defendant.**

As part of the defendant's sentencing filings, she included an excel spreadsheet containing data collected from SpotOption. See Exhibit A to Exhibit 2, Declaration of Vadim Turkov. This

spreadsheet included a tab labeled "Deposits," and a tab labeled "Withdrawals," both of which listed out particular transactions by brand (Binary Book / Big Option), date, amount, payment method/type of transaction, customer ID, name, and country, and agent. These two spreadsheets include deposits and withdrawals from May 1, 2014 through June 2017. The government has applied the calculation methodology set out in the government's sentencing memoranda to this data provided by the defense, which results in a total loss figure (based on net deposits) of $137,057,353 for losses occurring on between May 2014 and June 2017. *See* Exhibit A (Declaration of Michael Petron); Exhibit 20 to Exhibit A (Loss and Restitution Summary for Customer IDs based on Exhibit A to Turkov Declaration). The government respectfully submits that this is the appropriate — albeit conservative — figure that accurately captures the losses of investor victims while the defendant was participating in the scheme.

    **D.    Excluding Other Offices and Locations from Loss in this Case is Difficult on the Available Data and Would Substantially Understate Investor Losses and Restitution.**

In the Court's December 9, 2019 Order, the Court specified that loss "includes all activities of all retention agents of Yukom, Numaris, and Linkopia, whether or not specifically found at trial to be members of the conspiracy, but does not include the activities of other companies engaged in binary options fraud." D.E. 350 at 1. As set forth above, the government submits that by using the data set previously submitted by the defendant which limits losses to BinaryBook and BigOption investor victims — and which excludes any losses incurred by investor victims in some other binary options "brand," such as Binary Online — the government has appropriately limited loss in this case to only those losses that were reasonably foreseeable to the defendant. Because the defendant was responsible for retention for the BinaryBook and BigOption brands, and because almost all investor-victims flowed through Linkopia, the government believes the calculation as submitted is fully supported

The government understands that the defendant's position is that the calculation should exclude any losses for investors simply because they were passed off to branches other than Yukom, Linkopia, or Numaris, regardless of whether they initially flowed through Linkopia, and notwithstanding the defendant's supervisory role with respect to all branches. However, removing net deposits simply because investors had contact during the scheme with agents at branches besides Yukom, Numaris, and Linkopia will be unfair to certain investors. First, again while nearly all investor victims were originally routed through conversion in Linkopia, investor victims were sometimes transferred between branches and retention agents. Thus, removing particular losses or transactions from an investor victim's overall loss simply because they later had contact with a particular branch, would make little sense (even if it were feasible). For example, if an investor went through conversion in Linkopia, lost thousands through a Yukom retention agent, and was then passed along to a Ukraine-based retention agent (trained by Ms. Elbaz herself) where the investor lost tens of thousands more, that investor's losses to the Ukraine-based retention agent would not be included in their loss calculation. Such an approach would be fundamentally unfair to the victims of this scheme who had no knowledge of where these fraudsters actually worked or resided and would deprive them of inclusion in the restitution calculation.

Moreover, excluding certain branches and/or companies from the loss calculations in this case will be at best a difficult, manual, and time-consuming process based on data available to the government. The government does not currently have a comprehensive list of deposits or withdrawals that would allow the government to identify the branch where the investor victim made their initial deposit. Thus, the government's only current method to isolate and remove deposits affiliated with particular branches involves manually searching for reports, some (not all) of which contain location information. This process is made more challenging given that both

customers and, in some cases, retention agents, were transferred between branches and it is difficult to associate a particular customer or retention agent with a particular location. And, given the current data available to the government, it is also difficult to remove particular *transactions* as opposed to particular customers.

Again, the government does not believe that such an analysis is necessary under the terms of the Court's Order, or that such an analysis is required under the Guidelines, but should the Court wish to exclude losses based on whether an investor victim was given to a branch other than Linkopia, Numaris, or Yukom the government respectfully requests that the current sentencing date be continued for three additional weeks so that the government can attempt to complete such an analysis.

## II. Defendant's Position

Rather than respond to the Court's Order dated December 9, 2019, DE 350, the Government sets forth above numerous arguments that the Government had not made previously in its memorandum in aid of sentencing. Nor did the Government subsequently make these arguments as it was afforded the opportunity to do in accordance to the Court's sentencing order. *See* Regular Sent'g Order, DE 295 ("[a]ny other written materials related to sentencing . . . shall be delivered to chambers no later than Monday, December 2, 2019"). Instead, the Government set forth these arguments in a draft that it provided to Ms. Elbaz for the first time at 7:30 p.m. today, the day the Court ordered the parties to make a joint submission, a submission that the Court ordered to be made only after the parties were to meet and confer. DE 350. Ms. Elbaz asks the Court to strike these arguments. To the extent the Court is going to consider these arguments, however, Ms. Elbaz will respond to them at the sentencing hearing.

While preserving and maintaining all of the arguments Ms. Elbaz set forth in her memorandum in aid of sentencing regarding the appropriate calculation of the amount of the loss,

9

Ms. Elbaz confines her response here to the Court's Order dated December 9, 2019, DE 350. The Government's loss calculation of $137,057,353 fails to take into account the Court's request that it make the following assumptions: "The loss may be calculated from the Spot Option data using the overall net losses" DE 350 at ¶ 1; and "The loss includes all activities of all retention agents of Yukom, Numaris, and Linkopia, whether or not specifically found at trial to be members of the conspiracy, but does not include the activities of other companies engaged in binary options fraud." DE 350 at ¶ 4.

The Government's loss figure, contrary to the Court's Order to calculate "overall net losses," fails to reduce losses suffered by investors by gains achieved by investors.

Further, the Government's loss figure fails to include only losses resulting from activities of retention agents of Yukom, Numaris, and Linkopia. Rather, the data coming from SpotOption includes all deposits and withdrawals made by customers of BinaryBook and BigOption, regardless of the company that did the retention or if any retention was even done at all. Thus, the Government's calculations include three distinct categories of losses that should not be included under the Court's requested assumption: 1) It includes depositors who were "self-depositors," *i.e.,* depositors who went to either the BinaryBook or BigOption web site and made a deposit without ever speaking with any retention agent from any company; 2) It includes any deposits that resulted from retention activities performed for BinaryBook and BigOption by companies wholly unrelated to Yukom; and 3) It includes deposits that resulted from the activities of retention agents at all "branches" of Yukom, not just those customers who deposited as a result of activities of retention agents of Yukom, Numaris, and Linkopia.

There is no data in the record from which a calculation of, or even a reasonable estimate of, net losses resulting from all activities of all retention agents of Yukom, Numaris, and Linkopia

can be made. Based on the SpotOption data that is in the record (*see* DE 350 at ¶ 1), the amount of net deposits during the period in which the Government contends Ms. Elbaz was a member of the conspiracy (*see* DE 350 at ¶ 2), regardless of whether the depositor was based in the United States (*see* DE 350 at ¶ 3), that resulted from the activities of the individuals found to be Ms. Elbaz's co-conspirators is $11,671,461.39 (total net deposits, worldwide, for co-conspirators listed on the "Agents" Tab of Exhibit A to the Turkov Declaration) (attached as Exhibit 2 to Ms. Elbaz's Memorandum in Aid of Sentencing, DE 342).

Dated:  December 12, 2019

                                      Respectfully submitted,

                                      ROBERT A. ZINK
                                      Chief, Fraud Section
                                      Criminal Division
                                      U.S. Department of Justice

By:       /s/
                                      L. Rush Atkinson, Assistant Chief
                                      Caitlin R. Cottingham, Assistant Chief
                                      Henry P. Van Dyck, Principal Assistant Chief
                                      Fraud Section, Criminal Division
                                      U.S. Department of Justice
                                      1400 New York Ave. NW
                                      Washington, D.C. 20530

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2019, I caused the foregoing document to be electronically filed with the Clerk of Court for the United States District Court for the District of Maryland by using the Court's CM/ECF system, which will serve electronic notification of this filing on all counsel of record.

By:     /s/
Caitlin Cottingham, Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice