**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> **v.** <br><br> **LEE ELBAZ**, <br><br> *Defendant*. | Criminal No. 18-157-TDC |

**MS. ELBAZ'S RESPONSE TO THE
POSITION OF THE UNITED STATES ON RESTITUTION, ECF NO. 367**

EXHIBIT LIST

| | |
|---|---|
| Exhibit 1 | Email from C. Cottingham, Counsel for the Government, to J. Ettinger, Counsel for Ms. Elbaz, Apr. 16, 2020, and attachment ("List of Sales Reports") |
| Exhibit 2 | DOJ-ELBAZ-0001604613 (slip sheet) (submitted by flash drive for proposed filing under seal) |
| Exhibit 3 | DOJ-ELBAZ-0001462882 (slip sheet) (submitted by flash drive for proposed filing under seal) |
| Exhibit 4 | DOJ-ELBAZ-0001489599 (slip sheet) (submitted by flash drive for proposed filing under seal) |
| Exhibit 5 | DOJ-ELBAZ-0001464156 (slip sheet) (submitted by flash drive for proposed filing under seal) |

The Court determined at Lee Elbaz's sentencing that Yukom and Numaris retention agents caused investors in BinaryBook and BigOption to lose $28 million during the time Ms. Elbaz and her co-conspirators worked at those companies. The Court relied on that loss amount when sentencing Ms. Elbaz and made a preliminary determination that restitution in that amount was appropriate. The Court deferred entering a restitution order, however, because the Government had not identified specific victims who were entitled to restitution of $28 million and thus there was no basis for making a determination as to whom such restitution would be paid. The Court gave the Government 90 days to identify such victims and establish that an order of restitution in the amount of $28 million is warranted.

The Government did not follow the Court's instructions. Rather than identify those individuals to whom $28 million in restitution is owed, with supporting documentation, the Government has submitted a 755-page list of customers who the Government asserts incurred total losses of *$106.6 million*. Thus, the Government has simply ignored the Court's finding at sentencing that the amount of the loss was $28 million, which explicitly rejected the Government's contention that it had established a loss in excess of $100 million, as the Government had contended. The Government asks the Court to impose a $28 million restitution order, to be distributed pro rata to all the investors whose losses total $106.6 million. This proposal would necessarily mean that the Court would be awarding restitution to individuals who it has already concluded the Government has not established suffered any loss as a result of the offense conduct. Thus, nine months after trial concluded, there remains no evidence in the record from which the Court could enter a $28 million restitution order based on identified victims whose losses total $28 million and to whom restitution payments can be made.

The Court should not adopt or otherwise rely, even in part, on the Government's revised restitution calculation because it is flawed in several respects.  *First*, the calculation is inflated because it includes losses incurred by customers of Linkopia agents, which are losses the Court did not include in its $28 million loss calculation.  Even if the Court had included customers of Linkopia *retention* agents as victims who suffered quantifiable losses as a result of the offense conduct and would therefore be entitled to receive restitution, however, the Government's restitution calculation still would be inflated because it includes losses sustained solely at the hands of Linkopia *conversion* agents.  The alleged conspiracy did not encompass conversion agents, and the Court has made no findings that losses suffered as a result of actions by conversion agents in Mauritius are attributable to Ms. Elbaz.  *Second*, the Government's expert relied on incomplete "monthly sales reports" and an unjustified 10% margin of error in matching transactions to the branch at which particular agents were located when losses occurred.  *Third*, that faulty agent-location methodology—on which the entire restitution calculation is premised—resulted in obvious, demonstrable errors in identifying agent locations.  All three errors combine to produce a restitution schedule that includes investors to whom *no* restitution is owed.

The Government's failed efforts to identify the individuals to whom restitution should be paid in this case underscores the complexity of the facts at issue.  The data available does not allow for a reasonably accurate calculation or assignment of restitution to be made.  As such, the Court should make findings under 18 U.S.C. § 3663A(c)(3)(B) that no restitution will be entered

because the complexity of the facts and burden placed on the sentencing process outweigh the need to provide restitution to investors.[1]

## I.   THE GOVERNMENT DID NOT CARRY ITS BURDEN TO IDENTIFY VICTIMS TO WHOM $28 MILLION IN RESTITUTION IS OWED.

"The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government."  18 U.S.C. § 3664(e).  The Government's submission fails to satisfy this burden and should be set aside in its entirety.  The Court directed the Government to identify specific victims to whom $28 million in restitution should be paid, and the Government represented that it would do so.  *See* Tr. (Dec. 19, 2019) at 95–105.  The Government instead has taken the additional 90 days to again tell the Court that it believes the Court's calculation of the amount of the loss and the resulting preliminary finding on restitution is wrong.  *See* Gov't's Position on Restitution, ECF No. 367 ("Gov't's Restitution Position"), at 5 ("As the government's revised calculations indicate losses limited to those branches listed in the Court's December 9, 2019 Order is $106,582,527."); Revised Restitution Schedule, ECF No. 369 (identifying individual customer IDs whose losses total $106,582,527).

As a result, the record now contains:  (1) the Court's determination at sentencing that the amount of the loss was $28 million and its resulting preliminary determination that restitution in that amount is owed, but no list of individuals whose losses comprise that amount and to whom that restitution should be paid; and (2) the Government's (flawed) calculation of $106.6 million in restitution, with a corresponding list of individuals whose losses comprise that much greater amount.

The Government has not carried its burden to demonstrate to whom $28 million in restitution is owed.  The Government's calculation that a *different* amount of losses were

---

[1] Ms. Elbaz reasserts here all the arguments she previously advanced as to why restitution cannot be entered in this case. *See* Sent'g Mem., ECF No. 342, at 33–34 & nn.22–23.

3

incurred than the Court determined, with a list of individuals whose losses comprise that other amount, is *not* a demonstration of those individuals to whom $28 million in restitution is owed. The Government's proposed solution—that the Court order Ms. Elbaz to pay with $28 million a group of individuals whose losses purportedly total more than $106 million, *see* Gov't's Restitution Position at 1, 6—is no solution at all. The Government cites no authority for its extraordinary request that the Court order payment of restitution to individuals who the Court has determined did not suffer a loss as a result of Ms. Elbaz's offense conduct. *See id.* at 5–6.[2]

## II.     THE GOVERNMENT'S NEW RESTITUTION CALCULATION IS FLAWED.

### A.     The Government's calculation is inflated because it includes dollars attributable to Linkopia agents.

The Government's restitution calculation is in error because it includes losses from investors who lost their money interacting with Linkopia agents. At sentencing, the Government agreed that, in light of the Court's findings at sentencing, the restitution it would seek would be limited to those individuals whose losses informed the Court's loss amount calculation—i.e., Yukom-based and Numaris-based investors. *See* Tr. (Dec. 19, 2019) at 102 ("The Court's $28 million figure which is limited to loss with respect to Yukom, that number is going to be applied to Yukom-based investors. We're going to go back and put together a list of investors that's consistent with the Court's ruling today which would then mean that those individuals are entitled to the 28 – to the $28 million.").

---

[2] Nor can any use be made of the Government's new restitution schedule to identify the individuals to whom $28 million should be paid. The Government has listed all individuals by customer ID, brand, country (if known), and amount owed; no retention agent or branch-identifier distinguish them. Any effort the Court made to isolate a subset of individuals from this group whose losses totaled $28 million would be arbitrary and may include individuals who fall in none of the categories of people who the Court found at sentencing to be victims of the offense.

4

Yet, instead, the Government has given the Court a revised restitution calculation and schedule that includes losses sustained by investors who worked with Linkopia agents in Mauritius—individuals whose losses did not contribute to the Court's $28 million calculation and to whom no restitution is owed.

> B. **Even if the Court intends to order restitution to those allegedly defrauded by Linkopia *retention* agents, the Government's calculation is in error because it includes, and cannot be separated from, losses caused by Linkopia *conversion* agents.**

Restitution must be limited to losses caused to "victim[s]," which the statute defines as persons "directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(1)–(2). Because restitution is tied to the "offense," the Government must demonstrate that there is a "causal connection between the specific conduct underlying the offense of conviction and the victims' losses." *See United States v. Freeman*, 741 F.3d 426, 434–36 (4th Cir. 2014) (collecting cases in which reversal was warranted for failure to demonstrate "requisite causal connection"; "regardless of whether restitution is ordered pursuant to the VWPA, the MVRA, or as a condition of supervised release or probation, the alleged victims must be victims of the *offense of conviction*"). In other words, the concept of relevant conduct that pertains to the amount of the loss under the Sentencing Guidelines has no application to the calculation of restitution under the MVRA. *See United States v. Llamas*, 599 F.3d 381, 390–91 (4th Cir. 2010) ("Because the MVRA focuses on the offense of conviction rather than on relevant conduct, the focus of a sentencing court in applying the MVRA must be on the losses to the victim *caused by the offense*." (internal quotation marks omitted)); *see also United States v. Dridi*, 952 F.3d 893, 901 (7th Cir. 2020) ("The restitution issue is similar but not identical to the loss amount issue. The [MVRA] . . . applies to a victim's losses from the offense of conviction, which is *narrower* than relevant conduct under the Guidelines. Restitution is thus

5

limited to the actual losses caused by the specific conduct underlying the offense[.]" (citations and internal quotation marks omitted)).

The offense of conviction in this case is a conspiracy to commit wire fraud and substantive violations of the wire fraud statute based on certain call centers' provision of retention services to two binary options companies. *See* Indictment, ECF No. 37, ¶¶ 2, 4, 8, 18 ("ELBAZ supervised representatives of BinaryBook and BigOption, at Yukom and elsewhere, who performed retention services on behalf of BinaryBook and BigOption."). Thus, any amount of restitution must be limited to losses caused by retention agents, because the victims of the offense of conviction are those who interacted with retention agents.

Even were the Court to determine that Linkopia retention agents' activities were part of the offense of conviction and should be included in the restitution calculation, the Government's calculation and schedule still would be in error because losses incurred by Linkopia's *conversion agents* are also included in the Government's calculation and cannot be isolated and excluded based on the data the Government has provided. The evidence at trial reflected that both conversion agents and retention agents worked at Linkopia, but conversion services were not part of the charged conspiracy, *see also id.* ¶ 5 (distinguishing "conversion agent" from "retention agent"), and no evidence was presented at trial or sentencing to establish that conversion agents committed fraud, much less that they did so as part of a conspiracy with Ms. Elbaz. The Government's expert, Michael Petron, states that his analysis identified losses attributable to "retention agents," *see* Third Decl. of Michael J. Petron, ECF No. 367-1 ("Third Petron Decl."),

6

¶¶ 1, 5, 10, but fails to identify dollars brought into Linkopia by its conversion agents and reduce the Linkopia total accordingly.[3]

### C. Mr. Petron's agent-location methodology relies on incomplete "monthly sales reports" and an unjustified margin of error.

In order to assign a branch location to each agent ID in the defense's SpotOption data for purposes of deciding whether the deposits at issue were obtained at a branch at which the Court found there had been a showing that fraud occurred that can be attributed to Ms. Elbaz, Mr. Petron aligned transactions between two sets of data: (1) the SpotOption data from an exhibit to Mr. Turkov's declaration, which Ms. Elbaz submitted for the Court's consideration at sentencing with respect to the amount of the loss (*see* Third Petron Decl. ¶¶ 2–3 & n.2 (citing Exhibit A to Exhibit 2 to Def. Sent'g Mem., ECF No. 342-2)); and (2) "monthly sales reports" "received from the government, which is not a complete set of reports for all branches during the entire May 2014 through June 2017 time period." Third Petron Decl. ¶ 4 n.4. He then identified transactions in two steps. First, Mr. Petron identified a set of transactions in which "the Broker/Brand (i.e., Binary Book or BigOption), Customer ID, Date, and Amount were identical between the Spot Option Data and the monthly reports." *Id.* ¶ 4. Second, he identified a set of transactions for which "the Broker/Brand, Customer ID, and Date were identical, but . . . the Amount . . . differ[s] by only plus or minus 10%." *Id.* The agents-by-location list that Mr. Petron created (Gov't's Sent'g Ex. 23) is a combination of *both* sets of transactions—those to which no margin of error was necessary to create a match ("identical matches") and those to

---

[3] Mr. Petron says that he relied on data provided by the defense, which was an exhibit to Vadim Turkov's declaration, submitted by Ms. Elbaz at sentencing with respect to the amount of the loss. *See* Third Petron Decl. ¶¶ 2–3 & n.2 (citing Exhibit A to Exhibit 2 to Def. Sent'g Mem., ECF No. 342-2). That data does not differentiate between dollars attributable to conversion and retention agents working at Linkopia, which is precisely why Ms. Elbaz argued previously that including the Linkopia deposits would greatly overstate the losses attributable to the offense conduct. *See* Exhibit 1 to Def. Sent'g Mem., ECF No. 342-1, at 4 (objections to PSR); Def. Sent'g Mem., ECF No. 342, at 6 & n.6.

7

which the 10% margin of error was applied to create a match ("margin-of-error matches"). *See* Third Petron Decl. ¶¶ 4–5; *id.* at 6–27 & n.3 (Gov't's Sent'g Ex. 23). The agents-by-location list does not differentiate between the two sets of transactions.

Mr. Petron's analysis is faulty in at least two ways:

*First*, the set of reports on which Mr. Petron relied was incomplete, which affects how many transactions he matched between the two data sets and, in turn, how many agents' locations he was able to pinpoint and include in his calculation. Mr. Petron concedes that he was not given a complete set of reports. *See* Third Petron Decl. ¶ 4 n.4.[4] Yet, he relied on this information to generate the list of agents whose locations defined his restitution calculation and schedule:

> I summarized the locations available for each Agent ID (Exhibit 23). I then identified each Agent ID where 100% of the matched entries for that Agent ID were associated with a single branch location and that branch location was "Israel" (Yukom), "Mauritius" (Linkopia), or "Tel Aviv" (Numaris). For purposes of calculating restitution, I then considered the Agent IDs associated

---

[4] The reports on which Mr. Petron relied are dated between December 2014 and February 2017. *See* Ex. 1 (Email from Gov't Counsel to Def. Counsel identifying "monthly sales reports"). Based on that date-range alone, 11 months of data—approximately 1/3 the length of the conspiracy—is missing. But the reports that do exist are not consistent for each month in which they exist—they do not present the same data fields for the same companies each month, but rather, are a piecemeal collection of emails and spreadsheets; some months there is data available for multiple branches, while, for other months, there is no data for one of the branches. Not all the reports even contain customer transaction data. *See, e.g.*, Ex. 2 (DOJ-ELBAZ-0001604613) ███████████████████████████████████████████ Ex. 3 (DOJ-ELBAZ-0001462882) ███████████; Ex. 4 (DOJ-ELBAZ-0001489599) ██████████████; *see also* Ex. 5 (DOJ-ELBAZ-0001464156) ███████████████████████████████████████████.

8

> with these agents to represent the retention agents who worked at only Yukom, Linkopia, and Numaris.

*Id.* ¶ 5 (footnote omitted). In other words, he included agents only if there was a 100% match to show that the agent at issue was actually at a particular branch, but he deemed something a 100% match if there was a 100% match within an incomplete set of data.

If Mr. Petron had used a complete set of "monthly sales reports" to perform his analysis, then transactions currently included in the Government's restitution calculation may have been excluded. If, in using a complete set of "monthly sales reports," Mr. Petron identified additional transaction matches across the two data sets that placed an agent at a *different* location than other transaction matches, then that agent's transactions would have been excluded from the restitution calculation. As such, in the absence of a complete set of information to cross-reference, Mr. Petron's analysis is unreliable and may be inflated with customer losses attributable to an agent whose location was *not* "associated with a single branch location" 100% of the time. Without knowing how a matching analysis completed with a complete set of "monthly sales reports" compares to the existing analysis, there is no way to know whether Mr. Petron's calculation accurately captures losses attributable to retention agents at those three locations.

*Second*, Mr. Petron advances no justification for applying a 10% margin of error to generate the margin-of-error matches. Mr. Petron's methodology assumes that any transaction within this margin of error is a match and was not identical on account of currency fluctuations. Thus, even if two transactions did not match, and were, in fact, different by as much as 10%, Mr. Petron deemed it a match. He therefore did not exclude an agent on the basis that there was not a 100% match even though there were transactions that did not match—as long as they did not match by more than 10%. But there's no basis for the assumption that any two transactions that were in amounts as much as 10% different from each other were actually the same

9

transaction and the difference was caused by a currency fluctuation. It could be equally true that the two transactions are *not* a match: They were simply two separate transactions whose amounts were within a 10% difference of one another. Indeed, attributing a discrepancy to currency conversion seems particularly unfounded given that the SpotOption data and every "monthly sales report" on which Mr. Petron relied that contains customer transaction data presents transactions in U.S. dollars.[5]

### D. The Government's agent-location results contain clear errors.

The flaws in Mr. Petron's methodology are not purely hypothetical. There are several demonstrable errors in the results.

Mr. Petron's list of agent locations does not accurately report who was affiliated with Yukom. Although Mr. Petron represents that the list of agents affiliated with Numaris should appear in the data as located in "Tel Aviv," *see* Third Petron Decl. ¶ 5 & n.5, that list does not contain a single "Tel Aviv" entry, *id.* at 6–27 (Gov't's Sent'g Ex. 23). Instead, agents demonstrated at trial to be affiliated with Numaris appear incorrectly as affiliated with "Israel," i.e., Yukom, *see id.* ¶ 5 n.5. For example, Selen Alarie (Agent ID 373) and Mila Morales (Agent ID 400) were Numaris employees, but Exhibit 23 identifies them as being in "Israel" (Yukom) 100% of the time. *See* Ex. A to Turkov Decl., ECF No. 342-2; Third Petron Decl. at 13–14. This indicates the "Israel" category is inflated with agents from other branches. *See also Llamas*, 599 F.3d at 390–91 (vacating restitution order that included losses caused by other call centers). It is not clear whether this error is limited to agents from Numaris or may also include agents

---

[5] Because Mr. Petron does not identify how many or which transactions were identical matches versus margin-of-error matches, there is no way to reduce and salvage his analysis by focusing only on identical matches.

from other companies whose information appears in the SpotOption data, which would inflate the restitution calculation with losses to individuals not owed restitution.[6]

Mr. Petron's analysis also places Numaris and Yukom employees at *other* branches and performing services for *the wrong branded company*, which calls into question whether Mr. Petron's method of matching transactions across datasets is accurate at all.  For example, Mr. Petron's analysis identifies Monica Sanders (Lissa Mel) (Agent ID 323) as located in "Australia" 100% of the time she worked with BigOption customers and in "Israel" 100% of the time she worked with BinaryBook customers.  *See* Ex. A to Turkov Decl., ECF No. 342-2; Third Petron Decl. at 11.  According to Ms. Mel's plea agreement, she worked for *Yukom* from May 2015 to July 2015, where she provided services to *BigOption* clients; then for *Numaris* from July 2015 through November 2016, where she provided services to *BinaryBook*.  *See* Stipulation of Facts ¶¶ 1–2, *United States v. Mel*, No. 8:18-cr-571-TDC, ECF No. 51-1.  As such, there is a direct conflict between Ms. Mel's sworn statement of facts before this Court and Mr. Petron's analysis.

Similarly, Mr. Petron's analysis places John Ried (Austin Smith) (Agent ID 326) in "Australia" 100% of the time, providing services to BigOption clients, and in "Israel" 100% of the time, providing services to BinaryBook clients.  *See* Third Petron Decl. at 11.  Yet Mr. Smith swore under oath to this Court that he worked *only* at Numaris and provided services *only* to BinaryBook customers.  *See* Stipulation of Facts ¶¶ 1, 3, *United States v. Smith*, No. 8:19-cr-87-

---

[6] Indeed, the agent-by-location list that Mr. Petron created (Gov't's Sent'g Ex. 23) reflects that agents worked at places *other* than the branches discussed at sentencing (Caesarea, Tel Aviv, Ukraine, Turkey, Australia, Mauritius, Netanya) because, while some agents are identified at those locations, several others are identified using an ambiguous "Multiple" locations identifier. *See* Third Petron Decl. at 6, 11, 13, 14 (Agents 34, 35, 310, 387, 399, 415).

11

TDC, ECF No. 9-1.  As with Ms. Mel, there is no reconciliation to be made between Mr. Petron's analysis and Mr. Smith's representations to this Court.

Collectively, these errors demonstrate that the agent-location analysis Mr. Petron performed is not reliable.  Mr. Petron has not accurately aligned client losses with a retention agent who worked for Yukom, Numaris, or Linkopia.  Because the agents' locations were not accurate, the Government's schedule of the individuals to whom restitution should be paid also is not accurate.

### III. THE COURT SHOULD MAKE FINDINGS UNDER 18 U.S.C. § 3663A(c)(3)(B) THAT NO RESTITUTION CAN BE ORDERED IN THIS CASE.

The MVRA anticipates that there will be cases involving offenses "committed by fraud or deceit" in which "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process."  18 U.S.C. § 3663A(c)(3)(B).  In those circumstances, Congress determined that restitution is not required.  *Id.* ("This section shall not apply . . . .").  *See United States v. Vega-Martinez*, 949 F.3d 43, 56 (1st Cir. 2020) ("restitution should *not* be awarded when it is too difficult to estimate accurately," i.e., "where the facts are too difficult to discern, the sentencing court's option is to forgo restitution, not to fall back on a factually unsupported calculation method").

The Court should determine that this is such a case, because it is not possible to accurately discern *who* is a victim of the offense, given that the data available does not make clear the company for which each agent worked.  The two interests to be balanced—"the need to provide restitution to any victim" and "the burden on the sentencing process" posed by "determining complex issues of fact," 18 U.S.C. § 3663A(c)(3)(B)—weigh in favor of closing this case without an entry of restitution.

12

The burden that continuing to try to identify restitution victims in this case would place on the sentencing process is heavy. Attempting to calculate restitution in this matter has detained the Government for more than six months, *see* Gov't's Mot., ECF No. 319 (filed on Sept. 12, 2019), and despite the substantial amount of time afforded, the Government has been unable to accurately identify to whom $28 million in restitution should be paid. Nor has this been for lack of effort. Mr. Petron has submitted three declarations outlining a detailed (albeit flawed) process for attempting to identify investors and calculate their losses. In this latest attempt, forensic accountants have expended "over fifty hours of work" in "checking" his revised methodology. *See* Gov't's Restitution Position at 4–5. Nonetheless, for the reasons discussed above, obvious and irreconcilable errors remain. The cost of continuing to delay sentencing in this matter in an ill-fated effort to identify those investors is one that works to the detriment of U.S.-based victims, whose taxpayer dollars are funding the Government's efforts and Court's time in this regard.

Nor is this exercise necessary to obtain a judgment to benefit the victims of Ms. Elbaz's offense conduct. Already pending is a suit filed by the CFTC, which names Ms. Elbaz individually and demands that she and her co-defendants "make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest." *See* Compl. at 38, *Commodity Futures Trading Comm'n v. Yukom Commc'ns*, No. 19-cv-5416 (N.D. Ill. Aug. 12, 2019), ECF No. 1. The suit alleges that Yukom, Ms. Elbaz, and others "fraudulently solicited and accepted in excess of $103 million in customer funds to trade binary options in connection with the Yukom Enterprise's binary option trading scheme." *Id.* ¶¶ 8, 89. That a civil enforcement action is pending and others could be filed lessens the need for this Court to provide restitution to victims. *See United States v.*

*Gallant*, 537 F.3d 1202, 1252–54 (10th Cir. 2008) ("While the availability of other relief is deemed irrelevant to the process of calculating the *amount of* a restitution award, it is not necessarily irrelevant to the *availability of* such an award under § 3663A. The existence of pending civil litigation may in some cases be relevant to the balancing test established by § 3663A(c)(3)(B)'s complexity exception."); *see also In re Brown*, 932 F.3d 162, 175 (4th Cir. 2019) (endorsing *Gallant* for same proposition in context of VWPA's complexity exception).

Weighing these competing interests, the Court should determine that no restitution should be entered in this case, consistent with 18 U.S.C. § 3663A(c)(3)(B).[7]

## CONCLUSION

The Government has not carried its burden to demonstrate to whom restitution is owed in this case. The Court asked the Government to identify those individuals to whom $28 million of restitution should be paid, but the Government did not do so. Instead, the Government identified individuals to whom, according to the Government, approximately four times as much restitution is owed. That approach neither justifies the Court's preliminary finding of restitution in the amount of $28 million nor provides a pathway forward for making $28 million in payments to

---

[7] Ms. Elbaz also asserts that: (1) the Court lacked authority to defer restitution by 90 days under 18 U.S.C. § 3664(d)(5) because the Government did not provide notice that the victim's losses were not able to be determined, and (2) the Court no longer has statutory authority to enter an order of restitution in this case, per Rules 35(a) and 45(b)(2) of the Federal Rules of Criminal Procedure. Ms. Elbaz recognizes, however, that this Court is bound by *United States v. Johnson*, 400 F.3d 187, 189–99 (4th Cir. 2005), in which the Fourth Circuit held that noncompliance with either the 10-day notice provision or the 90-day hearing provision does not preclude entry of a restitution award absent harm to the defendant and did not recognize the entry of restitution *itself* as prejudicial. *See also Dolan v. United States*, 560 U.S. 605, 608 (2010) ("[A] sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) *only the amount*." (emphasis added)). Ms. Elbaz preserves these issues for appellate and en banc review.

those to whom restitution is owed.  Rather, it ensures that individuals who are not owed restitution will receive it.

Further, the methodology on which Mr. Petron relied to identify retention agents' locations is flawed.  Mr. Petron assigned locations to the agents listed in the defense SpotOption data by cross-referencing an admittedly incomplete set of "monthly sales reports," as well as applying an unjustified 10% margin of error to certain transactions.  The faulty method produced obvious, demonstrable errors.

The effort to calculate restitution in this matter should end here.  Despite multiple months of pouring over the data, no reliable restitution schedule has been produced.  Indeed, the data is imperfect and, at this point, it does not appear that a reliable estimate of the losses caused by retention agents at Yukom and Numaris even is possible.  Indeed, the Government has ably demonstrated that this case presents precisely the situation Congress anticipated when it created an exception to mandatory restitution under the MVRA where the complexity of the facts and burden on the sentencing process outweigh the need to provide restitution.  *See* 18 U.S.C. § 3663A(c)(3)(B).

Date:   May 20, 2020                                              Respectfully submitted,

                                                                                  /s/ Barry J. Pollack
                                                                                  Barry J. Pollack (No. 12415)
                                                                                  Jessica Arden Ettinger (No. 21160)
                                                                                  ROBBINS RUSSELL ENGLERT ORSECK
                                                                                  UNTEREINER & SAUBER LLP
                                                                                  2000 K Street NW, 4th Floor
                                                                                  Washington, D.C. 20006
                                                                                  Telephone: (202) 775 4500
                                                                                  Fax: (202) 775 4510
                                                                                  Email: bpollack@robbinsrussell.com

                                                                                  *Counsel for Ms. Elbaz*

**CERTIFICATE OF SERVICE**

On this 20th day of May 2020, I directed the foregoing document to be electronically filed with the Clerk of the Court for the United States District Court for the District of Maryland by using the Court's CM/ECF system, which will serve electronic notification of this filing on all counsel of record. A courtesy copy of this redacted document and its exhibits will be mailed to the Clerk's Office.

        Respectfully submitted,

        /s/ Barry J. Pollack
        Barry J. Pollack (No. 12415)
        ROBBINS, RUSSELL, ENGLERT, ORSECK,
        UNTEREINER & SAUBER LLP
        2000 K Street NW, 4th Floor
        Washington, District of Columbia 20006
        Telephone: (202) 775 4500
        Fax: (202) 775 4510
        Email: bpollack@robbinsrussell.com

        *Counsel for Ms. Elbaz*